UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>              Plaintiff,<br><br>    v.<br><br>AMAZON.COM, INC.,<br><br>           Defendant. | No. 2:14-CV-01038-JCC<br><br>**AMAZON.COM, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF BARRY A. SABOL AND CRAIG ROSENBERG AND TO STRIKE THEIR EXPERT REPORTS**<br><br>NOTED ON MOTION CALENDAR:<br>Friday, January 1, 2016 |

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ........................................................................................................... 1

     A.    The FTC Discloses Jennifer King as Expert Witness ............................................. 1

     B.    Amazon Engages and Timely Discloses Experts Craig Rosenberg and
           Barry Sabol to Rebut Specific Opinions Disclosed in the King Report ................ 2

III.  ARGUMENT ................................................................................................................ 3

     A.    The Rosenberg and Sabol Reports Are Proper Expert Rebuttal Reports ............... 3

          1.    The Rosenberg and Sabol Reports Respond to and Solely Rebut
               Evidence on Subject Matters Addressed by Ms. King ............................. 3

               a.    Dr. Rosenberg's Usability Test Rebuts Ms. King's
                    Opinions ....................................................................................... 3

               b.    Dr. Sabol's Survey Rebuts Ms. King's Opinions .......................... 5

          2.    The FTC Relies Exclusively on a Handful of Inapposite Cases
               from Other Jurisdictions that Are Inconsistent with the Federal
               Rules ...................................................................................................... 7

     B.    The Court Should Also Deny the FTC's Alternative Requested Relief .............. 12

IV.  CONCLUSION ........................................................................................................... 12

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – i

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

## I.    INTRODUCTION

The FTC seeks to exclude the testimony and strike the reports of two experts hired by Amazon specifically to rebut the opinions of FTC-designated expert Jennifer King.  In her initial expert report, Ms. King evaluates aspects of Amazon's user interface for purchases within applications ("in-app" purchases).  Without relying on any quantitative data, she opines that some Amazon disclosures of opportunities for in-app purchases or for interposing a password requirement in the future could be ineffective and used language that could be misunderstood by "some" consumers.  She also opines that Amazon failed to disclose effectively that refunds were available for unauthorized in-app purchases, that requesting a refund for a digital purchase is complex and time consuming, and that "some" consumers might be dissuaded from seeking one.

To counter Ms. King's subjective opinions, Amazon engaged Dr. Craig Rosenberg to conduct a usability test of twenty-four participants and Dr. Barry Sabol to survey over 1,200 Amazon customers of digital (including in-app) products.  These studies critically undermine Ms. King's opinions; as a result, the FTC's motion seeks to exclude highly relevant evidence of actual consumers' reactions to Amazon's in-app purchasing and refund processes.  Because the reports are "intended solely to contradict or rebut evidence on the same subject matter identified by another party," they are proper expert rebuttal under the Federal Rules of Civil Procedure. The Court should deny the FTC's motion, which relies on a handful of district court decisions from other jurisdictions that are inapposite, misapply principles governing rebuttal *at trial*, and are inconsistent with the federal rules and well-reasoned authority in this District.

## II.    BACKGROUND

### A.    The FTC Discloses Jennifer King as Expert Witness

The FTC alleges that Amazon's billing practices for "in-app purchases" constitute an unfair practice in violation of section 5 of the FTC Act.  Compl. (Dkt. 1), ¶¶ 33, 35.  The FTC disclosed two expert witnesses and accompanying expert reports on October 16, 2015, the case deadline for disclosure of affirmative expert reports.  Dkt. 23; Declaration of Harry H. Schneider,

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Jr. ("Schneider Decl."), ¶ 2.[1]  Amazon disclosed three experts, none of whom is at issue here.

The FTC's expert relevant to the instant motion is Jennifer King, who is studying for a Ph.D.  Ex. A, at 4.  Within the field of "Human-Computer Interaction" ("HCI"), Ms. King identifies "information privacy" as her "primary research focus."  Ex. A, at 12, 70.  According to Ms. King, "HCI findings are typically derived from data gathered using both quantitative and qualitative methods, such as: usability inspections, usability tests, focus groups, surveys, interviews, the examination of customer feedback . . . , and others."  Ex. A, at 13.  Ms. King chose one of those methods, "a usability inspection[,] to evaluate the [Amazon] interface in question for conformity with canonical heuristic guidelines and principles created by both academic researchers and professionals."  Ex. A, at 14.  It is not clear what "canonical heuristic guidelines" has to do with the statutory standard of unfairness.

Ms. King's report included her evaluation of (1)  language used in Amazon's disclosures of in-app purchasing; (2) two versions of Amazon's password prompts for a customer's first-time in-app purchase (the "May 2013 First-Time User Experience" or "May 2013 FTUX" and "June 2014 FTUX"); and (3) order-confirmation emails Amazon sends to every account holder after each in-app purchase.  Ms. King also visited Amazon's website to explore the availability of refunds for digital purchases and how to request one.  Ex. A, at 30-32, 36-39, 42-56.

**B.      Amazon Engages and Timely Discloses Experts Craig Rosenberg and Barry Sabol to Rebut Specific Opinions Disclosed in the King Report**

Having reviewed Ms. King's report and its discussion of alternative approaches that she apparently chose not to use, on October 20, counsel for Amazon first contacted Dr. Rosenberg, a user-interface expert.  Schneider Decl. ¶ 3; Ex. B, at 9.  Dr. Rosenberg was asked to review Ms. King's report for the purpose of potentially designing a usability test to evaluate certain of her opinions.  Schneider Decl. ¶ 3.  And in early November 2015, Amazon's counsel first contacted survey expert Dr. Sabol to potentially design a survey to test opinions offered by Ms. King.

---

[1] All references to "Ex." throughout refer to exhibits attached to the Schneider Declaration.

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Schneider Decl. ¶ 4; Ex. C, at 2.  Amazon disclosed reports by Dr. Rosenberg and Dr. Sabol on the December 7 deadline for rebuttal expert reports.  Schneider Decl. ¶¶ 3-4 & Exs. B, C.[2]

The Rosenberg and Sabol reports directly refute Ms. King's opinions.  Dr. Rosenberg conducted a usability study with twenty-four test participants, who performed three primary tasks and provided contemporaneous, written feedback.  Ex. B, at 1-4, 11, 15-16.  Dr. Sabol conducted a statistically valid survey to test Ms. King's "belief that contacting Amazon's customer service to request a refund for a digital product purchase is complex and time consuming and that Amazon did not effectively convey to consumers that refunds were available for accidental or unauthorized in-app purchases or how to request such refunds."  Ex. C, at 6.[3]

## III.  ARGUMENT

**A.  The Rosenberg and Sabol Reports Are Proper Expert Rebuttal Reports**

### 1.  The Rosenberg and Sabol Reports Respond to and Solely Rebut Evidence on Subject Matters Addressed by Ms. King

The sole issue in the FTC's motion is whether the expert reports of Dr. Rosenberg and Dr. Sabol are proper rebuttal reports.  By rule, an expert rebuttal disclosure is proper "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  When the FTC disclosed the King report on October 16, it provided insight into the FTC's theory in support of liability, on which it bears the burden of proof.  Because the Rosenberg and Sabol reports contradict and rebut opinion evidence offered by Ms. King in her October 16 report, they constitute proper expert rebuttal.

#### a.  Dr. Rosenberg's Usability Test Rebuts Ms. King's Opinions

Ms. King has stated her subjective opinion of what she thought some consumers might

---

[2] The FTC misleadingly states that Amazon served "four rebuttal reports totaling 504 pages."  FTC Mot. at 2.  That figure includes 350 pages of exhibits and appendices.; Dr. Rosenberg's report, for example, includes a 208-page data appendix and a 48-page appendix with test survey screenshots.  Schneider Decl. ¶ 5.

[3] On December 16 and 17, at Amazon's request, the parties conferred to discuss the FTC's position with respect to the Rosenberg and Sabol reports and to discuss a potential briefing schedule in light of the holidays.  Schneider Decl. ¶ 6 & Exs. D, E.  The FTC refused even to extend the briefing schedule a week.

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

misunderstand. Dr. Rosenberg's usability test actually tested consumer understanding. Study participants performed three primary tasks to evaluate opinions offered by Ms. King. In Task 1, subjects viewed app-description pages on a Kindle Fire tablet to assess their understanding of the information provided about in-app purchasing. Ex. B, at 16-20. Task 2 tested subjects' understanding of information provided in the May 2013 FTUX and June 2014 FTUX password prompts. Ex. B, at 20-22. In Task 3, subjects were presented with a confirmatory email for an in-app purchase, were asked about their understanding of the information provided, were told to try to contact Amazon to request a refund, and were asked about their attempt to do so. Ex. B, at 23. All of these tasks tested specific opinions offered by Ms. King. For example:

- King: "The title, 'Key Details,' [on app detail pages] does not communicate to the user who is concerned about the cost of the app that it contains information that he or she <u>must</u> know regarding potential charges prior to downloading or using the app." Ex. A, at 29.

  o Rosenberg Rebuttal, Task 1, Fig. 13: "As it is displayed on this page, what do you understand the phrase 'Key Details' to mean?" Ex. B, at 36 (*24/24 correct*).

- King: Users may be confused by the term "in-app purchasing." Ex. A, at 29, 37.

  o Rosenberg Rebuttal, Task 1, Fig. 10: "As it is displayed on this page, what do you understand the phrase 'In-App Purchasing' to mean?" Ex. B, at 34 (*23/24 correct* for each of two notices).

  o Rosenberg Rebuttal, Task 2, Table 4: "As it is displayed on this page, what do you understand the phrase 'This app contains in-app purchasing' to mean?" Ex. B, at 43 (*23/24 correct* for May 2013 FTUX).

- King: Users may be confused by the May 2013 FTUX prompt's reference to "real money" and not understand a financial transaction is being offered. Ex. A, at 37.

  o Rosenberg Rebuttal, Task 2, Table 4: "As it is displayed on this page, what do you understand the phrase 'which allows you to buy items inside the app using real money' to mean?" Ex. B. at 43 (*24/24 correct*).

- King: "To rely upon the term 'Parental Controls' in place of articulating the fact that <u>purchases</u> can be restricted is likely to introduce confusion . . . ." Ex. A, at 31.

  o Rosenberg Rebuttal, Task 1, Fig. 9: "As it is displayed on this page, what is your

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

understanding of 'Parental Controls'?" Ex. B, at 32-33 (*23/24 correct* for each of two notices).

- King: The in-app purchase notices on the app-details page "do not effectively convey to consumers that children can incur in-app charges without parental involvement and that they would have to change device settings to restrict purchasing." Ex. A, at 31-32.

  o Rosenberg Rebuttal, Task 1, Fig. 8: "What, if anything, do you think you can do if you want to prevent being charged money for actions taken while using the app?" Ex. B, at 32 (*22/24 and 23/24 correct* for two notices).

- King: "[T]ext [in the May 2013 FTUX] referring to "future in-app purchases" is vague. . . . [Some users *may*] fail to understand that they must change their device settings to prevent children from incurring additional in-app charges without password entry." Ex. A, 38.

  o Rosenberg Rebuttal, Task 2, Fig. 19: "What, if anything, do you think you can do to prevent being charged money for actions taken while your child/grandchild use the app?" Ex. B, at 42 (*24/24 correct* for each of two notices).

  o Rosenberg Rebuttal, Task 2, Table 4: "As it is displayed on this page, what do you understand the phrase 'If you'd like to require a password for future in-app purchases, please turn on Parental Controls' to mean?" Ex. B, a 43 (*22/24 correct*).

Task 3, which evaluated the in-app purchase confirmatory email and the process for contacting Amazon to request a refund, squarely tested Ms. King's subjective opinion that contacting Amazon for a refund is "confusing" and "a complex, time-consuming task." *Compare* Ex. A, at 43-44, 49, 51-56, *with* Ex. B, at 46-48, 56-58. (For additional detail on the opinions of Ms. King rebutted by Dr. Rosenberg's usability test and Dr. Sabol's survey, see the summary table at Ex. H, which is also attached as an Appendix to this brief for convenience.)

In sum, Dr. Rosenberg's report and his expected trial testimony are "intended solely to contradict or rebut evidence on the same subject matter identified" by Ms. King. The Rosenberg report is proper, and powerful, rebuttal, which the FTC does not want the Court to know.

**b.     Dr. Sabol's Survey Rebuts Ms. King's Opinions**

Similarly, Dr. Sabol's survey solely rebuts opinion evidence offered by Ms. King. For example, Ms. King opines that contacting Amazon for a refund is complex and time consuming,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

particularly with respect to digital products such as an in-app purchases. *See, e.g.*, Ex. A, at 49

("Finding the <u>Contact Us</u> page is an extremely complex task on Amazon.com . . . . [T]he clear

lack of a path for digital (non-physical) products in the primary Returns flow is also confusing

for customers seeking help with an IAP"); Ex. A, at 53 ("In order to find IAP orders [to request a

refund], a customer must notice that they need to select <u>Digital Orders</u> from the four options at

the top of the page . . . . [T]his page can be extremely confusing.").

To evaluate Ms. King's subjective opinions, Dr. Sabol surveyed 1,237 Amazon

customers (with a child under 17 in the household) who had made a digital purchase, including

301 who had made an in-app purchase. Ex. C, at 3. For respondents who had contacted Amazon

customer service about a digital product, the survey asked the following questions:

- Sabol Rebuttal, Question 1A: "Compared to your experience with other companies, was it easier, about the same or more difficult to contact Amazon's customer service?" Ex. C, at 16-17 (*94%* easier or about the same).

- Sabol Rebuttal, Question 1B: "Compared to your experience with other companies, was your experience with Amazon's customer service better, about the same or worse than with other companies?" Ex. C, at 17-18 (*96%* better or about the same).

These questions directly rebut Ms. King's opinions about the alleged difficulty to contact

Amazon customer service with respect to a digital purchase.[4]

Ms. King also opines that "Amazon <u>did not</u> effectively convey to consumers who

incurred unauthorized in-app charges that refunds were available for those charges." Ex. A, at

55. In support, Ms. King evaluates information contained in the email sent to account holders

immediately after each in-app purchase and information on the Amazon website, including on a

customer's "Digital Orders" page. *See, e.g.*, Ex. A, at 43-44, 54. Ms. King also notes that

Amazon's stated policy is that in-app purchases are not returnable. Ex. A, at 45-46, 51.

---

[4] For respondents who had not contacted Amazon customer service about a digital product, the survey tested whether there is a reputational deterrent by asking respondents about the expected ease or difficulty of contacting Amazon customer service and the expected customer service experience, as compared to other companies. Ex. C, at 18-19 (Question 2: *94%* easier or about the same); Ex. C, at 19-20 (Question 2A: *97%* better or about the same). These questions, as well as Questions 1A and 1B, not only contradict the opinions of Ms. King on the difficulty of contacting Amazon customer service, they rebut her implicit opinion that customers would presume no refund is available if not explicitly stated by Amazon. *See* discussion *infra*.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

To test these opinions, "including [Ms. King's] implicit contention that customers would not have understood that refunds were available unless Amazon so explicitly stated in the emailed order confirmation" or otherwise (Ex. C, at 25), Dr. Sabol's survey asked the following:

- Sabol Rebuttal, Question 3: "If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, how likely would you be to contact Amazon's customer service?"  Ex. C, at 21 (*95% very likely or somewhat likely to do so*).

- Sabol Rebuttal, Question 4: "If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"  Ex. C, at 22-23 (*92% yes*).

- Sabol Rebuttal, Question 5: "If Amazon's stated policy was that digital products were not returnable, but you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"  Ex. C, at 23-24 (*91% yes*).

These questions directly rebut Ms. King's opinion that Amazon customers would be dissuaded from requesting a refund for an in-app purchase as a result of Amazon's no-returns policy or the absence of an explicit statement that refunds were available for in-app purchases.[5]

In sum, Dr. Sabol's survey, expert report, and anticipated trial testimony rebut specific opinions of Ms. King's and are proper rebuttal.

## 2. The FTC Relies Exclusively on a Handful of Inapposite Cases from Other Jurisdictions that Are Inconsistent with the Federal Rules

The FTC understandably does not deny that the Rosenberg and Sabol reports contradict or rebut Ms. King's opinions.  Instead, the FTC relies on a small number of district court cases from other jurisdictions that are readily distinguishable, misapply legal principles governing rebuttal *at trial*, and are inconsistent with the plain language of Rule 26(a)(2).  The Ninth Circuit has never adopted the position the FTC advances in its motion (nor has any other circuit).

Notably, the FTC's position and the authority it relies on were squarely rejected by Judge

---

[5] Each of the 1,237 respondents indicated they had purchased an Amazon digital product, defined as a video, song, app, or in-app purchase.  Ex. C, at 8-10, 15.  Amazon's stated policy is that each of these types of digital products is not returnable.  https://www.amazon.com/gp/help/customer/display.html?nodeId=201818970.

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Jones in *Theoharris v. Rongen*, 2014 WL 3563386 (W.D. Wash. July 18, 2014). Judge Jones refused to impose restrictions on expert rebuttal disclosures that the FTC seeks here and that go beyond what is provided in the text of Rule 26(a)(2)(D)(ii). *Id.* at *3 ("Because neither Rule 26(a)(2) nor any other binding authority imposes additional restrictions on rebuttal expert testimony, the court declines to do so."). *Theoharris* rejected "a stricter view—that expert testimony is not rebuttal testimony where it addresses an anticipated (or reasonably anticipatable) portion of the other party's case." *Id.* (citing, for example, *Downs v. River City Group, LLC*, 2014 WL 814303 (D. Nev. Feb. 28, 2014)). The court concluded the stricter standard advocated by the FTC here "comports more closely to the standard for evaluating rebuttal testimony (expert or percipient) *at trial*, where rebuttal witnesses typically need not be disclosed at all. . . . and [a plaintiff's rebuttal witness] may only 'meet new facts brought out in her opponent's case in chief." *Id.* (citing *Morgan v. Comm'l Union Assur. Cos.*, 606 F.2d 554, 555 (6th Cir. 1979)).[6]

As explained by Judge Jones, "Rule 26(a)(2) provides more flexibility for rebuttal expert testimony than traditional notions of rebuttal testimony at trial":

> A party who does not bear the burden of proof on an issue may be keenly interested in avoiding the expense of designating an expert witness on that issue. If, however, the party with the burden of proof offers a compelling expert disclosure, the opposing party can still designate a rebuttal expert in compliance with the rules. For that reason, the court declines to adopt the rule that expert testimony on an anticipated portion of an opposing party's case cannot be rebuttal expert testimony.

*Id.* at *4. Here, as in *Theoharris*, a defendant's rebuttal expert reports are at issue. "Where a *plaintiff* attempts to introduce rebuttal expert testimony, the concerns about unfair surprise from rebuttal experts more closely resemble those applicable to rebuttal witnesses at trial." *Id.* at *4. By contrast, "where it is the defendant offering rebuttal testimony, the context is markedly different." *Id.* If a defendant opts to wait for the rebuttal deadline, the plaintiff's expert reports,

---

[6] *See also Dally Props., LLC v. Truck Ins. Exch.*, 2006 WL 5163004, at *2 (W.D. Wash. Jan. 9, 2006) (Lasnik, J.) (denying challenge to defendant expert's rebuttal report responding to other expert's opinion about timing of damage—a "central point of disagreement" in the case that defendant expert had not addressed in initial report—and describing "use of the rebuttal report is almost exactly that which is conceived by Rule 26.").

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

if any, may be narrow and offer the defendant with "little or nothing to rebut." *Id.* "But Rule 26(a)(2) does not prohibit a party from assuming the risk inherent in relying on a rebuttal expert disclosure." *Id.* Applying Rule 26(a)(2), the court struck only those portions of defendant's expert reports that "rebut[] none of Plaintiff's expert disclosures" *Id.* at *6; *id.* at *4-*10.

In his discussion of legal authority, Judge Jones noted that his view "closely comports with" this Court's analysis in *Daly v. Far Eastern Shipping Co.*, 238 F. Supp. 2d 1231, 1239 (W.D. Wash. 2003) (Coughenour, J.), *aff'd sub nom. Daly v. Fesco Agencies NA Inc.*, 108 F. App'x 476 (9th Cir. 2004). In *Daly*, this Court assessed whether an experiment conducted by plaintiff's expert was offered "solely to contradict or rebut" defendant's expert testimony and therefore proper rebuttal under Rule 26(a)(2). 238 F. Supp. 2d at 1239-41. *Daly* concluded that plaintiff's experiment was improper rebuttal not because it advanced new arguments or evidence or used a different methodology than did defendant's expert but because it did not address *any* opinions in the report of defendant's expert. *Id.* at 1240-41. Here, by contrast, the reports of Dr. Rosenberg and Dr. Sabol directly rebut opinions offered by Ms. King.[7]

The FTC ignores *Theoharris* and cites a portion of *Daly* not relevant to the motion, but which also supports Amazon's position. Mot. at 5-6. The FTC characterizes *Daly* as "excluding 'rebuttal' testimony on [the] case's central disputed issue and noting that '[r]ebuttal evidence is admissible only where the need for it could not have been foreseen.'" Mot. at 5. At issue in that part of the opinion, however, was plaintiff's proposed rebuttal witness *at trial*: "Rebuttal evidence is admissible only where the need for it could not have been foreseen at *the time the plaintiff presented its case-in-chief.*" *Daly*, 238 F. Supp. 2d at 1238 (emphasis added).[8]

---

[7] The FTC does not cite this portion of *Daly*, which no doubt reflects its concession that the facts of *Daly* are readily distinguishable. For example, *plaintiff*'s expert disclosed an initial expert report critiquing a pre-existing Navy report addressing an incident that resulted in plaintiff's injury. 238 F. Supp. 2d at 1239. In his rebuttal report, plaintiff's expert discussed the results of an experiment that tested conclusions in the Navy report, but which did not address the opinions of defendants' expert. *Id.* at 1240. The experiment had also been started prior to disclosure of the expert report it was purported to "rebut." *Id.* at 1241.

[8] *See also Daly*, 238 F. Supp. 2d at 1238 ("Shortly before the lunch recess on the last day of trial, plaintiff's counsel announced that plaintiff intended to call United States Senator Robert Smith as a rebuttal witness."). The Court favorably cited *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir. 1999), which also concerned rebuttal *at trial*.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Other cases cited by the FTC to support its argument that rebuttal experts cannot address issues that could have been anticipated or are limited to "new unforeseen facts" are equally inapplicable or suffer from the same confusion of rebuttal *at trial* and rebuttal *in discovery*. For example, in *R&O Construction Co. v. Rox Pro International Group, Ltd.*, 2011 WL 2923703, at *2 (D. Nev. July 18, 2011), and *Amos v. Makita U.S.A., Inc.*, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011), the magistrate judges' orders rely on cases addressing rebuttal at trial (or in turn cite decisions involving trial testimony).[9] The FTC's proposed limitation is inconsistent with Rule 26(a)(2) and the well-reasoned authority in this District, as discussed above.[10]

Yet even if the applicable rule required a defendant's initial expert reports to respond to plaintiff's anticipated arguments, striking the reports and excluding the testimony of Dr. Rosenberg and Dr. Sabol would be inappropriate. The specific opinions offered by Ms. King were newly advanced and could not reasonably have been anticipated. For example, the FTC's Complaint (Dkt. 1), Opposition to Amazon's Motion to Dismiss (Dkt. 11), and discovery responses did not give Amazon notice of Ms. King's opinions that were the subject of rebuttal. For example, Ms. King opines that the term "Key Details" does not communicate important information; customers may not understand the terms "in-app purchases," "in-app purchasing," "parental controls," "real money," and "actual money"; users may not understand the meaning of: "[i]f you'd like to require a password for future in-app purchases, please turn on Parental Controls"; users may not understand the text of the in-app-purchasing notices on app detail

[9] *See In re Apex Oil Co.,* 958 F.2d 243, 245 (8th Cir. 1992); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991); *Morgan,* 606 F.2d at 556.

[10] *See also Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (Rule 26(a)(2) "does not automatically exclude anything an expert could have included in his or her original report. Such a rule would lead to the inclusion of vast amounts of arguably irrelevant material . . . on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material. All that is required is for the information to repel other expert testimony . . . ."); *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, 2010 WL 3894444, at *15 (N.D. Ill. Sept. 30, 2010) ("In contrast to the presentation of a case-in-chief followed by a rebuttal case at trial—after discovery is complete and the parties often have a very good sense of their adversaries' theories of the case—an opening expert report is an early salvo in the process of defining the issues for trial, and thus it is more understandable at the expert discovery stage that a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports.").

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

pages; the May 2013 FTUX prompt is ineffective; and customers may not have understood that refunds were available unless Amazon included an express statement in order-confirmation emails or on its website. Ex. A, at 29-32, 36-39, 43-56. Also, Ms. King's report was the first time the FTC provided any detail about why it considers the process for obtaining a refund from Amazon to be complex and time consuming. Ex. A, at 42-56.[11]

Equally meritless and inconsistent with Rule 26(a)(2) are the FTC's arguments that a rebuttal report cannot advance new arguments or evidence or that "courts do not permit a party's experts to conduct new testing or new field work." Mot. at 3-6. For the former, the FTC cites *Columbia Grain, Inc. v. Hinrichs Trading, LLC*, 2015 WL 6675538 (D. Idaho Oct. 30, 2015), which relies exclusively on a case that says nothing about "new evidence." *See Century Indem. Co. v. Marine Grp., LLC*, 2015 WL 5521986 (D. Or. Sept. 16, 2015). Support for *Century Indemnity*'s restriction on "new arguments" traces to a decision that merely held that "new arguments" that elaborate on an expert's initial report without responding to an opposing expert are improper rebuttal.[12] *Columbia Grain* presented the same issue, as the expert's rebuttal report "was an attempt to support his original report rather than refute . . . [defendant's expert] report." 2015 WL 6675538, at *3. In *Century Indemnity*, the rebuttal report likewise included extensive analysis of a subject not covered by the other party's expert. 2015 WL 5521986, at *5.

The FTC's reliance on *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625 (2008), in support of its argument that a rebuttal expert cannot perform new testing is misplaced. There, *plaintiff's* expert issued an initial report, then two months later disclosed a rebuttal report. *Id.* at 629-30, 632. What the court excluded was a *third* report by plaintiff's expert based on new testing that could have been done as part of the first two reports. *Id.* at 638. And In *Columbia Grain*, the court concluded that new testing was improper rebuttal where *plaintiff's* expert sought

---

[11] The FTC, in fact, actively resisted Amazon's efforts in discovery to better understand the FTC's specific positions and alleged deficiencies with respect to Amazon's notices, password prompts, and in-app purchase flow, which changed over time, and with respect to its refund process. *See* Schneider Decl. Exs. F, G.

[12] *STS Software Sys., Ltd. v. Witness Sys., Inc.*, 2008 WL 660325, at *1-*2 (N.D. Ga. Mar. 6, 2008).

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

to support a theory from his original report, not rebut defendant's expert. 2015 WL 6675538, at *3 ("[Defendant's] report merely pointed out what [plaintiff's expert] himself had said in his original report—that there was no testing or studies to support [defendant's] smolder theory.").[13]

Here, consistent with the text of Rule 26(a)(2) and the substantial weight of authority, Dr. Rosenberg and Dr. Sabol appropriately rebutted specific opinions of Ms. King's by gathering evidence from actual consumers that Ms. King could have surveyed, but chose not to, based on methods Ms. King herself recognizes. That is the epitome of rebuttal evidence.[14]

## B. The Court Should Also Deny the FTC's Alternative Requested Relief

The Rosenberg and Sabol reports are proper rebuttal, and thus there is no basis to grant the FTC's alternative request for leave to serve surrebuttal reports. As plaintiff, the FTC bears the burden on the elements of its claim. It had ample opportunity to engage experts to conduct quantitative testing of its theories—Ms. King, in fact, identifies usability tests and surveys as methods to evaluate a user interface—but the FTC opted not to do so, or chose not to disclose the results of such testing. Moreover, unlike at trial, the FTC has not been prejudiced, as it can depose Dr. Rosenberg and Dr. Sabol and otherwise prepare for cross-examination at trial.

## IV. CONCLUSION

For the reasons set forth above, the Court should deny the FTC's Motion.

---

[13] *Calvert v. Ellis*, 2014 WL 3897949 (D. Nev. Aug. 8, 2014), in which a magistrate judge struck the portion of a rebuttal report using "novel" methodology, relies on *Downs*, 2014 WL 814303 at *9, whose analysis Judge Jones specifically rejected in *Theoharris*, 2014 WL 3563386, at *3.

[14] *See also, e.g.*, *Panasonic Commc'ns Corp. of Am. v. United States*, 108 Fed. Cl. 412, 415 (2013) (rejecting argument that would "limit the scope of a rebuttal report's 'additional data' only to that already in existence at the time initial expert reports were exchanged."); *Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013) ("A rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert."); *Deseret Mgmt. Corp. v. United States*, 97 Fed. Cl. 272, 274 (2011) ("While a rebuttal expert report must address the same subject matter as the report it contradicts, limiting its analysis only to those methods proposed by the first expert would impose an additional restriction on parties that is not included in the Rules.") (citation omitted); *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013) ("It is also acceptable for an expert to use new methodologies in a rebuttal for the purpose of rebutting or critiquing the opinions of Defendants' expert witness."); *In re Genetically Modified Rice Litig.*, 2010 WL 4483993, at *3 (E.D. Mo. Nov. 1, 2010) (same).

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

DATED:  December 28, 2015

*s/ Harry H. Schneider, Jr.*

Harry H. Schneider, Jr., WSBA No. 9404
David J. Burman, WSBA No. 10611
Jeffrey M. Hanson, WSBA No. 34871
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  (206) 359-8000
Facsimile:  (206) 359-9000
dburman@perkinscoie.com
hschneider@perkinscoie.com

*s/ J. Douglas Baldridge*

J. Douglas Baldridge WSBA No. 37247
Danielle R. Foley (admitted *pro hac vice*)
**Venable LLP**
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
jbaldridge@venable.com,
drfoley@venable.com

Attorneys for Defendant Amazon.com, Inc.

AMAZON'S OPP. TO MOT. TO EXCLUDE
TESTIMONY AND STRIKE EXPERT REPORTS
(No. 2:14-CV-01038-JCC) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

## CERTIFICATE OF SERVICE

I certify that on December 28, 2015, I electronically filed the foregoing Opposition to Plaintiff's Motion to Exclude the Testimony of Barry A. Sabol and Craig Rosenberg and to Strike Their Expert Reports with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys of record.

I certify under penalty of perjury that the foregoing is true and correct.


DATED this 28th day of December, 2015.


*s/ Jeffrey M. Hanson*

24976-0374/129087713.5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# Appendix

**Representative List of Opinions Addressed in Rosenberg and Sabol Rebuttal Reports**[*]

| Opinions of Jennifer King | Rosenberg Usability Test and Sabol Survey |
|---|---|
| Possibility of IAPs in Free Apps: <br><br> "For the parent who assumed a free app was, in fact, free of all charges, the IAP Note on the app detail page was the only information that communicated otherwise. . . . [M]any [consumers] would not understand that a free app could have additional costs associated with it." Ex. A, at 20. | *Rosenberg Rebuttal* (Task 1, Fig. 7): "Do you think it is possible to incur additional costs based on actions taken while using the app?" Ex. B, at 30 (*20/24 correct* answers for app with IAP opportunity). |
| "Key Details" Term: <br><br> "The title, 'Key Details,' suggests to the user that it contains a summary of information that they <u>may</u> wish to know, but . . . it does not communicate to the user who is concerned about the cost of the app that it contains information that he or she <u>must</u> know regarding potential charges prior to downloading or using the app." Ex. A, at 29. | *Rosenberg Rebuttal* (Task 1, Fig. 13): "As it is displayed on this page, what do you understand the phrase 'Key Details' to mean?" Ex. B, at 36 (*24/24 correct* answers). |
| Key Details IAP Badging: <br><br> "[U]sers must be familiar with the term 'in-app purchases' for the [Key Details] badge to have any impact. . . ." Ex. A, at 30. | *Rosenberg Rebuttal* (Task 1, Fig. 14): "As it is displayed on this page under 'Key Details' text, what do you understand the phrase 'In-App Purchasing' to mean?" Ex. B at 37 (*21/24 correct* answers). |
| "In-App Purchasing" Term: <br><br> "[T]he explanation given in the expanded overlay is abstract.  It contains no direct discussion of costs and the fact that IAPs have real costs associated with them that will result in charges to the customers' Amazon account." Ex. A, at 29. <br><br> "[U]sers who do read the text on the [May 2013 FTUX] prompt may be confused about the function of the prompt if they are unfamiliar with the concept of in-app purchases.  These users may not understand that they are approving an actual charge by entering their password . . . ." Ex. A, at 37. | *Rosenberg Rebuttal* (Task 1, Fig. 11): "As it is displayed on this page, what do you understand the phrase 'which allows you to buy items within the app using actual money' to mean?" Ex. B, at 34 (*24/24 and 24/24 correct* answers for PLEASE NOTE and Key Details badging, respectively). <br><br> *Rosenberg Rebuttal* (Task 1, Fig. 10): "As it is displayed on this page, what do you understand the phrase 'In-App Purchasing' to mean?" Ex. B, at 34 (*23/24 and 23/24 correct* answers for PLEASE NOTE and Key Details badging, respectively). <br><br> *Rosenberg Rebuttal* (Task 2, Table 4): "As it is displayed on this page, what do you understand the phrase 'This app contains in-app purchasing' to mean?" Ex. B, at 43 (*23/24 correct* answers for May 2013 FTUX). |

[*] This list of Ms. King's opinions that are rebutted by Dr. Rosenberg and Dr. Sabol is not intended to be exhaustive. By way of example only, the Rosenberg and Sabol reports also rebut Ms. King's seven high-level opinions. *See* Ex. A, at 7-8.  References to "Ex." in the table refer to exhibits attached to the Declaration of Harry H. Schneider, Jr.

| Opinions of Jennifer King | Rosenberg Usability Test and Sabol Survey |
|---|---|
| "Real Money" Term:<br><br>"While the text above the [May 2013 FTUX] prompt mentions 'real money,' it does so subtly, without mentioning the dollar amount of the particular charge or using a dollar sign[] or other signals to emphasize that there is a financial transaction." Ex. A, at 37. | *Rosenberg Rebuttal* (Task 2, Table 4): "As it is displayed on this page, what do you understand the phrase 'which allows you to buy items inside the app using real money' to mean?" Ex. B, at 43 (*24/24 correct* answers). |
| "Parental Controls" Term:<br><br>"To rely upon the term 'Parental Controls' in place of articulating the fact that <u>purchases</u> can be restricted is likely to introduce confusion or an additional learning barrier for novice parents or users who are not parents attempting to familiarize themselves with the system." Ex. A, at 31. | *Rosenberg Rebuttal* (Task 1, Fig. 9): "As it is displayed on this page, what is your understanding of 'Parental Controls'?" Ex. B, at 32-33 (*23/24 and 23/24 correct* for PLEASE NOTE and Key Details badging, respectively). |
| Overall Effectiveness of IAP Notices:<br><br>The IAP notices in the PLEASE NOTE and Key Details badging do not effectively convey to consumers that children can incur in-app charges without parental involvement and that they would have to change device settings to restrict purchasing. Ex. A, at 31-32. | *Rosenberg Rebuttal* (Task 1, Fig. 12): "As it is displayed on this page, what do you understand th[e] text [of the PLEASE NOTE IAP notice] to mean?" Ex. B, at 35 (*21/24 correct* answers).<br><br>*Rosenberg Rebuttal* (Task 1, Fig. 15): "As it is displayed on this page, what do you understand the text under 'In-App Purchasing' [in the Key Details IAP notice] to mean?" Ex. B, at 38 (*24/24 correct* answers).<br><br>*Rosenberg Rebuttal* (Task 1, Fig. 8): "What, if anything, do you think you can do if you want to prevent being charged money for actions taken while using the app?" Ex. B, at 32 (*22/24 and 23/24 correct* answers for PLEASE NOTE and Key Details badging, respectively). |
| May 2013 FTUX Options:<br><br>"[T]he call to action (entering a password) dominates the focus of this prompt and suggests the other text is less important. Many users would be unlikely to read the other text on the prompt, especially the text below the call to action." Ex. A, at 37. | *Rosenberg Rebuttal* (Task 2, Fig. 17): "What are your options as describe by this page [the May 2013 FTUX]?" Ex. B, at 39-40 (*21/24 correct* answers). |

| Opinions of Jennifer King | Rosenberg Usability Test and Sabol Survey |
|---|---|
| <u>May 2013 FTUX, Parental Controls</u>:<br><br>"While some users familiar with in-app purchases may read the text on the [May 2013 FTUX] prompt and understand that parental controls are available to prevent future in-app purchases without password entry, some may not.  This is because the text referring to "future in-app purchases" is vague.  The first three words of the sentence referring to parental controls read, "If you'd like. . ."  This softens the sentence, suggesting the information that follows is not urgent. . . .  Others may read the full sentence but because the information is characterized as optional, fail to understand that they must change their device settings to prevent children from incurring additional in-app charges without password entry."  Ex. A, at 38. | *Rosenberg Rebuttal* (Task 2, Fig. 18): "As it is displayed on this page, what is your understanding of 'Parental Controls'?"  Ex. B, at 41 (*23/24 and 23/24 correct* answers for May 2013 FTUX and June 2014 FTUX, respectively).<br><br>*Rosenberg Rebuttal* (Task 2, Fig. 19): "What, if anything, do you think you can do to prevent being charged money for actions taken while your child/grandchild use the app?"  Ex. B, at 42 (*24/24 and 24/24 correct* answers for May 2013 FTUX and June 2014 FTUX, respectively).<br><br>*Rosenberg Rebuttal* (Task 2, Table 4): "As it is displayed on this page, what do you understand the phrase 'If you'd like to require a password for future in-app purchases, please turn on Parental Controls' to mean?"  Ex. B, at 43 (22/24 correct answers). |
| <u>Availability of Refunds</u>:<br><br>"Amazon <u>did not</u> effectively convey to consumers who incurred unauthorized in-app charges that refunds were available for those charges from Amazon."  Ex. A, at 55. | *Sabol Rebuttal* (Question 3): "If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, how likely would you be to contact Amazon's customer service?"  Ex. C, at 21 (*95%* very likely or somewhat likely to do so).<br><br>*Sabol Rebuttal* (Question 4): "If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"  Ex. C, at 22-23 (*92%* yes).<br><br>*Sabol Rebuttal* (Question 5): "If Amazon's stated policy was that digital products were not returnable, but you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"  Ex. C, at 23-24 (*91%* yes). |

| Opinions of Jennifer King | Rosenberg Usability Test and Sabol Survey |
|---|---|
| <u>How to Request a Refund</u>:<br><br>"Amazon <u>did not</u> effectively convey to consumers who incurred unauthorized in-app charges how to request a refund for those charges from Amazon." Ex. A, at 55. | *Sabol Rebuttal* (Question 1A, for customers who contacted Amazon customer service about a digital product): "Compared to your experience with other companies, was it easier, about the same or more difficult to contact Amazon's customer service?" Ex. C, at 16-17 (*94%* easier or about the same).<br><br>*Sabol Rebuttal* (Question 1B): "Compared to your experience with other companies, was your experience with Amazon's customer service better, about the same or worse than with other companies?" Ex. C, at 17-18 (*96%* better or about the same).<br><br>*Sabol Rebuttal* (Question 2, for customers who have *not* contacted Amazon customer service about a digital product): "Compared to your experience with other companies, do you think it would be easier, about the same or more difficult to contact Amazon's customer service?" Ex. C, at 18-19 (*94%* easier or about the same).<br><br>*Sabol Rebuttal* (Question 2A): "Compared to your experience with other companies, do you think your experience with Amazon's customer service would be better, about the same or worse than with other companies?" Ex. C, at 19-20 (*97%* better or about the same).<br><br>*Rosenberg Rebuttal* (Task 3). Ex. B, at 46-48, 56-58. |
| <u>IAP Confirmation Email</u>:<br><br>The email and links in the email provide little or no "information about whether refunds for IAPs are available or how to obtain one." Ex. A, at 43-44.<br><br>"Customers are presented with a complex set of options that do not clearly signpost either how to contact customer service or provide a simple way for obtaining information that directly addresses whether IAPs are refundable. Finally, the only information that is provided on that point explicitly informs customers that Appstore purchases are in fact <u>not</u> returnable." Ex. A, at 51-52. | *Sabol Rebuttal* (Questions 1A, 1B, 2, 2A, 3, 4, 5, above).<br><br>*Rosenberg Rebuttal* (Task 3). Ex. B, at 46-48, 56-58. |

| Opinions of Jennifer King | Rosenberg Usability Test and Sabol Survey |
|---|---|
| Amazon.com Customer Service:<br><br>"Finding the <u>Contact Us</u> page is an extremely complex task on Amazon.com. . . .  Further, the clear lack of path for digital (non-physical products) in the primary Returns flow is also confusing for customers seeking help with an IAP."  Ex. A, at 49. | *Sabol Rebuttal* (Questions 1A, 1B, 2, 2A, above).<br><br>*Rosenberg Rebuttal* (Task 3).  Ex. B, at 46-48, 56-58. |
| Your Orders Page:<br><br>"In order to find IAP orders, a customer must notice that they need to select <u>Digital Orders</u> from the four options at the top of the page in order to find any IAPs . . . .  This choice architecture presumes a customer knows and understands that an in-app purchase is a 'digital' order.  For customers who don't understand this distinction, this page can be extremely confusing."  Ex. A, at 53.<br><br>"[O]n the <u>Digital Orders</u> page there is no information provided to customers that refunds for IAPs are available or how to obtain one. Further, from this point on the website, there is no clear path to reach the Appstore 'Contact Us' page."  Ex. A, at 54. | *Sabol Rebuttal* (Questions 1A, 1B, 2, 2A, 3, 4, 5, above).<br><br>*Rosenberg Rebuttal* (Task 3).  Ex. B, at 46-48, 56-58. |
| Refund Availability and Process:<br><br>"Attempting to locate any information that refunds for IAPs were available or how to obtain one is a complex, time-consuming task . . . ."  Ex. A, at 55-56. | *Sabol Rebuttal* (Questions 1A, 1B, 2, 2A, 3, 4, 5, above).<br><br>*Rosenberg Rebuttal* (Task 3).  Ex. B, at 46-48, 56-58. |

129097720.2