Exhibit G

Exhibit G

# Amazon Kindle Fire In-App Purchase Usability Report

**Craig Rosenberg, Ph.D.**

**12/7/2015**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Table of Contents

**Section 1: Introduction** ...................................................................................1

  1.1 Educational and Professional Background and Qualifications ...........................5

**Section 2: Experiment Methodology** ...........................................................11

  2.1 Test Subjects ............................................................................................11
  2.2 Location and Equipment .............................................................................12
  2.3 Procedure .................................................................................................14
  2.4 Tasks ......................................................................................................15
      2.4.1 Task 0: Demographic Survey ..............................................................16
      2.4.2 Task 1: App Description Page .............................................................16
      2.4.3 Task 2: In-App Purchase Workflow ......................................................20
      2.4.4 Task 3: In-App Purchase Notification and Refund Process.......................22
      2.4.5 Task Sequence ................................................................................23

**Section 3: Data Analysis** ...........................................................................25

**Section 4: Results** .....................................................................................27

  4.1 Descriptive Statistics .................................................................................27
  4.2 Results by Task ........................................................................................29
      4.2.1 Task 1: App Description Page .............................................................29
      4.2.2 Task 2: In-App Purchase Workflow ......................................................38
      4.2.3 Task 3: In-App Purchase Notification and Refund Process.......................46
  4.3 Counterbalance Validity .............................................................................48

**Section 5: Discussion** ................................................................................50

  5.1 App Description Page .................................................................................51
  5.2 FTUX Popups ...........................................................................................53
  5.3 Purchase Notifications and Refunds .............................................................56

**Section 6: Conclusion** ...............................................................................59

**Appendix A: craigslist Ad** .........................................................................61

**Appendix B: Screening Questions** ..............................................................62

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Appendix C: Consent Form** ..............................................................**64**

**Appendix D: Facilitator Script** .........................................................**66**

Experiment Checklist ..........................................................................66
Introduction .........................................................................................66
Getting Started.....................................................................................67
Task 0 ...................................................................................................68
Task 1 ...................................................................................................69
Task 2 ...................................................................................................72
Task 3 ...................................................................................................74
Debrief .................................................................................................75

**Appendix E: Facilitator's Visual Aid** ...............................................**76**

**Appendix F: Task Flow** ......................................................................**87**

**Appendix G: Survey Screenshots** ......................................................**97**

Task 0 ...................................................................................................97
Task 1 .................................................................................................104
Task 2 .................................................................................................121
Task 3 .................................................................................................136

**Appendix H: Curriculum Vitae** ......................................................**145**

**Appendix I: Materials Considered** ...................................................**155**

**Appendix J: Study Data** ....................................................................**157**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Section 1:   Introduction

This report presents the results of a usability test conducted to evaluate the user interface and workflow associated with Amazon Kindle Fire in-app purchases. Many applications ("apps") available from the Amazon Appstore that run on the Kindle Fire offer the ability for in-app purchasing. In-app purchasing allows Amazon customers to buy add-on products within games and other apps. I understand that the Federal Trade Commission (FTC) has alleged that Amazon's in-app billing practices constituted an unfair business practice under the FTC Act, contending that Amazon customers have incurred unauthorized in-app charges when a child is playing an app on a Kindle Fire tablet linked to the account holder's Amazon account.

Specifically, I was asked to review the expert report of Jennifer King (October 16, 2015) and determine the validity of the conclusions reached in that report and, if appropriate, to prepare a rebuttal report. I was first contacted by counsel for Amazon after Ms. King published her expert report. Ms. King conducted a subjective, heuristic usability inspection of Amazon's in-app purchase disclosures, purchase flow, and the process for customers to seek a refund. Ms. King's opinions included her view that Amazon did not "effectively" convey to consumers "that children can incur in-app charges, that they can incur in-app charges without parental involvement, or that they would have to change their device settings in order to prevent children from incurring in-app charges without parental involvement."[1]

---

[1] Expert Report of Jennifer King (October 16, 2015) at 68.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

In particular, Ms. King asserts that (1) "there is a lack of education material on the tablet that defines what [in-app purchases] are"; (2) the "Key Details badge" contained on the app-description page did not "effectively" convey to consumers "that children can incur in-app charges, that they can incur in-app charges without parental involvement, or that they would have to change their device settings to prevent children from incurring in-app charges without parental involvement"; (3) the "Key Details badge" does not "work together" with the in-app purchase notice and description contained on the app-description page and "alone must effectively convey the presence of [in-app purchasing]"; (4) the text of the Key Details overlay "contains no direct discussion" of the "fact that [in-app purchases] have real costs associated with them that will result in charges to the customer's Amazon account"; (5) customers must already be familiar with the term "in-app purchases" for the Key Details badge to have "any" impact; (6) the language of the Key Details badge, the Key Details overlay, and the in-app purchase notice are "unnecessarily vague"; (7) account holders would not understand that they can activate Parental Controls to limit or prevent unauthorized in-app purchases made by others who are using a tablet linked to owner's Amazon account; (8) the term "Parental Controls" ineffectively conveyed that account holders could restrict unauthorized purchases; (9) the dialog box presented beginning in May 2013 for all first-time in-app purchasers was ineffective for "many users"; (10) customers who read the May 2013 dialog box "may be confused" about its meaning; (11) the term "real money" was confusing in the absence of a dollar amount or dollar sign; (12) customers may "assume" that the May 2013 dialog box "is a routine security check rather than a financial authorization"; (13) the text of the May 2013 dialog box is "not clear" and the term

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"future in-app purchases" is vague; and (14) Amazon did not effectively convey to consumers how to contact Amazon to request a refund for an unauthorized in-app purchase.

I designed a usability test to evaluate many of Ms. King's subjective opinions and to assess whether Amazon Kindle Fire tablet interfaces, notifications, and descriptions associated with in-app purchases were so far below contemporary, accepted business practices that they would have unfairly confused parents and resulted in significant numbers of unwanted and non-refunded in-app purchases. In short, my usability test, designed according to accepted standards, would either corroborate or invalidate Ms. King's conclusions. This test was designed and performed to evaluate and assess how clearly the current (and prior) user interfaces communicate the availability and nature of in-app purchasing, the availability and purpose of Parental Controls as a means to restrict in-app purchasing, and the availability of contacting Amazon to request refunds for allegedly unauthorized purchases. The test also evaluates customers' ability to contact Amazon to request a refund in the event of an unwanted purchase.

Contrary to Ms. King's subjective opinions, the results of the usability test indicate that the availability and nature of in-app purchases was very clearly communicated to and understood by Kindle Fire users. Subjects reported and demonstrated very little confusion regarding the information that was provided to them on the Kindle Fire interfaces during the in-app purchase process. Subjects well understood the description pages of apps that supported in-app purchases as well as those that did not. Subjects well understood the difference between incurring a cost to download an application and incurring a cost associated with an in-app purchase. Subjects well understood confirmation screens that

3

asked users to enter a password to approve an in-app purchase. Subjects well understood the purpose of Parental Controls as it relates to preventing future in-app purchases. Lastly, subjects well understood the content of the email receipt that is emailed to every account holder when an in-app purchase is made and all subjects demonstrated various successful ways that they could contact Amazon if they desired a refund.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## 1.1 Educational and Professional Background and Qualifications

I hold a Bachelor in Science in Industrial Engineering, a Masters in Science and a Ph.D. in Human Factors from the University of Washington School of Engineering. For over 25 years I have worked in the areas of human factors, user interface design, software development, software architecture, systems engineering, and modeling and simulation across a wide variety of application areas including aerospace, communications, entertainment, and healthcare.

For the past 18 years, I have served as a consultant for Global Technica, Sunny Day Software, Stanley Associates, Techrizon, CDI Corporation, and the Barr Group. In this capacity I have provided advanced engineering services for many companies.

I consulted for the Boeing Company for over 16 years as a senior human factors engineer, user interface designer, and software architect for a wide range of advanced commercial and military programs. Many of the projects that I have been involved with include advanced software development, user interface design, agent-based software, and modeling and simulations in the areas of missile defense, homeland security, battle command management, networking and communications, air traffic control, location-based services, and Unmanned Aerial Vehicle ("UAV") command and control. Additionally, I was the lead system architect developing advanced air traffic controller workstations and air traffic control analysis applications, toolsets, and trade study simulations for Boeing Air Traffic Management.

5

I was also the architect of the Boeing Human Agent Model, which is an advanced model for the simulation of human sensory, cognitive, and motor performance as applied to the roles of air traffic controllers, pilots, and UAV operators. In another project, I was the lead human factors engineer and user interface designer for Boeing's main vector and raster computer aided drafting and editing system that produces the maintenance manuals, shop floor illustrations, and service bulletins for Boeing Commercial Aircraft Company. Additional responsibilities in my time as a consultant include system engineering, requirements analysis, functional specification, use case development, user stories, application prototyping, modeling and simulation, object oriented software architecture, graphical user interface analysis and design, as well as UML, C++, C#, and Java software development.

In 1995 and 1996, I was hired as the lead human factors engineer and user interface designer for the first two-way pager produced by AT&T. Prior to this technology, people could receive pages but had no way to respond utilizing their pager. This new technology allowed users to use a small handheld device to receive and send canned or custom pages, access and update an address book, and access and update a personal calendar. This high profile project involved designing the entire feature set, user interface/user interaction design and specification, as well as all graphical design and graphical design standards.

From 1999 to 2001, I was the lead human factors engineer and user interface designer for Eyematic Interfaces, which was responsible for all user interface design and development activities associated with real-time mobile hand held 3D facial tracking, animation, avatar creation and editing software for a product for Mattel. My work

6

involved user interface design, human factors analysis, requirements gathering and analysis, and functional specifications.

I was the lead user interface designer for a company called ObjectSpeed that developed a portable handheld device for use in homes and businesses that had the many of the same capabilities that we take for granted in mobile cellular phones. This portable multifunction device supported email, chat, video conferencing, internet radio, streaming media, Microsoft Outlook integration, photo taking and sharing, etc. The ObjectSpeed device was specifically designed and developed as a portable handheld device.

I am the founder, inventor, user interface designer, and software architect of WhereWuz. WhereWuz is a company that produces advanced mobile software running on GPS-enabled smartphones and handheld devices. WhereWuz allows users to record exactly where they have been and query this data in unique ways for subsequent retrieval based on time or location. WhereWuz was specifically designed and developed to run on small handheld devices.

I am the co-founder of a medical technology company called Healium. Healium is developing advanced wearable and handheld user interface technology to allow physicians to more effectively interact with electronic medical records. I am also the co-founder of a medical technology company called StratoScientific. StratoScientific is developing a handheld smartphone stethoscope that turns a handheld computer such as a smartphone, PDA, laptop, or tablet into a full featured digital stethoscope.

I designed and developed a large software project for Disney World called xGS that allowed the operational employees of Disney World to utilize a handheld device to view

7

the status of all of the guests within multiple attractions as well as within one of their restaurants. The application could run in a real-time/live mode where it would display data collected from sensors that showed the location and status of all guests within the attraction; the application could also be run in a fast-time/simulated mode. The application was developed on a laptop computer and was specifically designed to run on a variety of handheld devices including laptops, PCs, smartphones, and tablets.

I have received numerous awards for my engineering work relating to interface design, computer graphics, and the design of spatial, stereographic, and auditory displays, including a $10,000 scholarship from the I/ISEC for advancing the field of interactive computer graphics for flight simulation, a Link Foundation award for furthering the field of flight simulation and virtual interface design. I have created graphics for several popular book covers as well as animations for a movie produced by MIRAMAR. I have published twenty-two research papers in professional journals and proceedings relating to user interface design, computer graphics, and the design of spatial, stereographic, and auditory displays.

I graduated from the University of Washington in 1988 with a B.S. in Industrial Engineering. After graduation, I continued my studies at the University of Washington. In 1990, I obtained an M.S. in Human Factors. In 1994, I graduated with a Ph.D. in Human Factors. In the course of my doctoral studies, I worked as an Associate Assistant Human Factors Professor at the University of Washington Industrial Engineering Department. My duties included teaching, writing research proposals, designing and conducting funded human factors experiments for the National Science Foundation, as well as hiring and supervising graduate students.

8

While studying at the University of Washington, I also worked as a human factors researcher and designed and performed advanced human factors experiments relating to interface design, stereoscopic displays, and advanced visualization research, which was funded by the National Science Foundation. My duties included user interface design, systems design, software development, graphics programming, experimental design, as well as hardware and software interfacing.

Attorneys for Amazon.com first contacted and retained me for purposes of this report on October 20, 2015.

I am being compensated for my work on this matter and my fee is not contingent on the outcome of this case or on any of my opinions or the technical positions I explain in this report. My rate of compensation if $500 per hour, and the rate for the two individuals assisting me is $250 per hour.

In the last four years, I have testified as an expert at trial or by deposition in the following cases:

- Silver State Intellectual Technologies v. Foursquare, IPR2014-00159 (deposition)

- *Silver State Intellectual Technologies v. Garmin*, District of Nevada, 2:11-cv-01578-PMP-PAL (deposition and trial testimony)

- *Select Retrieval v. Overstock*, District of Delaware No. 1:11-cv-00812-RGA (deposition)

- *Location Labs v. Locatio.net*, IPR2014-00199 (deposition)

- *Intellectual Ventures v. Google*, IPR2014-00787 (deposition)

9

A detailed record of my professional qualifications, including a list of publications, awards, research grants, and professional activities, is set forth in my curriculum vitae that is attached to this report as Appendix H.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

10

# Section 2: Experiment Methodology

A usability test was performed to evaluate what is understood by people using Amazon Kindle Fire tablet interfaces, notifications, and descriptions that are associated with in-app purchasing. This test was carefully designed for neutrality to accurately determine what subjects noticed and understood regarding the various interfaces related to in-app purchases. Furthermore, the test was designed so that it would identify whether any of the tested interfaces, notifications, descriptions, and refund protocols associated with in-app purchasing were so far below contemporary, accepted business practices that they would have unfairly confused parents and resulted in significant numbers of unwanted and non-refunded in-app purchases.

## 2.1 Test Subjects

This usability test included 24 subjects (8 experienced Kindle Fire users and 16 inexperienced Kindle Fire users). There were a total of 28 people recruited for the study; however, three did not appear and one untimely canceled. All of the subjects were previously unknown to the researchers and were recruited using a craigslist post that advertised the study as a mobile tablet study for parents or grandparents. The inclusion criteria were that all subjects must be over the age of 20 years, comfortable using a tablet or smartphone, have at least one child or grandchild currently aged 13 or younger, and be fluent in English. The subjects did not know anything about the purpose of the study until the study was complete.

11

A copy of the craigslist post and recruitment screening survey is provided in Appendices A and B respectively. There were two copies of the craigslist post, one in the "Community" section November 20-24, 2015, and the second in the "Gigs" section November 21-24, 2015. Test subjects were each compensated $150 for their time.

Use of 24 subjects is consistent with the practice in the discipline, as is evident when considering similar studies published in books, peer reviewed journals, and proceedings. For example, a usability study by Page (2014) to evaluate the adoption of touchscreen mobile devices by older adults used four subjects. Werner, Werner, and Oberzaucher (2012) evaluated general usability of iPad tablets in a study with 11 adults over the age of 60 years old. Another study used 12 subjects to analyze user experience between apps delivered on a mobile smartphone versus a PC desktop (Ryan & Gonsalves, 2005). Madithil, Koikkara, Gramopadhye, and Greenstein (2011) utilized 15 subjects to study the usability of consenting systems on touchscreen interfaces, including tablets. Several studies have tested the general usability and performance of e-book readers and used 10 subjects (Siegenthaler, Wurtz, & Groner, 2010), 20 subjects (Pattuelli & Rabina, 2010), and 33 subjects (Bigson & Gibb, 2011). Similarly, (Siegenthaler, Schmid, Wyss, & Wurt, 2012) used 12 subjects to analyze reading behavior between LCD and e-ink tablets.

## 2.2   Location and Equipment

The experiment was performed at the Human Factors and Statistical Modeling Lab at the Seattle Campus of the University of Washington.

12

Each subject was provided a Kindle Fire HD 6 tablet, a Windows laptop computer, and standard telephone for use during the test. The Kindle Fire and laptop computer were both connected to the Internet and the telephone was fully operational. They were also provided the username and password for an active Amazon account.

Subjects completed an online survey using the laptop as they performed each task. The survey was created using Adobe Captivate 9 and the results were tracked using a learning management system provided by Knowledge Anywhere. The survey displayed one question at a time to each subject. In this way subsequent questions would not be able to influence the answers to previous questions. For the questions that required interpreting information presented on the Kindle Fire HD tablet, the survey provided a small thumbnail image to the user so that the user could be sure they were viewing the correct stimulus on the Kindle Fire display. Figure 1 shows a typical survey screen and screenshots for all screens are shown in Appendix G of this report.

13



**Figure 1. Typical survey screen**

## 2.3 Procedure

Prior to running the test with live subjects, the experimental team performed three dry runs with test subjects. In addition, the study facilitator performed numerous dry runs with no subjects in order to perfect the delivery of the experiment.

All study sessions were led by the same facilitator, Erika Miller, who has experience running hundreds of subjects through studies in a similar capacity. For some sessions a second facilitator participated as well.

The facilitator(s) led the subjects through the study, using a PowerPoint presentation (see Appendix E) containing screenshots guiding the subjects through all of the tasks. When content was presented on the Kindle Fire tablets, the facilitator(s) also observed each subject to ensure they were viewing the correct content associated with the relevant

14

question. The study included numerous stop points where activity ceased until all subjects had reached the same point.

To ensure consistency for all subjects, the instructions provided to the subjects were read by the facilitator(s) from a script, included in Appendix D of this report.

## 2.4   Tasks

The study design included four different tasks:

- Task 0 was a simple demographic survey that collected information about the subjects, such as their gender, age, education, occupation, experience with Kindle Fires, smartphones, and age of children or grandchildren.

- Task 1 related to the description of an app that is provided to a user before the user purchases that app. If the app offers in-app purchasing, information relating to in-app purchasing is also provided as part of this description.

- Task 2 related to the confirmation dialog box presented to users when they try to make their first an in-app purchase (testing both a version first implemented by Amazon in May 2013 and a revised version implemented in June 2014). This confirmation dialog box includes a request for an account password and provides information about and the option to set Parental Controls to require a password for future in-app purchases.

- Task 3 related to the emailed order confirmation that is sent to Amazon account holders immediately after completion of an in-app purchase, as well as the various methods account holders use to contact Amazon to request a refund, if desired.

15

The stimuli for Task 1 and Task 2 were presented on the Kindle Fire. Task 3 was presented on a computer, as that would be a typical way to view and react to an email, particularly if the email arrived while a child or grandchild was using the Kindle Fire.

Some Task 2 activities were based on an older version of the user interface. Since these screens are no longer available live on a Kindle Fire, subjects were shown screenshots. The Kindle Fire was used to display all screenshots that relate to interfaces that would be viewed on a Kindle Fire to ensure that the display was properly replicating the interface (e.g., size, location, resolution, brightness) that a Kindle Fire user would experience. A series of full-size screenshots were saved in the photo viewer on each Kindle Fire, and the test facilitator loaded the appropriate image onto the tablet as needed to accomplish each task.

Appendix F shows the task flow for each of the four tasks that were used in the study.

### 2.4.1   Task 0: Demographic Survey

A demographic survey was given at the outset to gather general information about each user (for example, gender, age, education, occupation, and age of children or grandchildren) and the users' experience with smart devices such as smartphones and tablets.

### 2.4.2   Task 1: App Description Page

Task 1 evaluated subjects' understanding of the information provided on the app-description page that Amazon customers see when selecting apps from the Amazon

16

==Appstore.== This task evaluated two types of apps: apps that are free to download and (1) provide opportunities for in-app purchases and (2) do not provide opportunities for in-app purchases. The app "Jump Racer" was used to represent apps with opportunities for in-app purchases (see Figure 2). The app "Jeweled Bricks" was used to represent apps without opportunities for in-app purchases (see Figure 3).

Amazon Underground launched after the relevant time period and began labeling apps as "Actually Free" in the description page. Therefore, only apps that did not include this "Actually Free" reference were used in the study. Furthermore, for both types of apps (with and without opportunities for in-app purchases), only apps with app-description pages that included "Key Details" badging were presented to the subjects. Also, the application that had the opportunity for in-app purchases ("Jump Racer") included the "+ Read More" feature, which when clicked would show the balance of the app-description, including the text description for in-app purchases and Parental Controls.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



**Figure 2. "Jump Racer" app-description page (in-app purchasing)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Figure 3. "Jeweled Bricks" app-description page (no in-app purchasing)**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The subjects were asked seven questions (see Task 1 in Appendix G) regarding each subject's interpretations for each app-description page. As discussed in Section 2.4.5 , the order of the apps presented was counterbalanced so that previous experimental conditions would not affect the subject's answers. As part of Task 1, subjects were asked to interpret the "PLEASE NOTE" in-app purchase notice, and, as a separate subtask, subjects were asked to interpret the "Key Details" badging and in-app purchasing popup definition. The "PLEASE NOTE" and "Key Details" badging topics were also counterbalanced between subjects.

### 2.4.3  Task 2: In-App Purchase Workflow

Task 2 evaluated the purchase workflow for the first-time in-app purchases as experienced by Amazon customers in May 2013 ("May 2013 First-Time User Experience" or May 2013 FTUX") and June 2014 ("June 2014 First-Time User Experience" or "June 2014 FTUX"). For this task, the subjects were shown the May 2013 FTUX popup and June 2014 FTUX popup displayed to confirm an attempted first-time in-app purchase. In this scenario, the subjects were told that they had given their Fire tablet to their child/grandchild, who is playing a game. The child then gives the Fire tablet back to the subject with the popup showing. This task was randomized between subjects as to which popup (May 2013 versus June 2014) was shown first to the subject.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Figure 4. May 2013 FTUX**



**Figure 5. June 2014 FTUX**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

There were two components to this task. The first was a timing task, where the subjects were instructed to flip over the Kindle Fire tablet and read the contents of the screen at the same pace they would if their child or grandchild had just handed them the tablet. Prior to flipping over the Fire tablet to begin, the subjects clicked "Next" on the computer survey, which started a timer unknown to the subjects. The subjects were told to enter the word "password" and click the "Submit" button after they finished reading the popup. Entering any text in the password box and clicking the submit button on the computer stopped each timer (i.e., it was not necessary to enter the correct password as reading time was being measured and not accuracy of password typing).

The second component to this task asked the subjects a series of questions about their understanding and interpretation of the information and options provided on the popup screens.

### 2.4.4   Task 3: In-App Purchase Notification and Refund Process

Task 3 evaluated the in-app purchase email notification and refund process. For this task, the subjects viewed an in-app purchase email receipt on the laptop and were told that they had received the email from Amazon. The subjects were then told that the product identified in the email was either never purchased or was accidentally purchased by their child or grandchild while using an app and the participants were instructed to go about seeking a refund from Amazon for the unintended charge. The various survey questions in Task 3 asked the subjects to interpret the email.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

This task was performed on the computer because it is more typical to receive email on a computer than to receive email on a Kindle Fire. This HTML-formatted email message included links that the subject could select as though the email had been received via the subject's inbox. The subjects also had access to an Internet browser (both Microsoft Internet Explorer and Google Chrome) that they could use to find contact information for Amazon customer support, if desired. Both Internet browsers were set to a default home screen of www.washington.edu, which was selected as an unbiased page and not suggestive of using www.amazon.com or a search engine such as www.google.com. The subjects were also provided an active Amazon username and password, which was paired to the email links.

In the survey questions, the subjects were first asked how they planned to contact Amazon to request the refund. The subjects were then instructed to contact Amazon to request the refund for the charge identified in the email in any manner they desired. Facilitators stopped the subjects just before they would reach Amazon (e.g., before dialing the phone or when they found the appropriate web form to contact customer support). During this last task where the user needed to determine how they would contact Amazon regarding the in-app purchase, each participant was timed without their knowledge. Lastly, the subjects were asked their subjective perception of how easy or difficult it was to contact Amazon.

## 2.4.5   Task Sequence

Task 0 was a demographic survey and was always presented first. Task 3 was an evaluation of the Amazon in-app purchase confirmation email and contacting Amazon

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

customer support and this task was always presented last. The order of Task 1 and Task 2 as well as the subtasks within Task 1 and Task 2 were counterbalanced, with different subjects performing the tasks in different orders so as not to influence the results due to previous exposure to the various experimental conditions. This counterbalancing was accomplished by the facilitator instructing the subjects which subtask to perform at the various branch points and by whether Tasks 1 or Task 2 was performed first.

This resulted in four different variations. Of the six experiment sessions conducted, two performed Order A, one performed Order B, one performed Order C, and two performed Order D. Due to scheduling and the failure of four subjects to appear, the groups were not evenly balanced across all four orders, but the analysis verified that the order of the tasks and subtasks did not affect subjects' responses (see Section 4.3).

- Order A: (n = 9)

  o Task 1 > Task 1.1 > Task 1.2 > Task 2 > Task 2.1 > Task 2.2

- Order B: (n = 2)

  o Task 1 > Task 1.2 > Task 1.1 > Task 2 > Task 2.2 > Task 2.1

- Order C: (n = 3)

  o Task 2 > Task 2.1 > Task 2.2 > Task 1 > Task 1.1 > Task 1.2

- Order D: (n = 10)

  o Task 2 > Task 2.2 > Task 2.1 > Task 1 > Task 1.2 > Task 1.1

# Section 3:   Data Analysis

The raw data was retrieved from the Knowledge Anywhere database using a SQL query. This output contained the applicable information for each question, including the question number, question text, answer type (e.g. fill-in versus choice), subject response, and time to respond. Approximately 10,900 rows of data were generated and analyzed for the subjects that participated in the test. The experimental data is available at Appendix J

The raw data was then exported using R data analysis software (version 3.2.2) to create a spreadsheet with one row per subject and two columns for each question (subject response and timing). Because the experiment was counterbalanced with subjects receiving questions in different order, the questions across subjects were matched based on the unique identifier for each question. Responses within topics were collapsed based on the subject identifier number.

Most of the questions called for open-ended responses. Prior to reviewing the data, the research team defined the various elements required in the response to each question such that the response be deemed correct (rather than incorrect). Each response was thereafter individually assessed and coded as either correct or incorrect. The researchers conservatively coded responses; ambiguous responses were coded as incorrect to ensure that the coding did not favor Amazon. In fact, often responses that were coded as incorrect could have been coded as correct because the words used indicate that the subject understood additional costs were involved and Parental Controls were available to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

prevent those costs. Nonetheless, out of an abundance of caution, where a response was ambiguous, not necessarily erroneous, it was coded incorrect.

Once each response was coded, all data was tabulated and analyzed using the R statistical software program to identify trends and extrapolate to the general public.

26

# Section 4:   Results

## 4.1   Descriptive Statistics

General demographic information was collected on the subjects prior to beginning the usability tasks. As displayed in Table 1, a comprehensive and applicable sample population was used in this experiment.

**Table 1. Demographic information**

| Variable | Response | Count |
|---|---|---|
| **Gender** | Male | 16 |
| | Female | 8 |
| **Age (years)** | 20-29 | 4 |
| | 30-39 | 9 |
| | 40-49 | 8 |
| | 50-59 | 2 |
| | 60-69 | 1 |
| **Highest Level of Education** | Some High School | 1 |
| | High School Diploma | 3 |
| | Some College | 11 |
| | Associate Degree | 1 |
| | Bachelor Degree | 6 |
| | Graduate School | 2 |

In addition, the subjects were asked if they had at least one child or grandchild under the age of 14 years old; all subjects satisfied this criterion. The range of ages for children/grandchildren was 2 years to 13 years old, where many subjects had more than one child/grandchild within this age group. The mean age for children/grandchildren was 7.38 years old, with a standard deviation of 3.39 years.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Descriptive information was also gathered on user experience with smart devices, such as smartphones and tablets. Two subjects had never owned a smartphone and one subject had never downloaded an app onto a smart device. However, when asked during the screening, all subjects stated they were comfortable using a smart device. Table 2 tabulates the responses for users' experience with smart devices.

**Table 2. Experience with Smart Devices**

| Question | Response |
|---|---|
| Have you ever owned a smartphone, such as an iPhone, Android Phone, or Windows Phone? | Yes 92% / No 8% |
| Do you currently own a smartphone, such as an iPhone, Android Phone, or Windows Phone? | Yes 88% / No 12% |
| Have you ever owned an Amazon Kindle Fire tablet? | No 67% / Yes 33% |
| Do you currently own an Amazon Kindle Fire tablet? | No 71% / Yes 29% |
| Have you ever downloaded an application (also known as an "app") onto your smartphone or tablet? | Yes 96% / No 4% |

28

## 4.2   Results by Task

The results from each of the three tasks are individually presented in this section.

### 4.2.1   Task 1: App Description Page

There were two apps used in this task and all the subjects confirmed that they had never used or downloaded either of the two apps ("Jeweled Bricks" and "Jump Racer"). Therefore, the subjects' responses are representative of their interpretation of the content controlled within the study, rather than from past experience.

Immediately after first viewing the app-description page for each app, the subjects were asked about what information was provided by the page. For both apps, all 24 subjects were able identify that the page contained content regarding general information about the app, such as game description, reviews, target ages, etc.



**Figure 6. What information is provided by this app-description page?**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The second question that each subject was asked after navigating to the app-description page for each app was whether they thought it was possible to incur additional costs based on actions taken while using the app. These results are shown in Figure 7. For the app that provided opportunities for in-app purchases, none of the subjects answered incorrectly, meaning all of the subjects (20) correctly understood or were unsure (4) that it was possible to incur additional costs while using the app. Answering unsure is not the same as answering incorrectly because those subjects admit that they do not fully know what is possible within the game play. Although 8 of the subjects were unsure and 3 answered incorrectly about the app with no opportunity for in-app purchasing, their misconception (in the absence of any additional information on the screen) would not result in any accidental purchases made by children because that app does not contain any opportunities for in-app purchases.



**Figure 7. Do you think it is possible to incur additional costs based on actions taken while using the app?**

The subjects were then asked questions relating specifically to the "PLEASE NOTE" in-app purchase description under "+ Read More" and the "Key Details" badging for the app with opportunities for in-app purchasing. The "PLEASE NOTE" and "Key Details"

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

subtasks were tested separately, such that a subject was asked to review and interpret the "PLEASE NOTE" description, then review and interpret the "Key Details" badging and in-app purchasing description. The subtask was counterbalanced so that some of the subjects answered questions about the "PLEASE NOTE" description first and the remaining subjects answered questions about the "Key Details" badging first. For ease of presentation and comparative purposes, the discussion and figures below address the "PLEASE NOTE" and "Key Details" results together.

After viewing each of the "PLEASE NOTE" and "Key Details" concepts, subjects were also asked about how they could limit being charged money for actions taken while using the app. The responses were coded as correct if they mentioned Parental Controls setting up a password (see Figure 8). There were 48 total responses for the "PLEASE NOTE" (24) and "Key Details" (24) questions with 45 correct answers. The sole incorrect response regarding the "Key Details" content was so coded because the response was too vague, not because it was erroneous. In fact, the language suggests that like all other 23 subjects, even this subject understood that account holders could enable Parental Controls to prevent unauthorized in-app purchasing: "*it is implied that you can down [sic] this with parental controls. But, noyt [sic] specifically stated. I am not certain.*"

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Figure 8. What, if anything, do you think you can do if you want to prevent being charged money for actions taken while using the app?**

For both the "PLEASE NOTE" and "Key Details" concepts, the subjects were asked about their understanding of Parental Controls (Figure 9) and the term in-app purchasing (Figure 10). All but one subject correctly understood the purpose of Parental Controls in the context of in-app purchasing as described in the "PLEASE NOTE" description, and all but one subject correctly understood the meaning of Parental Controls in the context of in-app purchasing as identified in the "Key Details" badging. The sole incorrect response about the "PLEASE NOTE" description was so coded because the subject seemed to indicate that Parental Controls have the ability to monitor application usage. That said, the subject had a good understanding that Parental Controls were for parents or legal guardians and was used for applications: "***Settings where parents or legal guardians can monitor other's current application usage.***" The sole incorrect response within the "Key Details" badging was so coded because the response did not explicitly mention that Parental Controls can prevent unauthorized in-app purchasing: "***'parental controls' allows me to monitor the content that my child is getting exposed to. I can set the levels with regards to violence, language etc.***"

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Figure 9.** ==As it is displayed on this page, what is your understanding of 'Parental Controls'?==

==With regard to Figure 10, 23 out of 24 subjects correctly understood the meaning of in-app purchasing as the term was used on the "Key Details" badging.== The sole incorrect response within the "Key Details" badging was so coded because the subject indicated that the purchase was within the "site" rather than within the application, but the subject clearly demonstrated that they were aware that an in-app purchase results in a purchase: "*making purchase while on this site.*" ==All but one subject correctly understood the meaning of in-app purchasing as the term was used in the "PLEASE NOTE" description.== The sole incorrect response within the "PLEASE NOTE" description was so coded because the response was too vague about purchases within an app, "*buying while on this site.*"

33



**Figure 10.** <mark>As it is displayed on this page, what do you understand the phrase 'In-App Purchasing' to mean?</mark>

<mark>All 24 subjects properly interpreted the phrase "which allows you to buy items within the app using actual money" to mean they would be charged real currency, withdrawn from their credit card on file with Amazon (see Figure 11).</mark>



**Figure 11.** <mark>As it is displayed on this page, what do you understand the phrase 'which allows you to buy items within the app using actual money' to mean?</mark>

<mark>Subjects were asked one additional question about the "PLEASE NOTE" content, which was a general question about what they understood by the information provided in the "PLEASE NOTE" description (see Figure 12). All but three subjects correctly</mark>

34

==understood its meaning.== Two of the three incorrect responses were so coded because their language implied that the user would have to purchase more content later in the future to continue playing the game. ==This misconception would not result in any accidental purchases, however, because at this point the user thinks they will need to spend money to progress in the future and still has the opportunity to choose not to download the app.== These responses were "***You will be expected to purchase additional tools and features via in-app purchasing***" and "***letting the costomer [sic] know that with buying the particular app you will have to purchase items later.***" The third incorrect response was so coded because it was too vague, though even it suggests that the subject understood that it meant purchases could be made within the app: "***using this too [sic] buy w/ money using in-app site.***"



**Figure 12. As it is displayed on this page, what do you understand this text to mean?**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

==Similarly, subjects were asked to interpret what they understood the "Key Details" badging to mean. All 24 subjects correctly identified that this content was to point out important information regarding the app; see Figure 13.==



==**Figure 13. As it is displayed on this page, what do you understand the phrase 'Key Details' to mean?**==

==Before being instructed to tap on the "Key Details" badging to access the popup window with additional information, the subjects were asked what they understood the bullet point "In-App Purchasing" to mean (see Figure 14). All but three answers were correct.== Of the three responses coded incorrect, one misunderstood the question and explained what happens when clicking on "Key Details": "***well when you click on the key details section it brings up a more in depth description of what it means. (enhanced functionality, game content etc).***" Another was coded incorrect because it implied that additional content would need to be purchased in the future to play the game, though even that response suggests that the subject understood that it meant purchases could be made within the app: "***app will need further purchases to operate the app being***

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*played.*". The last response was coded incorrect because it was vague and difficult to understand: "*purchaseing [sic] this game while on site.*"



Figure 14. As it is displayed on this page under 'Key Details' text, what do you understand the phrase 'In-App Purchasing' to mean?

The subjects were then instructed to tap on the "Key Details" badge and read the content under "In-App Purchasing" in the popup window. After reading this content, they were asked their understanding of the displayed text. All 24 subjects were able to correctly state that the app would allow opportunities to make purchases within the app using actual money (see Figure 15).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Figure 15. As it is displayed on this page, what do you understand the text under 'In-App Purchasing' to mean?

## 4.2.2  Task 2: In-App Purchase Workflow

Subjects were provided screenshots of the May 2013 FTUX and June 2014 FTUX first-time in-app purchase confirmation popup. The subjects on average spent 10 more seconds reading the June 2014 FTUX than reading the May 2013 FTUX.[2]

**Table 3. Time to read and input password: May 2013 vs. June 2014 FTUX**

| FTUX Popup | Time (seconds) | | | |
|---|---|---|---|---|
| | Mean | Standard Deviation | Minimum | Maximum |
| May 2013 | 25.17 | 6.82 | 15 | 39 |
| June 2014 | 35.79 | 12.54 | 25 | 83 |

---

[2] A paired t-test was used to compare the timings to read each FTUX, on a participant level. The results showed that there was a mean difference of 10.625, for $p < 0.001$. This indicates that there was a significant difference between each subject's times to read the two FUX popups. More specifically, the June 2014 FTUX took on average 10.625 seconds longer to read as compared to the May 2013 FTUX. The results of the timings between these two displays are provided in Table 3.

38

After reading each FTUX popup, the subjects were asked questions regarding their understanding of each screen. The first question for each task asked subjects, "What is the purpose of this page?" All 24 subjects correctly identified the primary purpose of the May 2013 FTUX as asking whether they confirm an in-app purchase; 23 subjects correctly identified the same for the June 2014 FTUX (Figure 16). The one incorrect response for June 2014 failed to identify the purpose of confirming the current in-app purchase (noting that the purpose was "*[t]o inform you that a purchase has just been made*").

Subjects were then asked, "What are your options as described by this page?" This question was designed to test whether the subject identified the option of turning on Parental Controls to require a password for future in-app purchases. For the May 2013 FTUX, 21 subjects correctly identified that option and 22 subjects identified that option in response to the June 2014 FTUX (Figure 17). The three incorrect responses for the May 2013 FTUX did not identify the option to require a password for future in-app purchases: "*Enter your password to complete purchase*" and "*to buy or not to buy*" and "*you can allow a purchase by giving password and this password will also be required for any future purchases.*"

The two incorrect responses for the June 2014 FTUX are listed below. In the first response, the subject did not know if he or she could cancel the in-app purchase: "*Im [sic] not sure if you can stop the purchase just made the child or not- it is unclear to me from the wordikng [sic]. Yo may set a password tocpnfirm [sic] future purchasing or choose to allow no password confirmation for future purchasikng [sic].*" In the

second response, the subject failed to address the Parental Controls aspect of the dialog: "*to require a password.*".



**Figure 16. What is the purpose of this page?**



**Figure 17. What are your options as described by this page?**

Figure 18 through Figure 20 provide the results for questions that were asked identically between the two FTUX popups. For the question asking what would happen if the subject closed the screen without entering the password (Figure 20), there were three

40

incorrect responses. One of the responses was so marked incorrect because it addressed only issues pertaining to Parental Controls, not that it was erroneous with respect to canceling the particular in-app purchase: "*No limits will be set on my account unless I take the step to go to Parental Controls and set limits.*" Another was so marked incorrect because it simply reiterated the question, not that it was erroneous with respect to canceling the particular in-app purchase: "*it will close.*"

For the June 2014 FTUX, the sole response coded incorrect for interpreting the meaning of Parental Controls was so coded because it was too vague as to what the subject meant: "*on adults are too use for their use.*" There were three answers coded incorrect for the question asking about the consequences of closing the window without entering the password. Two of the responses were coded incorrect because they did not address what would happen regarding the in-app purchase, not because they were erroneous: "*it will close*" and "*i think it will go back to the main page of the app, homepage, etc.*"



**Figure 18. As it is displayed on this page, what is your understanding of 'Parental Controls'?**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER





Figure 20. What do you think will happen if you close the screen without entering your password?

The subjects were asked additional questions about the May 2013 FTUX and June 2014 FTUX using varying wording depending on the specific text used for the individual dialog box. The results are provided in Table 4.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Table 4. Interpretations of the two FTUX popups**

| FTUX Popup | Question | Response |
|---|---|---|
| May 2013 | As it is displayed on this page, what do you understand the phrase "which allows you to buy items inside the app using real money" to mean? | *Correct*: 24 *Incorrect*: 0 |
| May 2013 | As it is displayed on this page, what do you understand the phrase "This app contains in-app purchasing" to mean? | *Correct*: 23 *Incorrect*: 1 |
| June 2014 | As it is displayed on this page, what do you understand the phrase "In-App Purchase" to mean? | *Correct*: 23 *Incorrect*: 1 |
| May 2013 | What do you think will happen if you enter your password and select "Continue"? | *Correct*: 21 *Incorrect*: 3 |
| June 2014 | What do you think will happen if you select "Do not require a password for future purchases," enter your password, and select "Continue"? | *Correct*: 22 *Incorrect*: 2 |
| June 2014 | What do you think will happen if you select, "Require a password for future purchases (turns on Parental Controls)," enter your password, and select "Continue"? | *Correct*: 23 *Incorrect*: 1 |
| May 2013 | As it is displayed on this page, what do you understand the phrase "If you'd like to require a password for future in-app purchases, please turn on Parental Controls" to mean? | *Correct*: 22 *Incorrect*: 2 |
| June 2014 | As it is displayed on this page, what do you understand the phrase "Do not require a password for future purchases" to mean? | *Correct*: 24 *Incorrect*: 0 |
| June 2014 | As it is displayed on this page, what do you understand the phrase "Require a password for future purchases (turns on Parental Controls)" to mean? | *Correct*: 23 *Incorrect*: 1 |

For the May 2013 FTUX, all 24 subjects correctly understood that "buying items inside the app using real money" would cost them actual currency from their credit card on file with Amazon.

In the second row of Table 4, 23 out of 24 subjects correctly answered the question about the meaning of applications that contain in-app purchases. The sole incorrect response was so coded because the subject did not indicate why he or she would be charged, even though the subject seems to well understand that he or she would need to access an electronic form of payment and therefore presumably be charged once that

43

electronic form of payment was accessed: "***You need access to an electronic form of payment.***" The one response coded incorrect for the June 2014 FTUX was so coded because it was too vague, not because it was erroneous: "***purchasing in-house apps.***"

All but three subjects correctly understood what would occur on the May 2013 FTUX if they entered their password and continued. Two responses were coded incorrect because they did not mention that the in-app purchase would be completed, though even those responses suggest that the subjects understood the process would be completed: "***it will go bac [sic] to app***" and "***it will continue too [sic] site.***" All but two subjects correctly understood what would occur on the June 2014 FTUX when the "Do not require a password for future purchases" option was selected. One response was coded incorrect because the subject thought there would be a follow-up popup window that confirmed the future password requirement decision, though even that response suggests that the specific purchase would require a password and additional passwords may still be required: "***it will most likely still make me type in the password for this purchase and perhaps confirm with a question whether or not i want to remove the password requirement for future purchases for sure.***" All but one subject correctly understood what would occur on the June 2014 FTUX when the "Require a password for future purchases (turns on Parental Controls)" option was selected. The sole incorrect response was so coded because the answer was too vague, not because it was erroneous: "***it will continue on***".

For the May 2013 FTUX, the subjects were asked about their understanding of the phrase "if you'd like to require a password for future in-app purchases, please turn on Parental Controls." All but one subject correctly understood the meaning of that phrase.

44

The vast majority of the subjects answered this question correctly. There were two responses out of 24 that were coded as incorrect. One of the responses was coded incorrect because the response indicated that the subject was not sure if the current purchase could be immediately canceled, though even that response indicates that the subject understood that settings were available to control future purchases: "***meaning that maybe you can not stop the transaction in process but can set your settings to control how purchases are approved in the future***". The other response that was coded incorrect was coded as such because the subject did not talk about the need for users to provide a password when trying to make in-app purchases in the future. That said, the response revealed that the subject realized that users would need to provide a password: "***In order to turn on this feature you need to provide a password.***"

All 24 subjects correctly understood that the option in the June 2014 FTUX for "do not require a password for future purchases" meant that future in-app purchases could be made without entry of a password. All but one subject correctly understood the meaning of the option "Require a password for future purchase (turns on Parental Controls)" in the June 2014 FTUX. The sole response coded incorrect was so coded because the subject did not appear to understand the context of the question: "***Make it so that if you think your password is compromised, you can change on PC and the tablet will double check.***"

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### 4.2.3 Task 3: In-App Purchase Notification and Refund Process

The subjects were asked their understanding of the information provided in the in-app purchase order-confirmation email. The summary of their responses is provided in Table 5. Note that for this task, the computer system failed to record one of the subject's responses for some of the questions; therefore, there are only a total of 23 responses for some of the questions related to the last part of this Task 3. Of the 11 total survey questions asked within Task 3, responses to four questions were collected by all 24 subjects.

All of the subjects correctly answered the questions about the information provided by the email order confirmation; everyone identified what information was provided in the email, what product was ordered, when it was ordered, and how much the credit card had been charged.

**Table 5. Interpretations of email notification**

| Question | Correct | Incorrect |
|---|---|---|
| What information is provided by this email? | 24 | 0 |
| As described in this email, what is the name of the product that has been ordered? | 24 | 0 |
| As described in this email, when was this product ordered? | 24 | 0 |
| If you received this email, do you think your credit card on file with Amazon has been charged for buying this product? | 24 | 0 |
| How much money do you think your credit card on file with Amazon has been charged for this order? | 23 | 0 |

Before the subjects were told they were going to actually contact Amazon, they were asked what methods they would use to contact Amazon to request a refund. Their responses about which modality they would use are summarized in Table 6. Note that for

46

this task their computer screen displayed the email notification, which may explain why so many subjects referenced the links within the email.

**Table 6. Possible ways to contact Amazon to request refund**

| Question | Modality | Count |
| --- | --- | --- |
| What possible way or ways could you try to contact Amazon and request a refund from Amazon? | www.amazon.com | 4 |
| | Links in email | 10 |
| | Online chat | 2 |
| | Phone | 6 |
| | Email | 6 |
| | Unsure | 1 |
| Are there other possible ways to contact Amazon to request a refund? Please identify. | www.amazon.com | 3 |
| | Links in email | 4 |
| | Online chat | 4 |
| | Phone | 6 |
| | Email | 2 |
| | Amazon Appstore | 1 |
| | Unsure | 6 |

All subjects were successfully able to contact Amazon to request a refund (that is, all of the subjects located the pertinent information to call Amazon directly, have Amazon call them, begin an online chat with customer service, or complete the online form, at which point the facilitator told the subject he or she was finished). The methods the subjects tried included visiting www.amazon.com, www.google.com, locating a phone number, online chat, and email. It took the subjects an average of 5.26 minutes to contact Amazon, with a standard deviation of 3.72 minutes. However, outliers substantially skewed this, where the range was 14 seconds to 15.9 minutes. The subjects were also asked their subjective perception of how easy or difficult it was to contact Amazon, which was based on a 5-point Likert scale. The results of this are provided in Table 7.

47

**Table 7. Likert scale on difficulty to contact Amazon**

| Question: How difficult was it to contact Amazon before the facilitator told you to stop? | | | | |
|---|---|---|---|---|
| **Very Easy** | **Easy** | **Neutral** | **Difficult** | **Very Difficult** |
| 1 | 2 | 9 | 8 | 3 |

Not surprisingly in light of the subjective nature of the question, responses to the question on how difficult to contact Amazon include some anomalous results. For example, one subject who said the task was "very difficult" completed it in 1:54. Two subjects deemed the task "difficult" despite completing it in 14 seconds and 2:26, respectively. The former of these two subjects considered the task "difficult" because she "***was using someone else[']s name and purchases.***" A subject who completed the task in 41 seconds answered "Neutral." By comparison, a subject who completed the task in 5:10 responded that it was "easy" to contact Amazon.

## 4.3   Counterbalance Validity

The order of Tasks 1 and 2, as well as the subtasks within Task 1 and Task 2 were counterbalanced across participants. There were four variations of ordering that were used in the experiment (see Section 2.4.5). By controlling the order of the tasks, the results are robust against variation due to exposure within the study (e.g., knowledge acquired and carried across tasks or adjusting to experiment setting).

There were very few responses that were incorrect; in fact, many of the questions had no incorrect responses and several only had one incorrect response. Therefore, a statistical analysis on differences between the groups would not yield significant power. However, it is apparent from analyzing the data that the distribution of incorrect

48

1    responses was not correlated with the ordering of the tasks. Therefore, these results are

2    not subjective based on exposure.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Section 5:   Discussion

The results of the usability study overwhelmingly indicate that subjects understood the various interfaces and workflow associated with Amazon Kindle Fire in-app purchases.

Parents and grandparents with children/grandchildren under the age of 14 years old participated in this study. All of the subjects were comfortable using a smart device given their responses from the initial screening questions. The cohort included people with and without experience using an Amazon Kindle Fire. The sample population used in this study was an accurate representation of the general public: the study included males and females, a comprehensive assortment of age groups, and a wide range of education levels.

The study counterbalanced experiment tasks and subtasks to account for exposure. Furthermore, the study was designed to be as unbiased as possible, in order to accurately evaluate what subjects understood and noticed regarding the various interfaces associated with in-app purchases. The majority of the questions asked for short-answer (fill-in the text box) responses from the subjects. This eliminated the potential for the study to provide suggestive answers (e.g., multiple choice). The open-ended questions were categorized as either incorrect or correct by the research team. Prior to reviewing the responses, a criterion for each question's response was determined. In cases where the subject's response was unclear, the response was marked as incorrect to ensure conservative results that did not improperly favor Amazon.

50

None of the participants had ever played or downloaded any of the apps used in the analysis. Therefore, their responses were not subject to influence through past experiences with the apps.

## 5.1   App Description Page

Task 1 tested the following opinions offered by Ms. King:

- The in-app purchasing notice and "Key Details badge" contained on app-description pages "does not effectively convey to consumers that children can incur IAPs [in-app purchases], that they can incur in-app charges without parental involvement, or that they would have to change their device settings to prevent children from incurring in-app charges" (p. 32);

- The text of the Key Details overlay "contains no direction discussion" of the "fact that IAPs have real costs associated with them that will result in charges to the customer's Amazon account" (p. 27);

- Customers must already be familiar with the term "in-app purchases" for the Key Details badge to have "any" impact (p. 30);

- The language of the Key Details badge, the Key Details overlay, and the in-app purchase notice are "unnecessarily vague" (p. 30);

- Account holders would not understand that they can activate Parental Controls to limit or prevent unauthorized in-app purchases made by others who are using a tablet linked to owner's Amazon account (pp. 30-31); and

- The term "Parental Controls" ineffectively conveyed that account holders could restrict unauthorized purchases (p. 31).

The test results are wholly inconsistent with the above-listed opinions of Ms. King. All of the subjects clearly identified what type of information was presented on the app-description page (Figure 6). After viewing the app-description page and being asked if there was potential to incur additional costs based on actions taken while using the app, there was very little confusion that would have resulted in unwanted charges (Figure 7).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

The majority of the subjects correctly identified that the app without opportunity for in-app purchases would not result in additional costs. Although some subjects were unsure or incorrect in their interpretations, this misconception could not have resulted in additional costs to the consumer.

For the app with in-app purchase opportunity, none of the subjects incorrectly interpreted the information (Figure 7). In other words, zero subjects said there was no opportunity to incur additional charges. When asked to identify possible ways to prevent being charged money for actions taken while using the app, 92% correctly answered after reading "PLEASE NOTE" content and 96% correctly answered after reading the "Key Details" content (Figure 8).

After reading the "PLEASE NOTE" content, 96% of the subjects correctly understood Parental Controls (Figure 9) and 96% understood the phrase "in-app purchasing" (Figure 10). After reading the "Key Details" content, 96% understood Parental Controls (Figure 9) and 96% understood the phrase "in-app purchasing" (Figure 10). All of the subjects were able to correctly interpret the phrase "which allows you to buy items within the app using actual money." (Figure 11). Furthermore, after viewing the popup by selecting "Key Details" and reading the section about in-app purchasing, 100% of the subjects correctly described the meaning of in-app purchasing (Figure 13)..

King indicated that it was inadvisable to "wait until the end of the checkout process" to discuss in-app purchasing (p. 21). These results indicate that there is ample previous disclosure about in-app purchasing prior to "checking out." This disclosure is provided

52

by the "Key Details" badging, the "PLEASE NOTE" indication, and the "Key Details" popup, and the study indicated that this information was well understood.

## 5.2   FTUX Popups

Task 2 tested Ms. King's opinions about the May 2013 FTUX and June 2014 FTUX. Ms. King opined that:

- The dialog box presented beginning in May 2013 for all first-time in-app purchasers was ineffective for "many users" (pp. 36-39);

- Customers who read the May 2013 dialog box "may be confused" about its meaning (p. 37);

- The term "real money" was confusing in the absence of a dollar amount or dollar sign (p. 37);

- Customers may "assume" that the May 2013 dialog box "is a routine security check rather than a financial authorization" (pp. 37-38);

- The text of the May 2013 dialog box is "not clear" and the term "future in-app purchases" is vague (p. 38).

On the contrary, the results from the May 2013 and June 2014 FTUX in-app purchase workflow show that Amazon clearly communicated the relevant information to parents/grandparents across both time periods. Although King is critical of the wording and design of the FTUX popups, the study results demonstrate that they communicate clearly and effectively.

Despite the shorter text of the May 2013 FTUX, subjects understood that the popup provided the option to require a password for future in-app purchases nearly as well as when shown the revised and expanded content within the June 2014 FTUX. For the May 2013 FTUX, 88% of the subjects understood the options that were available to them as

53

presented in the popup (Figure 17), and 96% understood what Parental Controls were and how to prevent being charged for actions taken while their child/grandchild use the app (Figure 18). After reading the May 2013 FTUX, all of the subjects understood the meaning of the phrase "which allows you to buy items inside the app using real money" (Table 4).

King indicated that there may be some customer confusion over the use of the term "real money" in the in-app purchasing confirmation prompt to indicate that actual costs would be incurred (p. 37). All study participants understood "real money" to mean that their credit card on file with Amazon would be charged.

For the June 2014 FTUX, 23 out of 24 subjects (96%) understood the purpose of the page (Figure 16) and the meaning of Parental Controls (Figure 18). After reading the June 2014 FTUX, all of the subjects were able to identify how to prevent being charged money for actions taken while their child/grandchild used the app (Figure 19). Although 3 out of 24 subjects incorrectly interpreted what would happen if they close the screen without entering their password (Figure 20), this misconception would not have resulted in additional or unwanted charges.

When asked about the term in-app purchasing, 96% correctly defined it after reading the May 2013 FTUX and 96% also correctly defined it after reading June 2014 FTUX (Table 4). When asked specifically about their options within the popup, 21 out of 24 correctly stated what would happen if they selected continue (May 2013 FTUX), 22 out of 24 correctly stated what would happen if they selected "Do not require a password for future purchases" and "Continue" (June 2014 FTUX), and 23 out of 24 correctly stated

54

what would happen if they selected "Require a password for future purchases" and "Continue" (June 2014 FTUX) (Table 4). Moreover, 22 out of 24 correctly understood the phrase "If you'd like to require a password for future in-app purchases, please turn on Parental Controls" after reading the May 2013 FTUX (Table 4). All 24 correctly understood the meaning of the phrase "Do not require a password for future purchases" on the June 2014 FTUX, and 23 out of 24 correctly understood the meaning of the phrase "Require a password for future purchases (turns on Parental Controls)" on the June 2014 FTUX (Table 4).

King indicated that customers presented with the May 2013 FTUX may not understand that, by entering a password to authorize an in-app purchase, they were permitting in-app purchases to occur without password entry (pp. 36-37). I believe that the dialog box is quite clear in the regard. The May 2013 prompt stated: "*If you'd like to require a password for future purchases, please turn on Parental Controls*." Study participants had no trouble correctly understanding this language.

With regard to the in-app purchasing verification window, King also indicates that "the only direct action one can take in this window other than to cancel is to enter one's password" (p. 37). It is not clear to me what other action should be available, as for the vast majority of users this should be a binary decision point: enter a password to make the purchase or click Cancel to decline the purchase. Introducing other options would clutter the dialog box, potentially require scrolling, and generally make the dialog box more difficult to understand or use.

55

## 5.3  Purchase Notifications and Refunds

The results from the study also indicate that Amazon clearly communicated information regarding the notification that an in-app purchase was made. After viewing the in-app purchase notification email, all of the subjects were able to correctly interpret the information provided. All of the subjects were able to clearly state what information was provided in the email, the name of the product that had been ordered, when it had been ordered, and how much the credit card had been charged.

When asked how they would seek a refund from Amazon for the purchase, 22 out of 23 subjects (a computer malfunction caused one subject's data to not be collected) were able to identify pertinent modalities of communication (Table 5). Even though the survey questions relating to contacting Amazon were only collected for 23 of the subjects, all 24 subjects attempted to contact Amazon for a refund. All 24 subjects successfully reached the point where they were about to commence a connection with Amazon customer service (e.g., dial the phone number, open an online chat). The average time it took subjects to reach this point was 5.26 minutes, with a range from 14 seconds to 15.9 minutes. Nearly 40% of the subjects completed the task in under 3 minutes, while nearly 75% completed the task in 6:12 or under.

As noted above, some of the responses describing how difficult it was to contact Amazon reveal inconsistencies across subjects when compared against the time it took to complete the task. For example, it is difficult to reconcile the response that it was "difficult" to contact Amazon for the subject who completed the task in 14 seconds. The responses also demonstrate the importance of an individual's expectations, as some

56

subjects considered the task "difficult" or "very difficult" when completing it in under 3 minutes, while another subject who finished in just over 5 minutes thought it was "easy" to contact Amazon.

With regard to subjects' expectations, it should be noted that Amazon's reputation for excellent customer service is well known. Subjects were not asked to contact the customer service department for any other company, nor were they asked their perception of how difficult it was to contact Amazon in comparison to their experience with any other company. It is my opinion that the responses could have been influenced by subjects' high expectations for Amazon and their consideration of the task in isolation, without comparison to other companies.

Regarding the time required to contact Amazon, although the experimenters tried to create an environment that was as close as possible to the environment that the users would experience at home, it is important to note that this task may have been more difficult and more complex than it would have been if experienced in the user's home environment. For example, subjects were in a room with up to four other people completing the same task. It is difficult to determine if this setting accidentally tunneled subjects towards one modality, when they may have tried something else if they had been at home. Also, there are many ways to reach Amazon's Contact Us page, but many require multiple clicks.[3] Although the facilitator told subjects it was not a race, the presence of others in the room may also have led some subjects to start down a path to

---

[3] Amazon's Supplemental Responses and Objections to Plaintiff's Third Set of Interrogatories (September 28, 2015), at 2-12. For example, the Contact Us page can be reached by clicking on "Your Apps and Devices" in a confirmatory email, then selecting "Customer Service" on the left of the screen; similarly, clicking on "Your Account" or the Order ID in a confirmatory email, then clicking "Help," will provide numerous routes to reach the Contact Us page with one or two additional clicks.

57

contact Amazon and quickly abandon it if not immediately successful. One subject wrote that it was confusing for them to be using someone else's Amazon account.

On December 6, 2015, I was provided a copy of a survey for this case conducted by Dr. Barry A. Sabol.[4] I reviewed Dr. Sabol's report, which summarized the findings of a survey of 1,237 Amazon customers (with children under the age of 17 living in their households) who had purchased a digital product from Amazon, including 301 in-app purchasers.[5] The 272 respondents who had previously contacted Amazon customer service about a digital product were asked the following question: "Compared to your experience with other companies, was it easier, about the same or more difficult to contact Amazon's customer service?"[6] Dr. Sabol summarized the results as follows: "Overall, 94% responded that it was easier (73%) or about the same (21%) to contact Amazon's customer service compared to other companies. Among In-App Purchasers, 97% responded that it was easier (74%) or about the same (23%) relative to other companies."[7]

Given that Dr. Sabol's survey asked respondents about their actual experience contacting Amazon's customer service and as compared to contacting other companies, it is my opinion that the results of Dr. Sabol's survey are more reliable than the results in this test regarding the task of contacting Amazon and the subjects' subjective perception of that task.

---

[4] Expert Report of Barry A. Sabol, Ph.D. (December 7, 2015).
[5] Expert Report of Barry A. Sabol, Ph.D. (December 7, 2015) at 16.
[6] Expert Report of Barry A. Sabol, Ph.D. (December 7, 2015) at 16-17.
[7] Expert Report of Barry A. Sabol, Ph.D. (December 7, 2015) at 16.

58

# Section 6:   Conclusion

My opinion is that the Amazon notifications and purchase flows tested informed parents adequately about in-app purchases. The results of this usability test strongly support this opinion. The results are conclusive that the Kindle Fire user interfaces and email notifications should not have resulted in significant percentages of unwanted and non-refunded in-app purchases. The results of the usability test substantially undermine Ms. King's opinions that the Kindle Fire notices, user interfaces, and confirmatory email were "ineffective."[8]

When considering these results, it is important to balance the user protection that Amazon provides regarding in-app purchases with the needs of those who do desire to make in-app purchases. There are many pieces of information that Amazon needs to disclose to consumers at various phases in the purchase flow and the intricacies of how in-app purchasing works are not the most important information to convey. It would be inappropriate for in-app purchasing information to always be front and center on every screen, particularly given that the results of this study show in-app purchasing information to be clearly understood as currently presented.

Further, Amazon's ongoing intention to improve the in-app purchasing experience is evident. For example, the FTUX popup was changed in June 2014. It is important to note that the study results show that the both the May 2013 and June 2014 FTUX popups were

---

[8] In my experience, a valid usability test is typically a superior way to evaluate a user interface than a usability inspection, particularly one performed by a single evaluator, as was done in Ms. King's report.

59

very well understood by the subjects of the experiment. It can be concluded from this result that subjects well understood both the May 2013 and June 2014 FTUX.

Dated: Dec 7, 2015

_____

CRAIG ROSENBERG, PH.D.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    very well understood by the subjects of the experiment. It can be concluded from this

2    result that subjects well understood both the May 2013 and June 2014 FTUX.

3

4

5      Dated: Dec 7, 2015

6

7

8

9

10                           CRAIG ROSENBERG, PH.D.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

60

# Appendix A: craigslist Ad

## $150 for Mobile Tablet Study

Are you interested in participating in a research study involving mobile table devices? Global Technica invites parents and grandparents to participate in a study evaluating mobile tablet devices and interfaces.

The study will take place at the University of Washington. Your participation will involve interacting with a tablet and answering a questionnaire. It will take approximately 2 hours to complete.

Who can be part of this study?

- Adults over the age of 20 years old
- Must have at least one child or grandchild currently aged 13 or younger
- Fluent English speakers
- Comfortable using a tablet or smartphone

Compensation $150

If interested, please register online at http://goo.gl/forms/4oWws95Zzp

or

Email: erika@globaltechnica.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Appendix B: Screening Questions

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Register for the Study

Thank you for your interest in the Kindle usability study. Use this survey to share your contact information, so that one of our researchers can contact you.

**First name**

**Last name**

**Gender**
- ◯ Male
- ◯ Female

**Primary phone number**

**E-mail**

**Do you have any children or grandchildren under 14 years old?**
- ◯ Yes
- ◯ No

**Age**

**Do you own an Amazon Kindle?**
- ◯ Yes
- ◯ No

**Please indicate the best days for us to contact you:**
- ☐ Monday
- ☐ Tuesday
- ☐ Wednesday
- ☐ Thursday
- ☐ Friday
- ☐ Saturday
- ☐ Sunday

**Please indicate the most convenient time for us to call:**
- ☐ Morning: 9AM - 12PM
- ☐ Afternoon: 12PM - 6PM
- ☐ Evening: 6PM - 9PM

[ Submit ]

*Never submit passwords through Google Forms.*

Powered by
Google Forms

This form was created inside of UW.
Report Abuse - Terms of Service - Additional Terms

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Appendix C: Consent Form

**CONSENT FORM**

**Mobile Tablet Usability Study**

*Researchers:*

Craig Rosenberg (PI), Global Technica

Doug Wieringa, Global Technica

Erika Miller, Global Technica

**PURPOSE OF THE STUDY**

The purpose of this study is to evaluate mobile tablet interfaces.

**STUDY PROCEDURES**

Your involvement will consist of one visit lasting approximately 2 hours, which will take place in a conference room with up to eight other people.

You will be asked to interact with a computer and mobile tablet during the study. On the computer, you will be asked a series of questions about the tablet as well as computer-generated images. Your input will be collected using a survey, but we will not ask for your name on the survey. There are no right or wrong answers in the study.

Before dismissing you, the researcher will compensate you for your time.

**BENEFITS AND RISKS**

There are no anticipated physical or emotional risks to participants. No risk greater than those experienced in ordinary conversation is anticipated. You will receive $150 after you complete all study procedures.

64

## CONFIDENTIALITY OF RESEARCH INFORMATION

Unless ordered otherwise by a court, your confidentiality will be protected throughout the experiment and evaluation, as well as in any subsequent reports. All findings used in any written reports or publications that result from this study will be reported in aggregate form with no identifying information.

For good and valuable consideration, including monetary payment received in exchange for your participation in this research exercise, you agree not to in any way discuss, disclose, or communicate that you participated in the study, the fact that the research is taking place, the conduct of the research, the content of the materials provided during the study, and the opinions and conclusions reached by the participants involved in the research including your own, whether in discussions with family, friends, or third parties (including any representatives of the media). You further agree that you will not publish your knowledge of the research, including via posting any information learned in the research in books, articles, or online resources such as websites, blogs, emails, any social-media platforms or on social media in any form, including but not limited to Facebook, Twitter, Instagram, Vine, Snapchat, or YouTube.

## OTHER INFORMATION

Your participation in this evaluation is completely voluntary. You may refuse to participate and you are free to withdraw from this study at any time.

If you agree to participate in this study, you will be compensated for your time and effort. You will be given $150 after you complete all study procedures.

## AUTHORIZATION

By signing this consent form, you are indicating that you fully understand the above information and agree to participate in this focus group.

Printed Name of the Participant _____

Signature of the Participant _____

Date _____

65

# Appendix D: Facilitator Script

*Note: Because of randomization of the experimental conditions, this script shows only one order in which the tasks were performed.*

## Experiment Checklist

Date:

_____

Number of Subjects:

_____

Usernames:

_____

Experimenter:

_____

## Introduction

Hi my name is Erika and I am from Global Technica. You are here today because we are doing a usability study on mobile tablet interfaces. Your involvement today should take about 1 to 2 hours.

How many of you are familiar with using a Kindle Fire? All right, well we are going to do a series of tasks on a Kindle Fire. But I will guide you through the steps so it shouldn't be too challenging if you're unfamiliar with the interface.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

We are going to be going through all the tasks as a group, so please don't jump ahead. During the study, you are going to answer questions on the computer as you look at various screens on the Fire tablet. I will tell you what screen you should be looking at, but if you have any questions during the process please ask.

I am now handing out a copy of the consent form. It's fairly short, so I am going to give you all a few minutes to read through it and answer any questions you may have.

Are there are questions I can answer? If you are still interested in being in the study, then please go ahead and sign the consent form.

*(Collect consent form)*

## Getting Started

Before we get started, here are a few things to keep in mind. During this study you will be going through a series of questions prompted through the computer. I am going to use this overhead projector to guide you through many of the steps. When you finish a task, the computer will prompt you to stop. Anytime you see a stop sign or a navigation screen; do not continue past these breaks in the tasks. Again, please do not continue forward until I tell you to.

Also remember that this is not a race. Please read through the questions carefully and consider your responses. Please do not look at the computer screen for the person sitting next to you. Others may or may not have the same number or order of questions as you, so please do not base your progress off others. Lastly, there are no right or wrong answers to these questions, just answer as you see appropriate.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

*Login to Quest Track Website for Each Subject*

http://qtsandbox.knowledgeanywhere.com/Enterprise

# Task 0

All right, we are ready to get going. First off we are going to take a preliminary survey. I am going to log into the computer for each of you.

*(set up computer, survey screen)*

Please launch "Kindle Study: Task 0 (Survey)" on the computer. A popup window should appear. Please make sure you expand the window so it takes up your entire screen. Did everyone find how to make the window take up the entire screen?

You can now fill out the questions. When you are finished please just wait until the whole group is ready.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Task 1

Overview:

1.1.    No IAP - Jeweled Bricks

1.2.    IAP – Jump Racer

                1.2.7 PLEASE NOTE (read more)

                1.2.8 Key Details + Popup (scroll down)


Order A:

1.1; 1.2; 1.2.7; 1.2.8

***Note that because of randomization of the experimental conditions, this order above only shows only one order in which the tasks were performed.***

Instructions:

1. Now that everyone has had a chance to finish the survey. Please close the popup window. And your screen should look similar to mine.

2. *(navigate to Kindle Study: Task 1) use PPT*

3. Remember to expand the popup window so it takes up your entire screen. And your computer should now look like mine.

4. (stop sign) > proceed

5. Select Task 1.1

6. (stop sign)

7. Now if you could focus your attention on the Kindle Fire in front of you. Please pick it up and we are going to navigate through it together.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

8.  For this task, we are going to navigate to the App store and look at the description pages for some apps. Imagine you are going to the App store to look for an app for your child or grandchild.

9.  Steps to get to "Jeweled Bricks"

10. Do not play or download the game.

11. Now does everyone's Kindle Fire show this screen? If it does not, please raise your hand.

12. For this task, you have now navigated to the app store and selected the app "Jeweled Bricks." When you click next on the computer you will be asked a series of questions regarding the app description page you see on your Kindle Fire. You will notice on the computer a small version of the Kindle Fire screen has been provided. Please do not answer the questions by trying to read the screenshot on the computer, but please focus on the Kindle Fire. The screenshot is merely provided for you so that you can verify you are looking at the correct content.

13. Remember, this is not a race. Please answer thoughtfully. The people next to you may or may not have the same questions as you, so don't worry about their progress.

14. Now go ahead you can begin and answer the questions through this task and stop when you get back to the navigation page, which I will display on the screen in a few minutes.

15. Alright we are now going to select Task 1.2

16. (stop sign)

17. Navigate to "Jump Racer"

18. Similar to before, you have now navigated to the app description page in the app store for the app "Jump Racer". Please answer the following questions regarding the content you see on your Kindle Fire. Again, do not try to read the small screenshots provided on the computer.

19. Stop when you get to the next stopping point.

20. (stop sign)

21. We are now going to select Task 1.2.7

22. (stop sign)

23. If you haven't already done so on your Kindle Fire, please tap the Read More link on the left of the page. I'm directing your attention to the bottom of the text starting with the capital letters PLEASE NOTE

24. Raise your hand if you do not see this.

25. Click next on your computer and answer the following question or questions.

26. We are now going to do Task 1.2.8

27. (stop sign)

28. For this task, please focus your attention on the Kindle Fire again.

29. Please direct your attention to the "Key Details" section on the screen, which should be on the right side.

30. Is there anyone that does not see "Key details" on their screen?

31. Okay, please proceed through the following questions relating to this Key Details section.

32. (stop sign)

33. Please press on "Key Details" on the right side of the screen.

71

34. This popup window should appear. Does everyone see it?

35. Please use your finger to scroll down. And you will see the section In-App
    Purchasing.

36. Please proceed through the questions on the computer, referencing this screen you
    see on your Kindle Fire.

## Task 2

Overview:

     2.1 May 2013 Screenshot

     2.2 June 2014 Screenshot

Order A:

     2.1; 2.2

Instructions:

1. Go through PowerPoint to navigate to survey

2. (stop sign after selecting Task 2.1)

3. Please hand your Kindle Fire to me and I am going to load an image.

4. Please do not turn over your Fire tablet yet.

5. For this task, you have a Fire tablet, which has been placed face down in front of you
   and an account password, which is simply the word "password." Imagine that you
   have given your Fire tablet to your child or grandchild, who has been playing a game

app on the tablet. Your child hands you the tablet. When I instruct you to do so, click 'Next' on the computer screen, turn your Fire tablet over and read the information displayed on the screen. When you are done reading the information on the screen, enter your password on the computer and click Submit. This is neither a race nor a memory test. Please read the information on the screen at the pace you would if your child or grandchild had just handed you the device.

6. *(charades, slow)* Just to repeat, When I instruct you to do so, click 'NEXT on the computer screen, turn your Fire tablet over and read the information displayed on the screen. When you are done reading the information on the screen, enter the word 'password' on the computer and click 'Submit.' Whenever you are ready, you may click 'Next' and proceed."

7. *(stop sign)*

8. You may now resume looking at the tablet displaying the same page you just saw. Click 'Next' on your computer and answer the following questions about that page. Remember it is not a race. Your screens may or may not be the same as the person next to you, so don't base your progress off others.

9. PowerPoint to show select 2.2

10. Please hand Kindle Fire back to me.

11. Do not turn over the tablet yet.

12. Repeat Step 4 and 5.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Task 3

Overview:

    3.1        Email Notification (split screen)

    3.2        Refund Plan (split screen)

    3.3        Contact Amazon (minimize survey)

Instructions:

1. For this task, I am going to set up your computer for you. (dual screen email and survey)

2. You are now looking at two windows. One is the survey. The other is an email. Note that the email can be scrolled down to view more content.

3. For this task, imagine that your child or grandchild has been playing with your Fire tablet. At some point, you check your email and see that you have received the email that is displayed on the left of your computer screen. Whenever you are ready, click Next on the right side of your computer and answer the following questions about the email. Remember, this is neither a memory test nor a race.

4. Imagine that the product identified in the email was never purchased or was accidentally purchased by you, your child, or your grandchild and that you would like to seek a refund from Amazon for the charge. Click Next on the right side of your computer and answer the questions about contacting Amazon.

5. For this task, we are going to actually try to contact Amazon just as you would in real life. When I instruct you to do so, please try to contact Amazon to seek a refund for

74

the product identified in the email that you believe was never purchased or was accidentally purchased by you, your child, or your grandchild. The tools you have available to contact Amazon include the computer in front of you, which has access to the Internet.

If you would like to use the Internet, you may click on the Internet Explorer icon or the Google Chrome Icon located at the bottom of the computer. You also have your Fire tablet, which has access to the Internet using the Silk Browser. You also have a telephone by which you may call Amazon. And you have the confirmation email identifying the product for which you seek a refund. If you need them, your account email address and password will be provided on the following slide.

6. Remember, this is neither a memory test nor a race. Imagine that you have actually received this email and want to seek a refund from Amazon for the product identified in the email. How will you do so? Whenever you are ready, please begin.

7. *(Stop people when they are finished)*

## Debrief

We are now finished with the study. Just for your interest, the purpose of this study was to evaluate the Amazon interfaces specifically regarding in-app purchases.

I am now going to give each of you $150 and then you will be free to go. Thank you again very much for your time and effort.

# Appendix E: Facilitator's Visual Aid





**TASK 0**



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# TASK 1









CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER









CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER













CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER











CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER









CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER













82

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER













83

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER













CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER













CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER







CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Appendix F: Task Flow

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Task 0: Survey



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Task 1 Overview**

Task 1.2.7

Task 1.2.8

Task 1.1

Task 1.2

Branch point

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



**Task 1.1**

1.1 intro

1.1.q1: What information is provided by this app-description page?

1.1.q3: Do you think it is possible to incur additional costs based on actions taken while using the app?

yes

No/unsure

1.1.3.q1: Why do you think it is possible to be charged money for on actions taken while using the app?

1.1.3.q2: Why don't you think it is possible to be charged money for actions taken while using the app, or why were you unsure?

1.1.q4: Have you ever downloaded or used this app?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Task 1.2**



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



## Task 1.2.7

**1.2.7.q1:** As it is displayed on this page, what do you understand this text to mean?

**1.2.7.q2:** As it is displayed on this page, what do you understand the phrase "in-app purchasing" to mean?

**1.2.7.q3:** As it is displayed on this page, what do you understand the phrase "which allows you to buy items within the app using actual money" to mean?

**1.2.7.q4:** As it is displayed on this page, what is your understanding of "Parental Controls"?

**1.2.7.q5:** What if anything, do you think you can do if you want to prevent being charged money for actions taken while using the app?

## Task 1.2.8

**1.2.8.q1:** As it is displayed on this page, what do you understand the phrase "Key Details" to mean?

**1.2.8.q2:** As it is displayed on this page under "Key Details" text, what do you understand the phrase "In-App Purchasing" to mean?

**1.2.8.q3:** As it is displayed on this page, what do you understand the text under "In-App Purchasing" to mean?

**1.2.8.q4:** As it is displayed on this page, what do you understand the phrase "In-App Purchasing" to mean?

**1.2.8.q5:** As it is displayed on this page, what do you understand the phrase "allows you to purchase items within the app using actual money" to mean?

**1.2.8.q6:** As it is displayed on this page, what is your understanding of "parental controls"?

**1.2.8.q7:** What if anything, do you think you can do if you want to prevent being charged money for actions taken while using the app?

92



Task 2 Overview

Task 2.1

Task 2.2

Branch point

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Task 2.1



2.1 password: Enter your password below when finished reading the tablet page

2.1 q2: What is the purpose of this page?

2.1 q3: What are your options as described by this page?

2.1 q4: As it is displayed on this page, what do you understand the phrase "This app contains in-app purchasing" to mean?

2.1 q5: As it is displayed on this page, what do you understand the phrase "which allows you to buy items inside the app using real money" to mean?

2.1 q6: As it is displayed on this page, what do you understand the phrase "If you'd like to require a password for future in-app purchases, please turn on Parental Controls" to mean?

2.1 q7: As it is displayed on this page, what is your understanding of "Parental Controls"?

2.1 q8: What do you think will happen if you enter your password and select "Continue"?

2.1 q9: What do you think will happen if you close the screen without entering your password?

2.1 q10: What if anything, do you think you can do to prevent being charged money for actions taken while your child/grandchild uses the app?

## Task 2.2



2.2 password: Enter your password below when finished reading the tablet page

2.2 q2: What is the purpose of this page?

2.2 q3: What are your options as described by this page?

2.2 q4: As it is displayed on this page, what do you understand the phrase to "In-App Purchase" to mean?

2.2 q5: As it is displayed on this page, what do you understand the phrase 'Do not require a password for future purchases' to mean?

2.2 q6: As it is displayed on this page, what do you understand the phrase 'Require a password for future purchases (turns on parental Controls)' to mean?

2.2 q7: As it is displayed on this page, what is your understanding of "Parental Controls"?

2.2 q8: What do you think will happen if select 'Do not require a password for future purchases,' enter your password, and select "Continue"?

2.2 q9: What do you think will happen if you select 'Require a password for future purchases (turns on Parental Controls,' enter your password, and select "Continue"?

2.2 q10: What do you think will happen if you close the page without entering your password?

2.1 q11: What, if anything, do you think you can do to prevent being charged money for actions taken while your child/grandchild uses the app?



**Task 3**

- 3.1.q1: What information is provided by this email?
- 3.1.q2: As described in this email, what is the name of the product that has been ordered?
- 3.1.q3: As described in this email, when was this product ordered?

- 3.1.q4: If you received this email, do you think your credit card on file with Amazon has been charged for buying this product?

yes

- 3.1.4.q1: How much money do you think your credit card on file with Amazon has been charged for this order?

No/unsure

- 3.1.4.q2: Why don't you think your credit card on file with Amazon has been charged for buying this product, or why were you unsure?

- 3.2.q1: What possible way or ways could you try to contact Amazon and requires a refund from Amazon?

- 3.2.q2: Are there other possible ways to contact Amazon to request a refund? Please identify.

- 3.3.contact: (Contact Amazon and) enter the word "finished" when instructed by the Facilitator.

- 3.3.q1: What method or methods did you use to try to contact Amazon?

- 3.3.q2: How difficult was it to contact Amazon before the facilitator told you to stop?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Appendix G: Survey Screenshots

*This appendix presents Captivate storyboards showing the survey questions.*

*Note that the box marked Review Area is not visible to survey participants. Note also that because of branching and randomization subjects did not necessarily view slides in the order shown here.*

## Task 0

**Slide1**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 **Slide2**

2
3
4
5
6
7
8
9
10
11



12 **Slide3**

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  **Slide4**

2
3


4
5
6
7
8
9
10
11

12  **Slide5**

13
14
15
16
17
18
19
20
21
22


23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 **Slide6**

2


3

4

5

6

7

8

9

10

11

12 **Slide7**

13


14

15

16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  **Slide8**



**Slide9**



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  **Slide10**

2



11

12  **Slide11**

13



22

23

24

25

26

27

1  **Slide12**

2
3


4
5
6
7
8
9
10

11

12  **Slide13**

13
14


15
16
17
18
19
20
21
22
23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 **Slide14**

2
3     **Task 0 Complete**
4
5
6     You have completed the survey.
7
8     Please wait for instructions from the
      Faciliator.
9
10
11

12 # Task 1
13

14 **Slide1**
15
16     **Task 1**
17
18
19
20
21     Please wait for instructions from the
      Facilitator.
22
23                              Next >
24

25
26
27



1  Slide2

2  

14  Slide3



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide4

2


3

4

5

6

7

8

9

10

11

12    Slide5

13


14

15

16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide6

2    

3    [1.1.3.q1]
     Why do you think it is possible to be charged
     money for on actions taken while <u>using</u> the
     app?

12   Slide7

13   

14   [1.1.3.q2]
     Why don't you think it is possible to be charged
     money for actions taken while <u>using</u> the app, or
     why were you unsure?

1  Slide8



12  Slide9



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide10

2



11

12    Slide11

13



23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1   Slide12

2   

3

4

5

6

7

8

9

10

11

12   Slide13

13   

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide14

2
3 
4
5
6
7
8
9
10
11

12 Slide15

13
14 
15
16
17
18
19
20
21
22
23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide16



14  Slide17



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 Slide18

2
3
4
5
6
7
8
9
10
11



12 Slide19

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



1 Slide20

2


12 Slide21

13


CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide22

2  

14  Slide23

Task 1.2.7 Complete

You have completed Task 1.2.7.

Click Return and wait for instructions from the Faciliator.

< Return

1  Slide24



12  Slide25

23
24
25
26
27

1    Slide26

2

3

4

5

6

7

8

9

10

11



12

13

14    Slide27

15

16

17

18

19

20

21

22

23

24



25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide28

2


3  As it is displayed on this page, what do you understand the text under "In-App Purchasing" to mean?

12  Slide29



As it is displayed on this page, what do you understand the phrase "In-App Purchasing" to mean?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1   Slide30

2
3   
4
5
6
7
8
9
10
11

12  Slide31
13
14  
15
16
17
18
19
20
21
22
23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide32



14  Slide33

# Task 1.2.8 Complete

You have completed Task 1.2.8.

Click Return and wait for instructions from the Faciliator.

< Return

Slide34



## Task 2

Slide1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 Slide2



14 Slide3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide4



13

14   Slide5



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide6



12  Slide7



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide8

2    
3
4
5
6
7
8
9
10
11

12    Slide9

13    
14
15
16
17
18
19
20
21
22
23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide10

2    

3

4

5

6

7

8

9

10

11

12   Slide11

13   

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 Slide12



12 Slide13



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1     Slide14

2

3



4

5

6

7

8

9

10

11

12

13

14     Slide15

15



16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide16



Slide17



1 Slide18



12 Slide19



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide20



12  Slide21



Properties:

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide22

2


3

4

5

6

7

8

9

10

11

12  Slide23

13


14

15

16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 Slide24

2
3 
4
5
6
7
8
9
10
11

12 Slide25

13
14 
15
16
17
18
19
20
21
22
23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 Slide26



12 Slide27



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide28

2


3

4

5

6

7

8

9

10

11

12

13

14  Slide29

15


16

17

18

19

20

21

22

23

24

25

26

27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Task 3

Slide1



Slide2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Slide3



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide4



12   Slide5

138

1    Slide6

2    

3

4

5

6

7

8

9

10

11

12   Slide7

13

14   

15

16

17

18

19

20

21

22

23

24

25

26

27

1  Slide8



12  Slide9



1 Slide10



12 Slide11



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Slide12



12   Slide13



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Slide14

2



12  Slide15

1  Slide16

2
3
4  
5
6
7
8
9
10
11

12  Slide17

13
14  
15
16
17
18
19
20
21
22
23
24
25
26
27

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Appendix H: Curriculum Vitae

## Craig S. Rosenberg, Ph.D.

An accomplished human factors engineer, user interface designer, and systems and software engineer specializing in analysis and design of mobile computing devices, complex systems, user centered design, information architecture, user experience, systems and software engineering, object oriented analysis, and modeling and simulation. Extensive experience in the entire software design and development life cycle applied to a wide range of domains from embedded mobile devices though enterprise class mission critical applications.

## SUMMARY OF QUALIFICATIONS

- Human Factors, User Interface Design, Information Architecture, Cognitive Engineering, Experimental Design
- Systems Engineering, Software Architecture, Modeling and Simulation, Virtual Environments, Animation, Art
- C++, C, C#, JAVA, UML, .NET, VISUAL BASIC, HTML, XML, LISP, FORTRAN, SAS
- Visual Studio, Eclipse, Rhapsody, RSA/RSM, ClearCase, ClearQuest, Dreamweaver, Photoshop, Illustrator
- 3D Studio, Alias, AutoCAD, Rogue Wave, GD Pro, Motif, Builder Accessory, JSPWiki, Spark, MS Office
- Windows, Linux, OSX, PC, Macintosh, Sun, HP, IBM, StereoGraphics

145

- Scholarship from the Interservice/Industry Training Simulation & Education Conference

- Moderator of the Seattle Android Users Group and founder of the Northwest Alias Users Group

## EDUCATION

- Ph.D. Human Factors, University of Washington, 1994

- M.S. Human Factors, University of Washington, 1990

- B.S. Industrial Engineering, University of Washington, 1988

- Graduate GPA: **3.83**

## PROFESSIONAL EXPERIENCE

**Global Technica, Seattle, WA**                    **Nov 1996 - Present**

Senior human factors engineer, user interface designer, and software architect for a wide range of advanced commercial and military programs.

- Senior modeling and simulation engineer developing advanced discrete event and agent based software tools, models, and simulations in the areas of missile defense, homeland security, battle command management, networking and communications, mobile computing, air traffic control, software simulation, and UAV command and control.

- Lead system architect developing advanced air traffic control analysis applications, toolsets, and trade study simulations for Boeing Air Traffic Management. Technical lead responsible for tasking of twelve engineers.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Architect of the Boeing Human Agent Model; an advanced model for the simulation of human sensory, cognitive, and motor performance as applied to the roles of air traffic controllers, pilots, and UAV operators.

- Lead human factors engineer and user interface designer for Boeing's main internal vector and raster computer aided drafting and editing system that produces all maintenance manuals, shop floor illustrations, and service bulletins for all Boeing commercial aircraft.

- Systems Engineer for the Future Combat Systems Network Systems and Software Engineering group.

- Senior Software Developer for Level 11 and Disney, working on software for tracking of visitors to Disney World

Additional responsibilities include system engineering, requirements analysis, functional specification, use case development, user stories, application prototyping, modeling and simulation, object oriented software architecture, graphical user interface analysis and design, as well as UML, C++, C#, and Java software development.

## WhereWuz, Seattle, WA                           March 2010 - Present

Founder, inventor, user interface designer, and software architect for a company producing advanced mobile software running on GPS enabled smartphones. WhereWuz allows users to record exactly where they have been and query this data in unique ways for subsequent retrieval based on time or location. Currently available for iPhones and Android handheld devices.

147

**Entrepreneur in Residence,**                    **April 2008 – Dec 2009**
**Spyglass Ventures, Los Angeles, CA**

Lead technologist and entrepreneur in residence for a Los Angeles based media oriented

venture capital firm focusing on early stage private equity investing. Responsibilities

include evaluating investment opportunities, generating new business ideas, and

providing functional expertise to assist existing investments in the mobile and

entertainment sectors.

**User Interface Designer,**                    **Feb 2006 – June 2007**
**ObjectSpeed, Seattle WA**

Lead user interface and interaction designer for a technology company specializing in

consumer hand held VoIP products. Responsible for all user interface design, user

interaction, information architecture design, industrial design and human factors

activities. Additional responsibilities include functional specification, human factors

analysis, requirements analysis, application prototyping, graphical design, and user

interface programming for a hand held VoIP mobile consumer device.

**User Interface Designer,**                    **June 2001 - Dec 2001**
**Ahaza Systems, Seattle, WA**

Lead user interface and interaction designer responsible for all user interface design and

development activities associated with a complete line of advanced IPv6 network

hardware devices. Duties include user interface design, human factors analysis, and

interactive application prototyping.

148

**User Interface Designer,**                  **Oct 99 - April 2001**
**Eyematic Interfaces, Seattle, WA**

Lead human factors and interaction designer responsible for all user interface design and

development activities associated with real-time mobile hand held 3D facial tracking,

animation, avatar creation and editing software. Duties include requirements analysis,

functional specification, user interface design, and human factors analysis.


**User Interface Designer,**                  **June 95 - March 96**
**AT&T Wireless/ Teague Corporation, Redmond, WA**

Lead human factors and interaction designer for a large industrial design firm.

Responsible for all functionality, human factors analysis, user interface design, graphical

design, systems analysis, and documentation for the first two-way wireless pager

produced by AT&T Wireless.


**Associate Assistant Professor**                **Dec 94 - Dec 95**
**University of Washington, Seattle, WA**

Human Factors Professor at the University of Washington Industrial Engineering

Department. Duties include teaching, writing research proposals, designing and

conducting funded human factors experiments for the National Science Foundation, as

well as hiring and supervising students.


**Software Design Engineer**                 **Aug 94 - Sept 95**
**Socha Computing, Bellevue, WA**

Responsible for designing and developing interactive multimedia games as well as

educational software for children and adults. Duties include functional specification,

149

software design and architecture, user interface design, application prototyping, software

development, focus group testing, and internet research.

**Network Engineer,** March 92 - Nov 96
**PSF Industries, Seattle, WA**

Independent consultant to a mechanical engineering firm specializing in the design,

fabrication, and installation of large scale, high pressure vessels. Responsible for

designing, procuring, and installing a state of the art networked computer aided

engineering system to greatly improve design quality and engineer productivity.

**Human Factors Researcher** Jan 89 - June 94
**University of Washington, Seattle, WA**

Responsible for designing and performing advanced human factors experiments relating

to virtual worlds and advanced visualization research. Funded by the National Science

Foundation to conduct research on advanced software and hardware interfaces for virtual

environments. Duties include user interface design, systems design, software

development, graphics programming, experimental design, as well as hardware and

software interfacing.

**Alias Animator,** April 91 - Jan 92
**Technology Design, Bellevue, WA**

Independent contractor to an industrial design firm specializing in high technology

hardware design for computers and consumer electronics products. Created models,

animations, and renderings that were used for product engineering and marketing.

Services also included training, hardware and software installation, and system

optimization.

150

**Operations Manager,**                                    June 88 - Sept 88
**Micro Products, Bellevue, WA**

Managed large scale computer graphics conversion contracts. Installed and optimized a

custom optical scanning and capture system for a computer graphics scanning company.

Responsibilities also included employee management, production scheduling,

subcontracting and outsourcing, and software development.


**Industrial Engineering Consultant,**                     Jan 88 - June 88
**Avtech Corporation, Seattle, WA**

Professional industrial engineer for a large aerospace digital electronics company. Solely

responsible for completely redesigning the entire manufacturing facility to optimize the

assembly of multiple lines of digital avionics communication equipment. Additional

responsibilities included integrating software for a CNC milling center to completely

automate the production of lighted instrument displays panels.


## ADDITIONAL INFORMATION

I have published twenty-two research papers in professional journals and proceedings

relating to user interface design, computer graphics, and the design of spatial,

stereographic, and auditory displays. I was the sole recipient of a $10,000 scholarship

award from the I/ITSEC for advancing the field of interactive computer graphics for

flight simulation. I received an award from the Link Foundation for my work furthering

the field of virtual interface design. I created five book covers for books by Harcourt

Brace Publishing that feature the authors Arthur C. Clarke, Isaac Asimov, and Stephen

King. Several minutes of my computer graphics animations appear in the movie Beyond

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the Mind's Eye produced by MIRAMAR. I have won two engineering design awards from the City of Los Angeles for the design of an energy saving product. In my free time I enjoy creating computer graphic images and animations as well as composing and recording music. My company's website can be found at: www.globaltechnica.com

**SELECTED PUBLICATIONS**

Rosenberg C., Advanced Systems Engineering and Human Factors Engineering, International Forum on Composite Material Applications for Large Commercial Aircraft, Shanghai, China, 2011.

Parks P., Rosenberg C., Interactive Distributed Simulation Environment for Collaborative Technology Experiments and Analysis, SimTecT, Brisbane, Australia, 2008.

Crutchfield J., Rosenberg C., Predicting Subjective Working Ratings: A Comparison and Synthesis of Operational and Theoretical Models, HCI-Aero Conference Proceedings, Seattle, WA, 2006.

Barfield, W., Rosenberg, C., & Lotens, W. A., Augmented-Reality Displays. In W. Barfield & T. A. Furness III (Eds.) Virtual Environments and Advanced Interface Design (pp.542-575), New York, NY: Oxford University Press, 1995.

Barfield, W., Rosenberg, C., & Furness, T.A., Situation Awareness as a Function of Frame of Reference, Computer-Graphics Eyepoint Elevation, and Geometric Field of View, International Journal of Aviation Psychology, Vol 5, pages 233-256, 1995.

Rosenberg, C., Barfield W., Lotens, W., Virtual Environments and Advanced Interface Design, Augmented Reality Displays, Oxford University Press, pages 542 – 575, 1995.

152

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Barfield, W., and Rosenberg, C., Judgments of Azimuth and Elevation as a Function of Monoscopic and Binocular Depth Cues Using a Perspective Display, Human Factors, Vol 37, Number 1 1995.

Rosenberg, C., Barfield, W., Estimation of Spatial Distortion as a Function of Geometric Parameters of Perspective, IEEE Transactions on Systems, Man and Cybernetics, Volume 25, Issue 9 , Sept. 1995.

Barfield, W., and Rosenberg, C., Perspective versus Stereoscopic Displays for Spatial Judgments, accepted for publication, Human Factors, 1994.

Barfield, W., and Rosenberg, C., and Furness, T., Situational Awareness as a Function of Frame of Reference, Virtual Eyepoint Elevation, and Geometric Field of View, International Journal of Aviation Psychology, 1994.

Rosenberg, C., Moses, B., Future Human Interfaces to Computer Controlled Sound Systems, 95th Annual Audio Engineering Conference, New York, New York, October, 1993.

Barfield, W., and Rosenberg, C., Comparison of Stereoscopic and Perspective Display Formats for Spatial Tasks, SID Conference, Seattle, Washington, September, 1993.

Barfield, W., and Rosenberg, C., Spatial Situational Awareness as a Function of Frame of Reference, Virtual Eyepoint Elevation, and Geometric Field of View, SID Conference, Seattle, Washington, September, 1993.

Barfield, W., Rosenberg, & Cohen., Presence as a Function or Frame of Reference within Virtual Environments (Technical Report). Seattle, WA USA: University of Washington, Sensory Engineering Lab, 1993.

Lion, D., Rosenberg, C., and Barfield, W., Overlaying Three-Dimensional Computer Graphics with Stereoscopic Live Motion Video: Applications for Virtual Environments, SID Conference, Seattle, Washington, September, 1993.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Barfield, W., and Rosenberg, C., The Effect of Geometric Field of View and Tunnel Design for Perspective Flight-Path Displays, Transactions of the Society of Automotive Engineers, Seattle, Washington, July, 1992.

Rosenberg, C., and Barfield, W., The Effects of Scene Complexity and Object Density for Low Level Flight, Sixth International Symposium on Aviation Psychology, Columbus Ohio, September, 1991.

Barfield, W., Rosenberg, C., and Levasseur, J., The Effect of Icons, Earcons, and Commands on the Design of a Hierarchical On-line Menu, IEEE Transactions on Professional Communication, 1991.

Barfield, W., Rosenberg, C., and Kraft, C., Relationship Between Scene Complexity and Perceptual Performance for Computer Graphics Simulations, Displays: Technology and Applications, 179-185, 1990.

Barfield, W., Lim, R., and Rosenberg, C., Visual Enhancements and Geometric Field of View as Factors in the Design of Perspective Displays, Proceedings of the Human Factors Society 34th Annual Meeting, Orlando, Florida, 1470-1473, 1990.

Barfield, W., and Rosenberg, C., The Effects of Scene Complexity on Judgments of Aimpoint and Altitude During Final Approach, Proceedings of the Human Factors Society 34th Annual Meeting, Orlando, Florida, 61-65, 1990.

Barfield, W., Rosenberg, C., and Kraft, C., The Effect of Visual Cues to Realism and Perceived Impact Point During Final Approach, Proceedings of the Human Factors Society 33rd Annual Meeting, Denver Colorado, 1989.

154

# Appendix I: Materials Considered

Amazon_00008749-00008892; Amazon_00290192-00290446; Amazon_00385350-00385372.

Amazon Memorandum to Federal Trade Commission (2014, May 30).

Amazon's Supplemental Responses and Objections to Plaintiff's Third Set of Interrogatories (2015, September 28)

Callahan, Michael. (2015, October 16). Expert Report of Michael Callahan. Federal Trade Commission v. Amazon.com, Inc. Case No. 2:14-cv-01038-JCC (W.D. Wash.)

FTC Complaint for Permanent Injunction and Other Equitable Relief (2014, July 20), Federal Trade Commission v. Amazon.com, Inc. Case No. 2:14-cv-01038-JCC (W.D. Wash.).

Gibson, C., and Gibb, F. (2011). An evaluation of second-generation ebook readers. *The Electronic Library, 29(3),* 303-319.

King, Jennifer. (2015, October 16). Expert Report of Jennifer King. Federal Trade Commission v. Amazon.com, Inc. Case No. 2:14-cv-01038-JCC (W.D. Wash.)

Madathil, K. C., Koikkara, R., Gramopadhye, A. K., and Greenstein, J. S. (2011). An empirical study of the usability of consenting systems: iPad, Touchscreen and Paper-based Systems. *In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, 55(1),* 813-817.

155

Page, T. Touchscreen mobile devices and older adults: a usability study. *International Journal of Human Factors and Ergonomics, 3(1),* 65-85.

Pattuelli, C., and Rabina, D. (2010). Forms, effects, function: LIS students' attitudes towards portable e-book readers. *Aslib Proceedings, 62(3),* 228-244.

Ryan, C. and Gonsalves, A. (2005). The effect of context and application type on mobile usability: an empirical study. *In Proceedings of the 28th Australasian conference on Computer Science.* Darlinghurst Australia.

Sabol, Barry A. (2015, December 7). Expert Report of Barry A. Sabol, Ph.D. Federal Trade Commission v. Amazon.com, Inc. Case No. 2:14-cv-01038-JCC (W.D. Wash.)

Siegenthaler, E., Schmid, L., Wyss, M., and Wurtz, P. (2012). LCD vs. E-ink: An analysis of the reading behavior. Journal of Eye Movement Research, 5(3), 1-7.

156

Exhibit H

Exhibit H

1                    UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF WASHINGTON

3

4

5     FEDERAL TRADE COMMISSION,              )

6                          Plaintiff,        )

7                 vs.                        ) Case No.

8     AMAZON.COM, INC.,                      ) 2:14-cv-01038-JCC

9                          Defendant.        )

10    _____)

11

12

13          VIDEOTAPED DEPOSITION OF CRAIG S. ROSENBERG

14

15                       January 7, 2016

16                      Seattle, Washington

17

18                   ***** Confidential *****

19

20

21          The deposition of CRAIG STUART ROSENBERG was taken

22    on Thursday, January 7, 2016, commencing at 9:05 a.m., at the

23    Federal Trade Commission, 915 Second Avenue, Suite 2896,

24    Seattle, Washington, before John M.S. Botelho, CCR, RPR,

25    Certified Court Reporter.

```
 1                    APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4              Helen Wong

 5              Katherine Worthman

 6              Federal Trade Commission

 7              600 Pennsylvania Avenue Northwest

 8              Mail Stop:  CC-10232

 9              Washington, D.C. 20580

10              202.326.3779

11              202.326.3768 Fax

12              hwong@ftc.gov

13              kworthman@ftc.gov

14

15    ON BEHALF OF THE DEFENDANT:

16              Jeffrey M. Hanson

17              Perkins Coie

18              1201 Third Avenue

19              Suite 4900

20              Seattle, Washington 98101

21              206.359.8000

22              206.359.4206 Fax

23              jhanson@perkinscoie.com

24

25              Also present: Melody Sorensen, videographer
```

```
 1                        PROCEEDINGS
 2
 3                   THE VIDEOGRAPHER:  We're now on the
 4     record.  Please note that recording will continue
 5     until all parties agree to go off the record.  My
 6     name is Melody Sorensen, videographer for For the
 7     Record, Inc.  Today is January 7th, 2016, and the
 8     time is now 9:05 a.m.
 9         This is the videotaped deposition of Craig
10     Rosenberg being taken in the case of Federal Trade
11     Commission vs. Amazon.com, Inc., Cause No.
12     2:14-cv-01038-JCC.  This deposition is being held at
13     915 Second Avenue, Room 2896, Seattle, Washington.
14         Will the attorneys please introduce themselves
15     for the record, including the parties they represent.
16                   MS. WONG:  I'm Helen Wong.  I'm
17     appearing on behalf of the plaintiff, Federal Trade
18     Commission.
19                   MS. WORTHMAN:  Katherine Worthman,
20     on behalf of the Federal Trade Commission.
21                   MR. HANSON:  Jeff Hanson, on behalf
22     of Amazon.
23                   THE VIDEOGRAPHER:  The court
24     reporter today is John Botelho.  Please swear in the
25     witness and proceed.
```

```
 1      CRAIG S. ROSENBERG,           having been first duly sworn
 2                                    by the Certified Court
 3                                    Reporter, deposed and
 4                                    testified as follows:
 5
 6                          EXAMINATION
 7      BY MS. WONG:
 8   Q  Mr. Rosenberg, can you please state and spell your
 9      full name for the record?
10   A  Sure.  Craig Rosenberg.  Craig Stuart Rosenberg.
11      C-r-a-i-g S-t-u-a-r-t R-o-s-e-n-b-e-r-g.
12   Q  Have you ever been deposed before?
13   A  I have.
14   Q  How many times?
15   A  Five times.
16   Q  Okay.  So I'll just -- I'll remind you of some ground
17      rules so that we're on the same page.  I'll be asking
18      you a series of questions, and everything we say will
19      be recorded.  Where possible, please try to give a
20      verbal response so that it appears on the transcript.
21      If I ask a question and you did not understand,
22      please let me know and I'll repeat it.  If you answer
23      a question, I will assume that you understand it.
24          If at any point you need a break, please let me
25      or your attorney know, and answer the question that's
```

Rosenberg - Confidential

1  together made it such that I couldn't test everything

2  we spoke earlier in the deposition about, given an

3  arbitrarily long time, could have tested every

4  interface.

5 Q So despite not testing the interface from 2011 until

6  May 2013, you still believe that the conclusions of

7  your study can be generalized to Amazon app users in

8  2011 and 2012?

9 A Well, I think some of the questions apply.  Like I

10  just said, some of the questions definitely apply.

11  But some of them don't.  I'd have to go and review

12  the specific questions.  But if it says, you know,

13  "What's your understanding of parental controls?" --

14  in the earlier interface, I mean, you could ask that

15  in general:  "What's your understanding of parental

16  controls?"  But I think it was more tied to the task

17  at hand and the later two interfaces where that term

18  actually appears on the dialogue box.

19 Q Okay.  Going back to the script.  I think we're still

20  on Page 72.  So we were at the section where

21  Ms. Miller, on Paragraph 33 of Page 71, tells the

22  users to press "Key Details" on the screen.  The

23  pop-up window should appear.  She asks if everyone

24  can see it.  And then she states, "Please use your

25  finger to scroll down.  And you will see the section

```
 1                    CERTIFICATE OF REPORTER

 2

 3      DOCKET/FILE NUMBER:    2:14-cv-01038-JCC

 4      CASE TITLE:  FTC v. AMAZON.COM, INC.

 5      HEARING DATE:  JANUARY 7, 2016

 6

 7          I HEREBY CERTIFY that the transcript contained

 8      herein is a full and accurate transcript of the steno

 9      notes transcribed by me on the above cause before the

10      FEDERAL TRADE COMMISSION to the best of my knowledge

11      and belief.

12

13                    DATED:  January 11, 2016

14

15          _____

16          JOHN M.S. BOTELHO

17

18

19

20

21

22

23

24

25
```

Exhibit I

Exhibit I

FEDERAL TRADE COMMISSION,

                Plaintiff,

v.

AMAZON.COM, INC.,

                Defendant.

Case No. 2:14-cv-01038

**EXPERT REPORT OF
BARRY A. SABOL, PH.D.**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Background and Qualifications

1.    My curriculum vitae appears as Exhibit A to this report.

2.    Strategic Consumer Research, Inc., of which I am founder and President, was engaged by Perkins Coie, on behalf of its client, Amazon.com, Inc., to design and execute a scientific study to measure experiences and perceptions with respect to contacting Amazon customer service, experiencing Amazon customer service as well as likely actions and perceptions in the instance of receiving an email from Amazon showing a charge for an unrecognized digital purchase.  This study was conducted among Amazon digital product purchasers in general including a subset of In-App Purchasers.

3.    For the past 33 years, I have designed, executed and interpreted over one thousand research studies similar to the one detailed in this report.  During this time, Strategic Consumer Research, Inc. and I have conducted similar scientific studies for hundreds of companies, which have relied on the results of said studies to make business decisions and develop strategies relating to their products and services.

4.    I have provided sworn testimony in a number of lawsuits over the past seven years.  A list of the cases in which I have provided sworn testimony during that period is attached as Exhibit B.

5.    I was first contacted by Amazon.com attorneys and retained in early November 2015 to conduct the survey and provide this expert report. Strategic Consumer Research, Inc. was paid a total of $71,000 to design and execute this research study.  This compensation was not contingent upon the obtained study results, nor was it contingent on the opinions I render for the interpretation of the study results, or the outcome of this case.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Summary of Conclusions

6.    This study was conducted primarily to measure experiences and perceptions with respect to contacting Amazon customer service among Amazon digital product purchasers in general and Amazon In-App Purchasers in particular, as well as likely actions and perceptions in the instance of receiving an email from Amazon showing a charge for an unrecognized digital purchase.

7.    To make this determination, I conducted an anonymous survey of 1,237 Amazon customers including 301 In-App Purchasers who (a) had children under the age of 17 living in their households (and thus likely had younger children in the households during the 2011—2014 period) and (b) who had purchased a digital product from Amazon.  This survey was conducted online using a widely-accepted and commonly used methodology.   Respondents were asked about the following:

- Whether or not they had ever contacted Amazon's customer service for any reason about a digital product.  A digital product was defined as a video, a song, an app or an in-app purchase.

- Among those who had actually contacted Amazon's customer service about a digital product, the ease or difficulty of doing so, relative to their experiences with other companies.

- Among those who had actually contacted Amazon's customer service about a digital product, their evaluation of the customer service experience relative to their experiences with other companies.

3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Among those who had never contacted Amazon's customer service about a digital product:

  - The perceived ease or difficulty of doing so in relation to other companies.

  - The perceived evaluation of the likely customer service experience relative to their experience with other companies.

- The likelihood of contacting Amazon's customer service if they received an email from Amazon showing that they had been charged by Amazon for a digital product purchase that they did not recognize.

- The extent to which digital product purchasers think that they would be entitled to a refund:

  - If they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize.

  - If Amazon's stated policy was that digital products were not returnable, but they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize.

When those who had contacted Amazon's customer service about a digital product were asked if it was easier, about the same or more difficult to do so compared to their experiences with other companies, 94% responded that it was easier (73%) or about the same (21%). There was no significant difference between In-App Purchasers (97%) and Non-In-App Purchasers (92%). This data suggests that the vast majority of In-App and Non-In-App digital product purchasers had no more difficulty in contacting Amazon's customer service than they had ever experienced with any other company and in fact strong majorities of both digital product

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

purchaser groups indicated that it was <u>easier</u> to contact Amazon's customer service than had been their experience with other companies (In-App – 74%, Non-In-App – 72%).

When those who had contacted Amazon's customer service about a digital product were asked if their experience with Amazon's customer service was better, about the same or worse than their experiences with other companies, 96% responded that it was better (77%) or about the same (19%). There was no significant difference between In-App Purchasers (99%) and Non-In-App Purchasers (95%).

When those who had <u>never</u> contacted Amazon's customer service about a digital product were asked if they thought that it would be easier, about the same or more difficult to contact Amazon's customer service compared to other companies, 94% responded that it would be easier (46%) or about the same (48%). There was no significant difference between In-App Purchasers (97%) and Non-In-App Purchasers (93%).

When those who had <u>never</u> contacted Amazon's customer service about a digital product were asked if they thought that the experience with Amazon's customer service would be better, about the same, or worse than their experiences with other companies, 97% responded that it would be better (58%) or about the same (39%). There was no significant difference between In-App Purchasers (98%) and Non-In-App Purchasers (97%).

When asked how likely they would be to contact Amazon's customer service if they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize, 95% responded that they would be very likely (84%) or somewhat likely (11%) to do so. There was no significant difference between In-App Purchasers (95%) and Non-In-App Purchasers (95%).

5

When asked if they thought that they would be entitled to a refund if they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize, 92% responded in the affirmative with no significant difference between In-App Purchasers (93%) and Non-In-App digital product purchasers (92%).

When asked if they thought that they would be entitled to a refund if Amazon's stated policy was that digital products were not returnable, but they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize, 91% responded in the affirmative with no difference between In-App (91%) and Non-In-App (91%) digital product purchasers.

I understand from having read the expert report submitted by Jennifer King that it is her belief that contacting Amazon's customer service to request a refund for a digital product purchase is complex and time consuming and that Amazon did not effectively convey to consumers that refunds were available for accidental or unauthorized in-app purchases or how to request such refunds. My survey results show otherwise. The vast majority of Amazon digital product purchasers and In-App Purchasers in particular:

- Found it to be or believe it to be easier to contact Amazon's customer service than they have experienced with other companies.

- Found or believed that the actual Amazon customer service experience was or would be better than what they had experienced at other companies.

- Would be likely to contact Amazon's customer service if they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Believe that they would be entitled to a refund if they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize.

- Believe that they would be entitled to a refund if Amazon's stated policy was that digital products were not returnable, but they received an email from Amazon showing that they were charged by Amazon for a digital product purchase that they did not recognize.


## Introduction

8.     The overriding goals of this study were:

- To determine actual and perceived level of difficulty in contacting Amazon's customer service

- To determine actual and perceived quality of Amazon's customer service

- To determine the likelihood of contacting Amazon's customer service about any unrecognized digital product purchase

- To determine beliefs about refunds for unrecognized digital products purchases

9.     The survey instrument appears in Exhibit C.

10.     The methodology and survey questionnaire are described below.

11.     Other materials considered for this report are the FTC's Complaint for Permanent Injunction and Other Equitable Relief, filed July 20, 2014, and the expert reports of Jennifer King and Daniel S. Hamermesh, Ph.D, dated October 16, 2015, and October 15, 2015, respectively.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Survey Methodology

### *Survey Participants*

12.     This research study was designed to elicit beliefs surrounding contacting Amazon's customer service about digital product purchases and the availability of refunds for unrecognized digital product purchases.  This was done by having respondents answer a number of specific questions designed to elicit these responses.

Studies using this type of design and methodology are widely used to produce empirical data regarding consumer attitudes, beliefs and behavior.

Studies of this type are widely used and relied upon by companies to gauge consumer attitudes, beliefs and behaviors.

This study design is widely used by our company and many others, and consistently produces valid, reliable data useful for decision-making.

This type of quantitative study produces valid, reliable empirical data which can be used to test/validate/refute claims made by the parties in this case.

13.     The relevant survey universe for this study consisted of consumers who (1) had children under age 17 currently living in their households; and (2) had purchased a digital product from Amazon.  A digital product was described as a video, song, app or in-app purchase.

14.     This study was conducted using a web-based survey to collect data.  Pivotal to conducting a web-based survey is the acquisition of e-mail addresses of the relevant universe, so that invitations to participate in a survey can be sent.  In this case, no database existed which met the criteria for the relevant survey universe, necessitating that the relevant survey universe be

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

constructed through screening of general consumer population databases. This study relied on such a database panel provided by Research Now.

15.     This panel identifies consumers with respect to the presence of children under age 17 in the household, but not Amazon digital product purchasers. This was accomplished through screening questions contained in the survey instrument. All respondents were promised confidentiality of responses and in fact the survey was conducted on a blind basis with respect to the names of the participants. Participant names were not and are not known. There was no pre- or post-survey contact with any of the participants. The survey itself was never identified as being undertaken for any particular purpose, including this lawsuit.

16.     This survey began on November 19, 2015, and concluded on November 28, 2015. The median time to complete the survey was 1.4 minutes per respondent. All respondents were provided an incentive to participate by Research Now using their own established guidelines for respondent incentives for their constructed panels. This practice is common to all panels constructed for research purposes by all companies who construct them. Panels of this type offer potential respondents monetary or other incentives to participate prior to their actual entry into the survey website. Thus, incentives are not contingent upon any particular response or result.

17.     A total of 2,614 potential respondents entered the survey website. After answering all screening questions (to become members of the relevant survey universe), there were 1,237 qualified respondents. The disposition of terminated respondents was as follows:

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | |
|---|---|
| No children under age 17 in household | 183 |
| No digital purchases from Amazon | 1,135 |
| Abandoned the survey prior to completing the entire questionnaire | 59 |
| Qualified and completed survey | 1,237 |

18.     The final sample size of 1,237 qualified respondents yields a maximum error rate (margin of error) of ±2.7% at the 95% confidence interval.  This means that if this same survey were to be conducted 100 times with different populations of 1,237 qualified consumers, the obtained results would not differ by more than 2.7% in 95 of 100 cases.  This is a very low margin of error and makes this an exceptionally reliable study.

There was a subsample of 301 In-App Purchasers as part of the total sample described above.  This sample of 301 respondents yields a maximum error rate of ±5.8% and the Non-In-App sample of 936 respondents yields a maximum error rate of ±3.3%, both at the 95% confidence interval.

***The Survey Questionnaire***

19.     All potential respondents who accepted the invitation to participate in this survey by clicking the link in the invitation e-mail were introduced to the survey as follows: "Thank you for participating in this survey which will take no more than 2 minutes to complete.  Your responses will be kept completely confidential.  There are no right or wrong answers.  Your opinion is all that counts."

20.     All potential respondents were then asked: "Do you have any children under the age of 17 living in your household?"  All those responding in the negative were terminated,

10

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

while those responding in the positive were next asked: "Have you ever purchased any one or more of the following underlined digital products from Amazon:

- o A video
- o A song
- o An app
- o An in-app purchase
- o None of these

All those responding "none of these" were terminated, while those choosing one or more digital products were next asked:

"Have you ever contacted Amazon's customer service for any reason about a digital product? A digital product is defined as a video, a song, an app or an in-app purchase?"

- o Yes
- o No

21. Those respondents who answered "no" were skipped past the next two questions. Those respondents who answered "yes" were next asked:

"Compared to your experience with other companies, was it easier, about the same or more difficult to contact Amazon's customer service?"

- o Much easier
- o A little easier
- o About the same
- o A little more difficult
- o Much more difficult

11

− And –

"Compared to your experience with other companies, was your experience with Amazon's customer service better, about the same or worse that with other companies?"

- o  Much better

- o  A little better

- o  About the same

- o  A little worse

- o  Much worse

22.     Those respondents who answered "yes" to the earlier Amazon customer service contact question were skipped past the next two questions.  Those respondents who answered "no" to the earlier Amazon customer service contact question were next asked:

"Compared to other companies, do you think it would be easier, about the same or more difficult to contact Amazon's customer service?"

- o  Much easier

- o  A little easier

- o  About the same

- o  A little more difficult

- o  Much more difficult

− And –

"Compared to your experience with other companies, do you think your experience with Amazon's customer service would be better, about the same or worse than with other companies?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- o Much better

- o A little better

- o About the same

- o A little worse

- o Much worse

23. **ALL** respondents were next asked:

"If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, how likely would you be to contact Amazon's customer service?"

- o Very likely

- o Somewhat likely

- o Unsure

- o Somewhat unlikely

- o Very unlikely

Those who chose either the very likely or somewhat likely responses were skipped past the next question. Those who chose the unsure, somewhat unlikely or very unlikely responses were next asked:

"Why would you be unsure or unlikely to contact Amazon's customer service?"

24. **ALL** respondents were next asked the final two questions:

"If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- o   Yes

- o   No

- o   Not sure

    − And –

"If Amazon's stated policy was that digital products were not returnable, but you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"

- o   Yes

- o   No

- o   Not sure

25.    The survey concluded with the following statement: "Thank you very much for your time."

## Survey Results

26.    This survey analysis was based on the responses of 1,237 consumers who had children under age 17 living in the household and who had made a digital product purchase from Amazon.   This data has been analyzed in total and by In-App Purchasers and Non-In-App Purchasers with the following maximum margins of error:

| | |
|---|---|
| Total (N=1,237) | ±2.7% |
| In-App Purchasers (N=301) | ±5.8% |
| Non-In-App Digital Product Purchasers (N=936) | ±3.3% |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

This data was analyzed using StatPac statistical analysis software. This statistical analysis software is used by many market research companies and has been used continuously by me and my company for over 25 years. Over that period, I have gained experience in the use of the program and the interpretation of results. A cross-tabulation program was used to compare responses between In-App Purchasers and Non-In-App digital product purchasers in order to detect statistically significant differences in responses. Throughout the balance of this report, arrows ($\rightarrow$ $\leftarrow$) are used to denote statistically significant differences between responses of respondents comprising these two customer segments. The level of statistical significance testing used throughout this analysis was p<.01. This means that where statistical significance was found, there is only 1 chance in 100 that this obtained result could have occurred by chance.

27.    For each analysis detailed in this section of this report, the results will be detailed along with an explanation of the significance of the finding and in some cases a conclusion for each significant finding.

28.    The first analysis details the types of digital product purchases made by this sample of respondents. As can be seen in the table below, there was no difference between In-App and Non-In-App Purchasers in terms of the rates of purchasing videos or songs.

| Digital Product | Total (N=1,237) | In-App Purchasers (N=301) | Non-In-App Purchasers (N=936) |
|---|---|---|---|
| A video | 59% | 58% | 60% |
| A song | 55% | 60% | 53% |
| An app | 47% | 67% → | 41% |
| An in-app purchase | 24% | 100% → | 0% |

29.     The next analysis compared rates of actually contacting Amazon customer service for any reason about a digital product.  While 22% had done so overall, In-App Purchasers were more likely to have contacted Amazon customer service than Non-In-App Purchasers as shown in the table below:

| Ever Contacted Amazon Customer Service About Digital Product? | Total (N=1,237) | In-App Purchasers (N=301) | Non-In-App Purchasers (N=936) |
|---|---|---|---|
| Yes | 22% | 35% | 18% |
| No | 78% | 65% | 82% |

30.     The next analysis focused only upon those respondents who <u>had</u> contacted Amazon's customer service about a digital product.  These respondents were asked:

"Compared to your experience with other companies, was it easier, about the same or more difficult to contact Amazon's customer service?"

Overall, 94% responded that it was easier (73%) or about the same (21%) to contact Amazon's customer service compared to other companies.  Among In-App Purchasers, 97% responded that it was easier (74%) or about the same (23%) relative to other companies.  This data, presented in the table below, also shows that there were no significant differences between In-App Purchasers and Non-In-App Purchasers in their responses.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Ease or Difficulty in Contacting Amazon Customer Service? | Total (N=272) | In-App Purchasers (N=105) | Non-In-App Purchasers (N=167) |
|---|---|---|---|
| Much easier | 42% | 45% | 41% |
| A little easier | 31% | 29% | 31% |
| About the same | 21% | 23% | 20% |
| A little more difficult | 6% | 3% | 8% |
| Much more difficult | 0% | 0% | 0% |

31.     The next analysis again focused only upon those respondents who <u>had</u> contacted Amazon's customer service about a digital product.  These respondents were asked:

"Compared to your experience with other companies, was your experience with Amazon's customer service better, about the same or worse than with other companies?"

Overall, 97% responded that their experience was better (77%) or about the same (20%) as their experiences with the customer service departments of other companies.  Among In-App Purchasers, 99% responded that their experience with Amazon's customer service was better (76%) or about the same (23%) compared to other companies.  This data, presented in the table below, also shows that there were no significant differences between In-App Purchasers and the purchasers of other digital products in their responses.

17

| Amazon Customer Service Experience | Total (N=272) | In-App Purchasers (N=105) | Non-In-App Purchasers (N=167) |
|---|---|---|---|
| Much better | 47% | 49% | 45% |
| A little better | 30% | 27% | 32% |
| About the same | 20% | 23% | 17% |
| A little worse | 3% | 1% | 5% |
| Much worse | <1% | 0% | 1% |

32.     While the previous two analyses focused upon <u>actual</u> contact experiences with Amazon's customer service, this next analysis focuses upon the <u>expected</u> ease or difficulty of contacting Amazon's customer service among those respondents who <u>had not</u> done so.  This information is relevant to determine whether there is any reputational deterrent to contacting Amazon's customer service.  These respondents were asked:

"Compared to other companies, do you think it would be easier, about the same or more difficult to contact Amazon's customer service?"

Overall, 94% responded that they thought it would be easier (46%) or about the same (48%) to contact Amazon's customer service compared to other companies.  Among In-App Purchasers, 97% responded that they thought it would be easier (55%) or about the same (42%) to contact Amazon's customer service relative to other companies.  This data, presented in the table below, also shows that there were no significant differences between In-App Purchasers and purchasers of other digital products in their responses.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Expected Ease or Difficulty to Contact Amazon Customer Service? | Total (N=965) | In-App Purchasers (N=196) | Non-In-App Purchasers (N=769) |
|---|---|---|---|
| Much easier | 21% | 25% | 20% |
| A little easier | 25% | 30% | 24% |
| About the same | 48% | 42% | 49% |
| A little more difficult | 5% | 2% | 6% |
| Much more difficult | 1% | 1% | 1% |

33.     The next analysis focuses upon the <u>expected</u> experience with Amazon's customer service compared to other companies, again among those who <u>had not</u> contacted Amazon's customer service about a digital product.  These respondents were asked:

"Compared to your experience with other companies, do you think your experience with Amazon's customer service would be better, about the same or worse than with other companies?"

Overall, 97% responded that they thought the Amazon customer service experience would be better (58%) or about the same (39%) relative to their experiences with other companies.  Among In-App Purchasers, 99% responded that they thought the Amazon customer service experience would be better (60%) or about the same (39%) as they had experienced at other companies.  This data, presented in the table below, also shows that there were no significant differences between In-App and Non-In-App Purchasers.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Expected Amazon Customer Service Experience | Total (N=965) | In-App Purchasers (N=196) | Non-In-App Purchasers (N=769) |
|---|---|---|---|
| Much better | 22% | 23% | 22% |
| A little better | 36% | 37% | 36% |
| About the same | 39% | 39% | 39% |
| A little worse | 2% | 1% | 2% |
| Much worse | 1% | <1% | 1% |

### *Actual vs. Expected Ease or Difficulty of Contacting Amazon's Customer Service*

34.    As can be seen in the table below, the <u>actual</u> experience of contacting Amazon's customer service was found to be better than the <u>expected</u> experience of contacting Amazon's customer service.  This data suggests that Amazon <u>exceeds customer expectations</u> regarding the ease or difficulty of contacting Amazon's customer service.

| Ease or Difficulty to Contact Amazon's Customer Service? | Total | | In-App Purchasers | | Non-In-App Purchasers | |
|---|---|---|---|---|---|---|
| | Actual (N=272) | Expected (N=965) | Actual (N=105) | Expected (N=196) | Actual (N=167) | Expected (N=769) |
| Much easier | 42% → | 21% | 45% → | 25% | 41% → | 20% |
| A little easier | 31% | 25% | 29% | 30% | 31% | 24% |
| About the same | 21% ← | 48% | 23% ← | 42% | 20% ← | 49% |
| A little more difficult | 6% | 5% | 3% | 2% | 8% | 6% |
| Much more difficult | 0% | 1% | 0% | 1% | 0% | 1% |

### *Actual vs. Expected Amazon Customer Service Experience*

35.    As can be seen in the table below, the <u>actual</u> Amazon customer service experience was found to be better than the <u>expected</u> Amazon customer service experience.  This data suggests that Amazon's customer service experience <u>exceeds customer expectations</u>.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Amazon Customer Service Experience | Total | | In-App Purchasers | | Non-In-App Purchasers | |
|---|---|---|---|---|---|---|
| | Actual (N=272) | Expected (N=965) | Actual (N=105) | Expected (N=196) | Actual (N=167) | Expected (N=769) |
| Much better | 47% → | 22% | 49% → | 23% | 45% → | 22% |
| A little better | 30% | 36% | 27% | 37% | 32% | 36% |
| About the same | 20% ← | 39% | 23% ← | 39% | 17% ← | 39% |
| A little worse | 3% | 2% | 1% | 1% | 5% | 2% |
| Much worse | <1% | 1% | 0% | <1% | 1% | 1% |

36.     The next analysis focused upon the likelihood of respondents contacting Amazon if they received an email from Amazon showing a charge they did not recognize.   All respondents were asked:

"If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, how likely would you be to contact Amazon's customer service?"

Overall, 95% responded that they would be very likely (84%) or somewhat likely (11%) to contact Amazon's customer service.  This was true for both In-App Purchasers and Non-In-App Purchasers as shown in the table below.

| Likelihood to Contact Amazon? | Total (N=1,237) | In-App Purchasers (N=301) | Non-In-App Purchasers (N=936) |
|---|---|---|---|
| Very likely | 84% | 84% | 84% |
| Somewhat likely | 11% | 11% | 11% |
| Unsure | 4% | 4% | 4% |
| Somewhat unlikely | 1% | 1% | 1% |
| Very unlikely | <1% | <1% | <1% |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

37. The next analysis focuses upon the reasons given by those who indicated in the previous question that they would be somewhat unlikely, very unlikely or unsure if they would contact Amazon if they received an email from Amazon showing a charge for a digital product which they did not recognize. These respondents were asked:

"Why would you be unsure or unlikely to contact Amazon's customer service?"

Verbatim responses are summarized below:

**Contact Amazon Customer Service?**

| Unsure (N=44) | Somewhat Unlikely (N=10) | Very Unlikely (N=5) |
|---|---|---|
| Don't know / Not sure / NA (19) | Long process (1) | The wait (1) |
| No need to (9) | Wouldn't feel the need (1) | They rarely mess up (1) |
| Depends on amount (7) | Don't like to deal with people – prefer troubleshooting (1) | I'd call my bank (1) |
| Not sure how (1) | No reason to contact them (1) | You can never get a human being at Amazon (1) |
| Poor service (1) | Difficult to find a number to call (1) | In past dealings I had to be transferred several times just to get right department and still got nowhere with the problem (1) |
| I speak broken English (1) | No problems with them (1) | |
| Like to solve things on my own (1) | Not much help (1) | |
| No help (1) | Probably nothing wrong (1) | |
| They wouldn't help me (1) | Usually satisfied with Amazon and don't have a need to call customer service (1) | |
| Don't usually do that (1) | No time (1) | |
| Don't have time (1) | | |
| If I ran into some trouble (1) | | |

Only 9 of 59 comments reflect poorly on Amazon. This represents less than 1% of the total sample of respondents.

38. The next analysis focuses upon customer refund expectations for digital products. All respondents were asked:

"If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"

Overall, 92% responded that they thought they <u>would</u> be entitled to a refund. Only 3% responded with "no" while 5% were "not sure." Among In-App Purchasers, 93% indicated that they thought they would be entitled to a refund. As can be seen in the table below, there were no significant differences between In-App and Non-In-App Purchasers.

| Entitled to Refund? | Total (N=1,237) | In-App Purchasers (N=301) | Non-In-App Purchasers (N=936) |
|---|---|---|---|
| Yes | 92% | 93% | 92% |
| No | 3% | 4% | 3% |
| Not sure | 5% | 3% | 5% |

39. The next analysis focuses upon customer refund expectations for digital products in light of Amazon's return policy. All respondents were asked:

"If Amazon's stated policy was that digital products were not returnable, but you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?"

Overall, 91% responded in the affirmative. This was also true for In-App and Non-In-App Purchasers. Only 2% of all three respondent groups responded in the negative, while 7% of

each group responded that they were not sure.  As can be seen in the table below, there were no significant differences between In-App and Non-In-App Purchasers.

| Entitled to Refund? | Total (N=1,237) | In-App Purchasers (N=301) | Non-In-App Purchasers (N=936) |
|---|---|---|---|
| Yes | 91% | 91% | 91% |
| No | 2% | 2% | 2% |
| Not sure | 7% | 7% | 7% |

**Final Observations and Conclusions**

40.    My report outlines behaviors and attitudes of Amazon digital product purchasers and In-App Purchasers in particular with respect to contacting Amazon customer service and the Amazon customer service experience from both an actual and expected viewpoint.

The King report concludes that contacting Amazon's customer service to request a refund for a digital product purchase is complex and time consuming.  The results of my study stand in stark contrast to this assertion.  The vast majority of Amazon digital product purchasers, including In-App Purchasers, found it easier or no more difficult to contact Amazon's customer service than they had experienced with other companies.  The vast majority of Amazon digital product purchasers, including In-App Purchasers, reported that the Amazon customer service experience was better than or the same as other companies they had dealt with.

This study also found that Amazon's actual delivery of customer service contact and experience <u>exceeded</u> customer expectations.

The King report, which is based on her subjective, theoretical analysis, also concludes that Amazon did not effectively convey to consumers that refunds were available for accidental

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

or unauthorized in-app purchases or how to request such refunds. The results of the study which I conducted among 1,237 <u>actual</u> Amazon digital product purchasers challenges this assertion, including the implicit contention that customers would not have understood that refunds were available unless Amazon so explicitly stated in the emailed order confirmation:

- 95% of all Amazon digital product purchasers and 95% of In-App Purchasers <u>would</u> contact Amazon if an unrecognized charge appeared in an email from Amazon. Less than 2% of all Amazon digital product purchasers (including In-App Purchasers) were unlikely to do so. And only 15% of those few purchasers who were unsure or unlikely to contact Amazon said so for a reason reflecting poorly on Amazon.

- 92% of all Amazon digital product purchasers and 93% of In-App Purchasers expected unrecognized charges in emails from Amazon to be refunded. Only 3% of all digital product purchasers and 4% of In-App Purchasers did not think they would be entitled to a refund.

- 91% of all Amazon digital product purchasers and 91% of In-App Purchasers expected unrecognized charges in emails from Amazon to be refundable even in light of Amazon's stated policy that digital products are not returnable. Only 2% of all digital product purchasers and 2% of In-App Purchasers did not think they would be entitled to a refund even in light of the stated policy.

Thus, the vast majority of Amazon digital product purchasers and In-App Purchasers in particular would seek refunds for unrecognized charges detailed in emails from Amazon and believe and have found that it would be easy to contact Amazon's customer service and that the

25

Amazon customer service experience would and has been found to be better than or equal to other companies.

Date: December 7, 2015

_____
Barry A. Sabol, Ph.D.
President of Strategic Consumer Research, Inc.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Amazon customer service experience would and has been found to be better than or equal to other companies.

Date: December 7, 2015

_____

Barry A. Sabol, Ph.D.
President of Strategic Consumer Research, Inc.

# EXHIBIT A

# Curriculum Vitae of
# Dr. Barry A. Sabol

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# Barry Allan Sabol, Ph.D.

President
Strategic Consumer Research, Inc.
26250 Euclid Avenue
Cleveland, Ohio 44132
216-261-0308
bsabol@scr-research.com

## Professional Experience

### President – Strategic Consumer Research, Inc.                    1982 – Present

- Founded firm in 1982
- Responsible for all phases of project design, analysis and reporting
- Responsible for client development and support
- Expertise in many types of research including:
  - Advertising Effectiveness
  - Awareness and Image Assessment
  - Competitive Positioning
  - Customer Satisfaction and Loyalty Measurement
  - Market and Store Performance Assessment Tracking
  - Market/Customer Segmentation
  - New Concept Testing
  - New Product/Service Evaluation
  - Website Navigation Evaluation

### Research Director – Fox and Associates, Inc.                    1978 – 1982

- Responsible for the design, development and execution of quantitative consumer attitude, opinion, image, awareness and demographic research studies for clients of this full-service advertising agency.

### Research Specialist – Psychological Research Services            1975 – 1978

- Responsible for the development and execution of projects within the areas of training needs assessment, training, training program evaluation, performance appraisal, organizational analysis, testing, test validation and survey research.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## Professional Organizations/Activities

| | |
|---|---|
| 1995 – 2006 | Member of the Thiel College Board of Trustees<br>Greenville, Pennsylvania<br>Vice Chairman 2001-2002 |
| 1979 – Present | Member of the American Marketing Association<br>Cleveland Chapter President in 1989-1990 |
| 1983 – 1990 | Board Officer for the Cuyahoga County Drug Abuse Services<br>Chairman in 1990 |
| 1991 – 2000 | Board Officer for The Cleveland Treatment Center, a Cleveland area<br>heroin-addiction treatment center |

## Publications

Sirdeshmukh, Deepak, Singh, Jagdip and Sabol, Barry (2002), "Consumer Trust, Value and Loyalty in Relational Service Exchanges, *Journal of Marketing*, 66 (January): 15-37.

The preceding was also published by the Marketing Science Institute as working paper and Report No: 01-116 for distribution worldwide to managers, researchers and companies affiliated with the MSI.

Wilcott, R.C., Sabol, B.A. and Yurchesen, R.P., Frontal Cortex and Response Suppression in the Rat. <u>Brain, Behavior and Evolution</u>, 1976, 13, 116-124.

Wilcott, R.C. & Sabol, B.A., Response Suppression Produced by Electrical Stimulation in the Neocortex of the Cat, <u>Neuropsychologia</u>, May 1976.

## Teaching Experience

**Guest Lecturer – MBA Marketing Research**                    *2006 - 2010*
   Weatherhead School of Management
   Case Western Reserve University, Cleveland, Ohio

## Academic History

**Ph.D.  Quantitative Design and Research Analysis**          *1979*
   Case Western Reserve University, Cleveland, Ohio

**Masters  Psychology**                                       *1976*
   Case Western Reserve University, Cleveland, Ohio

**Bachelors  Psychology**                                     *1974*
   Thiel College, Greenville, Pennsylvania

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT B

# Past Four-Year Sworn
# Testimony by
# Dr. Barry A. Sabol

Dr. Barry A. Sabol has testified as an expert witness in one case in the past four years:

> Promark Brands Inc. and H.J. Heinz Company, Opposers,
> V. GFA Brands, Inc., Applicant
> Opposition No. 91194974
> − By deposition, March 12, 2013

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT C

# Survey Instrument

**DIGITAL PRODUCT PURCHASER**

<u>**FINAL SURVEY INSTRUMENT**</u>

Thank you for participating in our survey.  There are no right or wrong answers.  Your honest opinions are all that count.  This survey should take no more than 5 minutes to complete.  First . . .

**SCREEN A:**     Do you have any children under the age of 17 currently living in your household?

> **-1**  Yes  *(CONTINUE)*
>
> **-2**  No  *(THANK AND TERMINATE)*

**SCREEN B:**     Have you ever purchased any one or more of the following <u>**DIGITAL PRODUCTS**</u> from <u>**AMAZON**</u>:  *(CIRCLE ALL PURCHASED)*



> **-1**  A video
>
> **-2**  A song
>
> **-3**  An app            *CONTINUE*
>
> **-4**  An in-app purchase
>
> **-5**  None of these  *(THANK AND TERMINATE)*

1.  Have you <u>ever</u> contacted Amazon's customer service for any reason about a digital product?  A digital product is defined as a video, a song, an app or an in-app purchase.

> **-1**  Yes  *(ASK Q. 1A AND Q. 1B, THEN SKIP TO Q. 3)*
>
> **-2**  No  *(SKIP TO Q. 2)*

1A.  Compared to your experience with other companies, was it easier, about the same or more difficult to contact Amazon's customer service?

> **-1**  Much easier
>
> **-2**  A little easier
>
> **-3**  About the same
>
> **-4**  A little more difficult
>
> **-5**  Much more difficult

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**1B.** Compared to your experience with other companies, was your experience with Amazon's customer service better, about the same or worse than with other companies?

-1   Much better

-2   A little better

-3   About the same

-4   A little worse

-5   Much worse

**2.** Compared to other companies, do you think it would be easier, about the same or more difficult to contact Amazon's customer service?

-1   Much easier

-2   A little easier

-3   About the same

-4   A little more difficult

-5   Much more difficult

**2A.** Compared to your experience with other companies, do you think your experience with Amazon's customer service would be better, about the same or worse than with other companies?

-1   Much better

-2   A little better

-3   About the same

-4   A little worse

-5   Much worse

**3.** If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, how likely would you be to contact Amazon's customer service?

-1   Very likely

-2   Somewhat likely      *(SKIP TO Q. 4)*

-3   Unsure

-4   Somewhat unlikely      *(CONTINUE)*

-5   Very unlikely

**3A.** Why would you be unsure or unlikely to contact Amazon's customer service?

_____

_____

_____

**4.** If you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?

>    **-1**   Yes

>    **-2**   No

>    **-3**   Not sure

**5.** If Amazon's stated policy was that digital products were not returnable, but you received an email from Amazon showing that you were charged by Amazon for a digital product purchase that you did not recognize, do you think you would be entitled to a refund for that charge?

>    **-1**   Yes

>    **-2**   No

>    **-3**   Not sure

Exhibit J

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FEDERAL TRADE COMMISSION,

            Plaintiff,

    v.                                          Case No. 2:14-CV-01038-JCC

AMAZON.COM, INC.

            Defendant.

**<u>EXPERT REPORT OF ANDREW L. SEARS, PH.D.</u>**

**December 7, 2015**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

I.  Qualifications ................................................................................................... 1

II.  Introduction ..................................................................................................... 2

    A.  Assignment ............................................................................................ 2

    B.  Information Considered .......................................................................... 3

    C.  Summary of Opinions ............................................................................ 3

III.  Analysis ........................................................................................................... 6

    A.  Usability Must Be Viewed In Context .................................................. 6

        1.  Time and Experience Redefines What Is Usable ....................... 7

        2.  State of the Art for In-App Purchases in November 2011 ......... 9

        3.  Design, Release, and Redesign Is An Accepted Practice ......... 10

    B.  Heuristic Evaluations Are Less Reliable and Prone to Error if Applied Incorrectly ........................................................................................... 11

        1.  Heuristic Evaluations Are Subjective ...................................... 13

        2.  Reliable Application of Heuristic Evaluation Requires the Use of Multiple Evaluators ............................................................. 13

        3.  Heuristic Evaluations Can Overestimate the Severity of Potential Problems and Identify False-Positives ...................... 14

        4.  Heuristic Evaluations Are Not a Substitute for Usability Testing ........... 15

    C.  Ms. King's Heuristic Evaluation Is Incomplete and Unreliable ......... 17

        1.  Prominence of In-App Purchase Disclosures .......................... 19

        2.  Prominence and Clarity of Key Details Badge ........................ 21

        3.  Clarity of In-App Purchase Disclosures .................................. 22

        4.  Usability of In-App Purchase Flow and Disclosures ............... 23

        5.  Prominence and Clarity of Purchase Confirmation Screen ..... 25

        6.  Ms. King's Analysis of Customer-Service Contacts Is Flawed ... 25

    D.  Amazon Designed for Parents to Exercise Control Over Their Devices ............. 27

    E.  Dr. Rosenberg's Usability Test ............................................................ 28

IV.  Conclusion ..................................................................................................... 29

## I.      Qualifications

1.      I am the Dean of and a Professor in the College of Information Sciences and Technology at The Pennsylvania State University. I have been working in the field of computer science with a focus on human-computer interaction since 1988. I earned a Bachelor's Degree in Computer Science from Rensselaer Polytechnic Institute in 1988 and a Ph.D. in Computer Science from the University of Maryland, College Park, in 1993. The chair of my doctoral dissertation committee at the University of Maryland was Professor Ben Shneiderman. Jennifer King relies upon Professor Shneiderman in her expert report and identified him as one of the "[l]eading researchers" in the field of human-computer interaction. I concur that he is one of the leading researchers in the field of human-computer interaction. Indeed, Professor Shneiderman is responsible for many innovative ideas, methods, and tools widely accepted today, such as direct-manipulation interface design, advances in information visualization, and his well-respected "Eight Golden Rules of Interface Design" first explained in his leading treatise "Designing the User Interface: Strategies for Effective Human-Computer Interaction" published in 1986. Professor Shneiderman also is well known for contributing to the development of the research area of universal usability, a concept pertinent to my expert opinions set forth below.

2.      My research has explored many aspects of human-computer interaction, including the use of mobile devices, touchscreen-based interfaces, web-based interactions, and accessibility in the context of computing technologies. My research has been funded by various government agencies, foundations, and corporations, including the National Science Foundation, the National Institute on Disability and Rehabilitation Research, the National Institute of Standards and Technology, the Verizon Foundation, IBM, and Motorola.

3.      In addition to my academic research and teaching, I have advised a variety of companies and organizations in the areas of human-computer interaction and user-interface design, including design for mobile devices and touchscreen-based interactions.

4.      I served as a founding Editor-in-Chief of the Association for Computing Machinery's (ACM's) journal "Transactions on Accessible Computing" before becoming a member of that journal's editorial board. I also served on the editorial boards of several additional journals,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

including ACM's "Transactions on Computer-Human Interaction," the "European Journal of Information Systems," the "International Journal of Human-Computer Studies," and "Universal Access in the Information Society."

5.      I served as Conference and Technical Program Co-Chair of the premier conference on human-computer interaction: ACM Conference on Human Factors in Computing Systems (CHI 2001) and as both General Chair and Program Chair for the premier conference on accessibility in the context of computing: ACM SIGACCESS Conference on Computers and Accessibility (ASSETS 2004 and ASSETS 2005). I served as the Chair of the ACM Special Interest Group on Accessible Computing and as a member of the ACM Council. I currently serve as a member of the Board of Directors for the Computing Research Association. I was named an ACM Distinguished Scientist in 2010.

6.      I have received numerous awards in recognition of my service to both the ACM Special Interest Group for Computer Human Interaction (1998, 1999, 2001) and the ACM Special Interest Group for Accessible Computing (2004, 2005). As a doctoral student, I was selected to receive a fellowship by NASA, which supported my PhD studies, and I was also selected to participate in the Doctoral Consortium at CHI 1992.

7.      I was first contacted by Amazon.com attorneys on October 23, 2015, and retained to review and, if appropriate in my opinion, respond to Ms. King's expert report. I am being compensated for my work on behalf of Amazon at the rate of $1000 per hour. My compensation is not contingent upon the outcome of my opinions or of this litigation.

## II.      Introduction

### A.      Assignment

8.      I was retained in late October 2015 by counsel for Amazon to serve as an expert witness for purposes of consultation and potential expert testimony in the case of *FTC v. Amazon.com, Inc.* Specifically, I was asked to analyze the expert report of Jennifer King and to opine on the following:

   a. Whether the methods and practices described and used by Ms. King in her expert report in this case are consistent with accepted and reliable methods and practices in

academic and commercial fields related to human-computer interaction and user-interface design.

b. Whether Amazon's Kindle Fire tablet interfaces, notifications, and descriptions associated with in-app purchases were so far below contemporary, accepted business practices that they would have unfairly confused parents about the presence of and opportunity to make in-app purchases, about the presence of and opportunity to enable Parental Controls to restrict in-app purchases, or the availability of and means to request a refund for any accidental or unwanted in-app purchases.

c. The veracity of Ms. King's opinions, including her conclusions "that Amazon did not effectively convey to consumers downloading an in-app charge app (an app containing in-app charges) from the Amazon Appstore that children could incur in-app charges"; "that Amazon did not effectively convey to consumers downloading an in-app charge app from the Amazon Appstore that they would have to change their device settings to prevent children from incurring in-app charges without parental involvement"; "that Amazon did not effectively convey to consumers who incurred unauthorized in-app charges that refunds were available for those charges from Amazon"; and "that Amazon did not effectively convey to consumers who incurred unauthorized in-app charges how to request a refund for those charges from Amazon."

### B.    Information Considered

9.    My opinions are based on more than twenty-five years of knowledge, skill, experience, training, and education in the field of human-computer interaction and user-interface design. The list of specific materials I considered and relied upon in forming my opinions in this report is available at Appendix B.

### C.    Summary of Opinions

10.    Usability is a subjective concept that evolves with time and experience and must be viewed with great care and consideration and in context. Context includes users, user goals, prior

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

experience, state-of-the-art, environment, system capabilities, and system goals. As a result, what is considered well designed at one point in time may be considered poorly designed at another point in time. Current understanding of usability may appear obvious in hindsight, but it is often the result of significant research or extensive trial and error unavailable at launch.

11.     There is significant risk by imposing liability for negative results during usability trial and error or while exploring new options in an effort to improve upon the status quo. Unless liability is limited to situations in which the design was objectively unreasonable at launch or made in bad faith—and not simply sub-optimal, particularly in hindsight—the risk of liability will deter positive efforts and hamper innovation.

12.     Understanding usability requires knowledge of the intended users and the various tasks those users may want to complete. Tasks are often prioritized; compromises in design are often necessary and recommended. Time and experience routinely redefine usability. Changed understanding of user ability and technological capability often create new opportunities for improved human-computer interaction and user-interface design.

13.     It is common and accepted practice for organizations to release a product, observe how the product is used, gather feedback from users, and revise the product to address user concerns and improve the user experience. Amazon's in-app-purchase innovations for usability are consistent with this accepted approach.

14.     Heuristic usability evaluations or "inspections" such as Ms. King undertook here have significant limitations, particularly where they are performed by evaluators with limited formal training or usability experience. Even when performed by experts, results from heuristic evaluations typically differ from one individual to the next; thus, it is strongly discouraged to rely on a single, subjective evaluation to categorically establish usability or "effectiveness."

15.     There is no single accepted set of heuristics, and isolated heuristic evaluations are prone to overemphasizing the severity of perceived problems, including identifying false-positives— items that would not actually create problems for users interacting with a live system. Reliable heuristic evaluations require the use of multiple evaluators to independently review a system and systematically aggregate the results while carefully assessing the existence and severity of potential problems.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16.    The methods and practices described and used by Ms. King in her expert report are inconsistent with accepted and reliable methods and practices in academic and commercial fields related to human-computer interaction and user-interface design. Ms. King's goal of identifying major flaws is particularly susceptible to the shortcomings of heuristic evaluation, and her opinions were not informed by more reliable user testing or surveys.

17.    Ms. King often draws sweeping, unqualified conclusions about wide swaths of tablet users and interfaces without statistical support. Ms. King erroneously assumes that Amazon's primary task is always to address in-app purchasing and Parental Controls; she fails to recognize the variety of tasks at issue, the various users, the context of the marketplace and the device; and she applies a standard of perfection or best practice, with the aid of hindsight, that is uncalled for in the field and inappropriate where, as here, the question is whether Amazon's practices were unfair, not whether they were imperfect.

18.    Ms. King identifies a collection of potential or candidate problems of uncertain reliability and unknown severity, and her solutions, where suggested, do not adequately consider context, show little or no appreciation for competing design objectives, and could introduce unaddressed and unintended consequences.

19.    Contrary to Ms. King's opinion, I conclude that Amazon's initial design and refinement process were reasonable and consistent with the practice of the industry. In several ways it was superior to the state-of-the-art, as it provided more detailed information about in-app purchasing, immediate notification of purchases, and Parental Controls to give customers more options with respect to their children's activities. Amazon designed for parents to exercise control over their account-connected devices, and Amazon's launch-and-learn approach and constant refinement is a preferred approach in the industry to improving usability.

20.    Amazon's Kindle Fire tablet interfaces, notifications, and descriptions associated with in-app purchases did not fall so far below contemporary, accepted business practices that they would have unfairly confused parents about the presence of and opportunity to make in-app purchases, about the presence of and opportunity to enable Parental Controls to restrict in-app purchases, or the availability of and means to request a refund for any accidental or unwanted in-app purchases.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

### III. Analysis

#### A. Usability Must Be Viewed In Context

21. Usability is largely a subjective concept that evolves with time and experience. There is no single definition of usability. What is usable for one group of individuals may be poorly designed for another group of individuals. What is well designed for one set of tasks may be poorly designed for another set of tasks. What is considered well designed at one point in time may be considered poorly designed at another point in time.

22. It is therefore critical that context be considered when evaluating usability. Context includes not only the users of the system and the goals of those users but also the users' prior experience, both with the system and with other systems that may have existed at the time, and the overall environment in which the system will be used.[1]

23. Understanding usability requires knowledge of the intended users and the various tasks those users may want to complete. The more diverse the population of potential users, the more challenging it can be to design solutions that effectively address the goals and abilities of all users. Designing for diverse tasks also introduces challenges. Tasks are often prioritized, based on the current understanding of which tasks users consider most important or which tasks they will complete most often. It has been long accepted that compromises are necessary for well-designed applications, and designs often must necessarily focus on key segments of the target population and frequent or important tasks.[2] As a result, some features that are important for a specific segment of the population may be less obvious or accessible than other features, which were considered more relevant or important for a larger subset of the population.

24. Since the concept of usability evolves with time and experience, a system may be well designed when introduced only to be critiqued or redesigned later because the community's understanding of usability or design has changed. While the new standard for what constitutes "well designed" may appear obvious in hindsight and with evolving goals, it is often the result of significant research or extensive trial and error, which was not available when the system was

---

[1] See, for example, Hartson, R., & P.S. Pyla, The UX Book: Process and guidelines for ensuring a quality user experience, Elsevier (2012).

[2] Ibid.

first introduced. Many interfaces have been designed with the best of intentions and in such a way that was consistent with or superior to what had been state-of-the-art at the time, only to have aspects of the user interaction redesigned after the product was released because it was determined that a redesigned solution would provide a superior user experience.[3]

### 1. Time and Experience Redefines What Is Usable

25.     Time and experience routinely redefine usability and what both users and designers consider well designed. The evolution of touchscreen-based interfaces and keyboards serves as an example of how time and experience affects what is considered usable. In the mid- and late 1980s, it was widely believed that touchscreens could only be used to select relatively large objects. At the same time, the state-of-the-art was to design interfaces such that selections were made based on where the user's finger initially contacted the screen.[4] That was the norm, and systems were designed leveraging this understanding.

26.     While the original strategy, known as "land on," allowed for selection of large objects, researchers developed new interaction techniques, including what became known as the "lift-off" strategy. The lift-off strategy allows users to reposition their finger before lifting it from the screen.[5] The location where the finger is lifted from the screen is activated rather than the location where the finger first touches the screen. Even with the lift-off strategy, however, the size of the objects an individual could select remained limited. In the late 1980s, researchers demonstrated that carefully designed touchscreen-based interactions could allow users to select smaller targets than previously believed.[6]

27.     This changed understanding of how user ability (for finger location) and technological capability (for smaller-area selections) combine created new opportunities for improved human-computer interaction and user-interface design. And although those practices are now accepted

---

[3] Ibid.

[4] Potter, Richard L., Linda J. Weldon, and Ben Shneiderman. "Improving the accuracy of touch screens: an experimental evaluation of three strategies." Proceedings of the SIGCHI conference on Human factors in computing systems. ACM, 1988.

[5] Ibid.

[6] Sears, Andrew, and Ben Shneiderman. "High precision touchscreens: design strategies and comparisons with a mouse." International Journal of Man-Machine Studies 34.4 (1991): 593-613.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

standards in the touchscreen market, no reasonable human-computer-interaction expert would conclude that the early touchscreen designs were ineffective or were so far below any accepted standard to be considered unusable or unfair at the time they were introduced.

28.     The evolution of touchscreen-based keyboards may be even more dramatic.[7] Land-on selection has been replaced by lift-off selection. Larger keys have replaced by smaller keys. Even small lift-off-based touchscreen keyboards have evolved significantly. For example, gesture-based interactions have been integrated, allowing users to drag their finger from one letter to the next, entering a complete word in a single action, and predictive technologies allow users to enter complete words without having to enter each individual letter.[8] Dictionary-based techniques, combined with knowledge of common errors, allow touchscreen keyboards to automatically correct some errors.

29.     Some improvements are driven by changes in the underlying technologies, while others are a result of trial and error, a desire to improve upon the status quo, and exploring new options. There is significant risk by imposing liability for negative results during such trial and error or while exploring new options in an effort to improve upon the status quo. Unless liability is limited to situations in which the design was objectively unreasonable at launch or made in bad faith—and not simply sub-optimal, particularly in hindsight—that risk of liability will deter such positive efforts and hamper innovation.

30.     A touchscreen keyboard that only allowed individual letters to be entered with each touch—using the land-on or lift-off strategy—would have been state-of-the-art in the late 1980s. In many contexts, this same keyboard would likely be considered poorly designed by today's standards, particularly given users' exposure to and current understanding of auto-correct algorithms, predictive algorithms, and gesture-based interactions in the context of text entry. The time at which an interface was developed must be considered when analyzing whether it was a reasonable solution when it was introduced.

---

[7] Sears, Andrew, et al. "Investigating touchscreen typing: the effect of keyboard size on typing speed." Behaviour & Information Technology 12.1 (1993): 17-22.

[8] See, for example, Zhai, Shumin, and Per Ola Kristensson. "The word-gesture keyboard: reimagining keyboard interaction." Communications of the ACM 55.9 (2012): 91-101.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

31.     As a result, analyzing the usability of a system that existed at some point in the past, with the goal of understanding how well a system was designed, requires great care and consideration of the context in which the system was produced. Importantly, this requires consideration of what was known and what was considered state-of-the-art at the time. A system may have been well designed when introduced, based on what was known at the time, only to be less than ideal at the present. Without that understanding and careful evaluation, there otherwise remains significant risk that reliance on hindsight will produce merely differences of opinion on optimization, not objective assessment of usability or reasonableness.[9]

## 2.     State of the Art for In-App Purchases in November 2011

32.     The evolution of how users were informed about in-app purchases is another example. When Amazon introduced in-app purchases in November 2011, both Apple and Google had already been providing apps that offered in-app purchases. The user experience provided by Apple and Google, who were the largest providers of apps that include in-app purchases, was state-of-the-art at the time. To be sure, Apple and Google are skilled, respected consumer companies with particularly strong reputations for user-interface design and ease of use. Apple began offering apps with in-app purchasing in October 2009.[10] Yet according to the FTC's complaint against Apple, even by November 2011 Apple was not providing any up-front disclosure regarding the existence of in-app purchases.[11] Nor was Apple providing any immediate notification to the device owner after an in-app purchase was completed. Similarly,

---

[9] Ms. King often ignores the importance of context and time. For example, she identifies one study finding that confusion between apps being advertised as free but, in fact, not free to use has led to consumer disappointment and lower consumer ratings. Expert Report of Jennifer King at 20. Yet the results of that study were reported in May of 2015, nearly four years after Amazon launched in-app purchases. Amazon could not have designed its products in 2011 based on the insights provided by an article published four years later.

[10] Expert Report of Ravi Dhar, October, 16, 2015.

[11] *In re Apple Inc.*, Dkt. No. C-4444, Complaint, Federal Trade Commission (Mar. 2014) (FTC_AMZ_00000001). Contrary to the representation in the FTC's complaint against Apple, it may be that by November 2011 Apple included on its app-description page a limited note about in-app purchases. (I understand from Amazon's counsel that the FTC refused to provide information to Amazon in this case about Apple's or Google's in-app purchase disclosures and interfaces.) Even if so, Amazon still met and exceeded the state-of-the-art because it too included a description, its description was detailed, and it specifically identified Parental Controls.

even by November 2011, Google was not providing any up-front disclosure regarding the existence of in-app purchases.[12]

33.    When Amazon launched in-app-purchasing opportunities in November 2011, Amazon went beyond then-accepted state-of-the-art. Amazon included a description of the availability of in-app purchases on an app's description page. That note began with large, all capitalized letters stating "PLEASE NOTE." It described in-app purchasing, including that such purchases were paid for using "actual money." And it explained that users could configure Parental Controls.[13] That these details had been excluded by the other market participants supports the conclusion that Amazon was operating above contemporary, accepted business practices with regard to making this information available to all users including parents.

34.    Moreover, unlike Apple, in November 2011 (and through today), Amazon *immediately* emailed an order-confirmation receipt to the account holder after each in-app-purchase. That email receipt included detailed information about each purchase, including the name and cost of the product and the order number. It also included links to the user's account page as well as to Amazon help pages.[14] That Amazon included those details and links in an immediate confirmatory email further supports the conclusion that Amazon's in-app purchasing practices exceeded those of its largest competitors and then-standard practices.

### 3.    Design, Release, and Redesign Is An Accepted Practice

35.    Usability is not a formula-driven concept. It is based on the experiences of the users. As a result, it is common for organizations to release a product, observe how the product is used, gather feedback from users, and revise the product to address user concerns and improve the user experience. It is common for this to be an interactive process involving multiple releases as the system is improved.[15] This is consistent with the approach Amazon employed here. Design,

---

[12] *In re Google Inc.*, Dkt. No. C-4499, Complaint, Federal Trade Commission (Dec. 2014) (FTC_AMZ_00000025).

[13] Expert Report of Jennifer King (October 16, 2015) at 25, Fig. 4; Expert Report of Ravi Dhar (October 16, 2015) ¶¶ 54-55.

[14] Expert Report of Jennifer King (October 16, 2015) at 43, Fig. 12; Expert Report of Ravi Dhar (October 16, 2015) ¶ 36 & Appendix A.

[15] Hartson, R., & P.S. Pyla, The UX Book: Process and guidelines for ensuring a quality user experience, Elsevier (2012).

release, and redesign is not only supported by the usability community and literature but also has distinct advantages in terms of obtaining the most pertinent feedback, ensuring earlier entry of competitive alternatives, and furthering innovative approaches.

36.     As already noted, Amazon's initial release of in-app purchasing in 2011 went beyond what was state-of-the-art by providing both an up-front notification about in-app purchases and immediate email updates whenever in-app purchases were made. This was followed by multiple revisions to how in-app purchases were introduced and how in-app purchases were completed. Passwords were introduced for certain in-app purchases in 2012 in response to insights gained based on customer behaviors. The Key Details feature was introduced in 2013, providing users with an additional way to learn about in-app purchases. Which purchases required a password continued to evolve based on user experiences, with a new requirement in May 2013 that a password be entered prior to the first in-app purchase regardless of the cost. This same dialog box informed users that they could require a password for all future in-app purchases by turning on Parental Controls. Building on knowledge gained from user experiences, the current interface was introduced in June 2014. This interface requires users to explicitly choose between requiring and not requiring a password for future purchases.

37.     An iterative approach involving product launch, user review and feedback, and refinement—such as that used by Amazon—is a preferred approach that allows for continuous improvement of the user experience. Usability and innovation in design will suffer if companies avoid addressing known interface issues or refrain from exploring ways to improve user design because they fear that making such improvements will invite litigation based on the (incorrect) assumption by others that the changes indicate their original designs were unreasonable.

### B.     Heuristic Evaluations Are Less Reliable and Prone to Error if Applied Incorrectly

38.     Even at a fixed point in time, usability is a subjective concept. What is ideal for one individual may be less than ideal for another. What is usable for one individual may be less clear to another individual. There is no "formula" based approach that can be applied to ensure that a system is usable. As a result, various methodologies have been developed to evaluate

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

usability in the context of information technologies. When used properly, these methodologies can help identify and address usability problems.

39.    Many methodologies are available for evaluating usability. The website Usability.gov, as Ms. King mentions in her report, is one useful resource that summarizes a number of methodologies. However, Usability.gov does not provide a comprehensive understanding of the issues involved and should not be relied on in isolation.

40.    Some usability evaluation methodologies are based on direct input from users, often based on interactions with some version of the system in question. These are important techniques because, as highlighted by usability expert Dana Chisnell, on whom Ms. King also relies, there is no substitute for observing users interacting with a system if the goal is to understand the user experience.[16] Other methodologies rely on input from usability experts, who provide insights based on their own personal review of or interaction with some version of the system. Due to the subjective nature of usability, an effective evaluation—whether user- or expert-based—relies on input from multiple individuals rather than on the input of just a single individual.

41.    Ms. King's identified method for evaluating the "effectiveness" of Amazon's in-app-purchasing process is not a usability test but a "usability inspection." But a usability inspection is a collection of techniques, not a single methodology.[17] Later, Ms. King clarifies that she conducted a "heuristic evaluation." Stated differently, she "review[ed] an application interface for compliance with an accepted set of heuristics."[18]

42.    The history of heuristic evaluation within the human computer interaction community is typically traced back to the early 1990s and research reported by Jakob Nielsen. As detailed below, however, extensive subsequent research now reveals that there are important limitations with a heuristic evaluation. Heuristic evaluations are inherently subjective, and they are even less reliable when the evaluator has limited formal training or experience in usability concepts.

---

[16] Chisnell, Dana. "What you really get from a heuristic evaluation." UX Magazine, Feb. 19, 2010. http://uxmag.com/articles/what-you-really-get-from-a-heuristic-evaluation

[17] See, for example, Mack, R. L., & Nielsen, J. (Eds.). (1994). Usability inspection methods. New York, NY: Wiley & Sons.

[18] Expert Report of Jennifer King (October 16, 2015) at 13 & n.3.

Indeed, even experienced heuristic evaluators typically produce different results when evaluating the same subject. There is no single "accepted set of heuristics." Isolated heuristic evaluations are also prone to overemphasize the severity of perceived problems and identify false-positives—items that would not actually create problems for users interacting with a live system. The more reliable, accepted method for heuristic evaluation requires the use of multiple usability experts to independently review the system, followed by careful analysis involving multiple individuals that assesses the severity of the potential problems. This severity analysis reduces false-positives and better assesses the severity of potential problems. Ms. King's much more informal process does not account for the synthesis of information that would reduce the presence of false-positives and better assess the severity of potentially problems, and therefore her conclusions are subject to those flaws.

### 1. Heuristic Evaluations Are Subjective

43.    Critically, studies confirm that usability is a subjective concept and different individuals applying this same technique will often arrive at different conclusions. Expertise (or lack thereof) affects those conclusions, and heuristic evaluation is more effective when the individuals performing the evaluation have formal training or usability experience. Importantly, even when the individuals are usability experts, results typically differ from one individual to the next. Because variation in usability opinions is inevitable, it is strongly discouraged to rely on a single, subjective evaluation to categorically establish usability or "effectiveness."[19]

### 2. Reliable Application of Heuristic Evaluation Requires the Use of Multiple Evaluators

44.    Also critical to an effective heuristic evaluation is the use of multiple evaluators to independently assess and then evaluate others' assessments. The need for multiple evaluators has been a well-documented guiding principle for at least 20 years.[20] Even Usability.gov, on which Ms. King relies, emphasizes this requirement.[21] Jakob Nielsen, also on whom Ms. King relies

---

[19] http://www.nngroup.com/articles/how-to-conduct-a-heuristic-evaluation; Nielsen, Jakob. "Finding usability problems through heuristic evaluation." Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '92), ACM, New York, NY, USA, 373-380.

[20] Ibid.

[21] http://www.usability.gov/how-to-and-tools/methods/heuristic-evaluation.html.

and who is often credited as one of the scholars who introduced this approach to the community, similarly cautions about the importance of using multiple evaluators.[22] To use techniques like heuristic evaluation properly, several usability experts should independently review the system. This initial review should be followed by a systematic approach to aggregate evaluations, synthesize the inputs gathered, and assess the existence and severity of potential problems.

### 3. Heuristic Evaluations Can Overestimate the Severity of Potential Problems and Identify False-Positives

45. Because heuristic evaluations, which are designed to uncover potential problems, are subjective comparisons of an interface to a set of guidelines or heuristics, such an evaluation often identifies problems that do not actually exist in practice. Accordingly, any item identified by an individual evaluator should be considered a potential or candidate problem.[23] The potential usability problems identified via inspection-based techniques including heuristic evaluation will vary in importance. Some of the items identified will correspond to minor usability problems, causing little more than an occasional annoyance. Other items will correspond to severe usability problems, which may interfere with an individual's ability to complete a task. Importantly, items identified using heuristic evaluation have also been shown to be false-positives. In other words, some of potential problems identified by individual evaluators, including evaluators who are usability experts, will not represent real problems that need to be addressed.[24]

46. A systematic process of reviewing the existence and severity of the potential problems, which also needs to include several individuals, is vital to address and eliminate false-positives while also distinguishing between issues that may produce little more than an occasional irritation and those that may cause severe problems for users.[25] Unlike usability tests, which rely on users interacting with the system and encountering problems, heuristic evaluation relies on

---

[22] http://www.nngroup.com/articles/how-to-conduct-a-heuristic-evaluation.

[23] Cockton, Gilbert, and Alan Woolrych. "Understanding inspection methods: lessons from an assessment of heuristic evaluation." People and Computers XV—Interaction without Frontiers. Springer London, 2001. 171-191.

[24] Sears, Andrew. "Heuristic walkthroughs: Finding the problems without the noise." International Journal of Human-Computer Interaction 9.3 (1997): 213-234.

[25] http://www.nngroup.com/articles/how-to-rate-the-severity-of-usability-problems/.

individuals reviewing a system and identifying things they *think* may be problems. The nature of heuristic evaluation makes the problem severity rating process even more important.

47.     The concern of false-positives has been in the forefront since heuristic evaluation was introduced. One of the original papers introducing the heuristic technique highlighted the potential for false-positives.[26] Other researchers subsequently confirmed the problem of false-positives and the importance of a separate process for reviewing problem severity in the context of heuristic evaluation.[27] Researchers have also demonstrated that heuristic evaluation can produce numerous potential problems that are not identified or corroborated through user testing.[28] Finally, Jakob Nielsen continues to highlight the critical importance of an effective severity rating process, stressing the importance of having several people independently review the severity of each potential problem.[29]

### 4.     Heuristic Evaluations Are Not a Substitute for Usability Testing

48.     Ms. King states that the "overriding goal" of her heuristic evaluation is to "identify major flaws."[30] She also says "a usability inspection [such as she performs] can provide similar insights to those generated through user testing, particularly when reviewing interfaces for conformance with basic principles."[31] Both of these statements raise serious concerns.

49.     First, heuristic evaluations are *not* known or designed to focus on "major flaws." As described above, heuristic evaluations identify a mixture of potentially severe problems, minor problems, and false-positives. Most often, the number of minor problems identified is far greater than the number of severe problems identified.

---

[26] Nielsen, Jakob, and Rolf Molich. "Heuristic evaluation of user interfaces." Proceedings of the SIGCHI conference on Human factors in computing systems. ACM, 1990.

[27] Sears, Andrew. "Heuristic walkthroughs: Finding the problems without the noise." International Journal of Human-Computer Interaction 9.3 (1997): 213-234.

[28] Law, Effie Lai-Chong, and Ebba Thora Hvannberg. "Analysis of strategies for improving and estimating the effectiveness of heuristic evaluation." Proceedings of the third Nordic conference on Human-computer interaction. ACM, 2004; http://www.nngroup.com/articles/usability-problems-found-by-heuristic-evaluation/.

[29] http://www.nngroup.com/articles/how-to-rate-the-severity-of-usability-problems/.

[30] Expert Report of Jennifer King (October 16, 2015) at 14.

[31] Expert Report of Jennifer King (October 16, 2015) at 14.

50. ==Second, the results produced by heuristic evaluations are not as reliable as those produced through user testing and do not necessarily produce similar insights.[32] In fact, the reference Ms. King uses to support the assertion about the similarity of those results supports the *opposite* conclusion. Ms. King relies on Dana Chisnell's 2010 article titled "What you really get from a heuristic evaluation" for her similarity position,[33] but that article actually concludes otherwise.[34]==

51. Chisnell makes several statements that are in direct conflict with Ms. King's interpretation of Chisnell's work. Chisnell states, for example, that "[u]nfortunately, the request [by a client to do a heuristic evaluation of a product] usually suggests that a heuristic evaluation can substitute for usability tests." But Chisnell confirms that heuristic evaluation is "an inspection, *not* an evaluation. It is *not* about the user experience."[35] Chisnell further verifies that any such heuristic review that "claims to answer" questions about a user's actual experience "is just guessing." Chisnell also confirms that heuristic evaluations such as Ms. King's are likely to identify design problems that are not actually problematic: "Worse, they may identify things that don't comply with the heuristics that should *not* be changed."[36]

52. Chisnell explains why Ms. King's individual, subjective heuristic evaluation inspection is unreliable in evaluating Amazon's in-app purchasing process: "Heuristic evaluation may help a team know whether their UI [user interface] complies with someone else's guidelines. But observing people using a design in a usability test gives a team primary data for making design decisions for their users using their design . . . ." Notably, Chisnell identifies touchscreen devices and online connectivity (the interfaces at issue here) as particularly susceptible to error from a heuristic evaluation: "[user testing is superior,] especially in a world evolved far beyond command line entry and simple GUIs [graphic user interfaces] to options like touchscreens, social media, and ubiquitous connectivity." As Chisnell concludes, "For me, observing people using a design will always trump an inspection or audit for getting solid evidence to determine a

---

[32] http://www.nngroup.com/articles/usability-problems-found-by-heuristic-evaluation/.

[33] Expert Report of Jennifer King (October 16, 2015) at 14.

[34] Chisnell, Dana. "What you really get from a heuristic evaluation." UX Magazine, Feb. 19, 2010. http://uxmag.com/articles/what-you-really-get-from-a-heuristic-evaluation

[35] Emphasis added.

[36] Emphasis added.

design direction." Heuristic evaluations can be useful, when applied properly, for determining if a system conforms to guidelines. But as Chisnell notes, the fact that something does not conform to a predefined set of guidelines does not mean that there is a problem that needs to be addressed.

### C. Ms. King's Heuristic Evaluation Is Incomplete and Unreliable

53. Ms. King's report contains questionable conclusions drawn from an incomplete and unreliable heuristic evaluation. By conducting an individual, subjective evaluation in a vacuum with an "overriding goal" to "identify major flaws," Ms. King uses an approach that is particularly susceptible to overemphasizing the severity of perceived problems and identifying false-positives. Ms. King's conclusions were not informed or corroborated by user testing or user surveys, and she does not consider the fact that the overwhelming majority of customers used in-app purchasing without complaint.[37] Yet, Ms. King often draws sweeping, unqualified conclusions about wide swaths of tablet users without statistical support—opining that "many" customers would not understand in-app purchasing, that "many, if not most" customers would never see Amazon's in-app-purchasing notices, that "many users were not likely to know that a free app would have any additional costs attached" (even though no additional costs were ever necessary to use the free apps at issue here), and that "in the majority of cases" Amazon's badging alone must effectively convey the presence of in-app purchasing. Ms. King presents her own personal, broad opinions on these topics while discounting the judgments of Amazon's team of web and tablet designers, who have considerable experience and real-world success improving user interfaces and user experiences.

54. Moreover, Ms. King's analysis seems to erroneously assume that Amazon's primary task is always to address in-app purchasing and Parental Controls. She often fails to recognize the variety of tasks at issue on each screen and how the various groups of potential users would perceive these tasks, particularly for a multimedia device designed to provide a multitude of services to a variety of customers. She fails to recognize that most Amazon customers prefer a frictionless purchasing experience unencumbered by additional dialog boxes and password prompts.[38] She often ignores her own opinion that adding more text likely means that users will

---

[37] Expert Report of Ravi Dhar (October 16, 2015) ¶¶ 103-07 & Table 2.

[38] Expert Report of Donna Hoffman (October 16, 2015) ¶¶ 55-64, 73-76.

skim the text rather than read it. And, Ms. King's analysis focuses almost exclusively on the most uninformed user who is unwilling to make any effort to understand the purpose and ability of the purchased tablet device. Indeed, she goes so far as to conclude that the term "real money" only "subtly" conveys the use of actual currency and that the term "future in-app purchases" is "vague."

55.     Ms. King similarly ignores the fact that Kindle Fire tablets are media-consumption devices, which necessarily implies some purchasing ability via that device—an understanding that is reinforced by the fact that device owners must first link the tablet to an Amazon credit-card account before making any purchase on the device. In other words, Ms. King assumes that the average Kindle Fire account owner is unaware that his or her device, once enabled for credit-card charges, could be used by another user for credit-card purchases. That is not a reasonable assumption because ownership of such an account-connected device should and likely would prompt at least of a modicum of vigilance by tablet owners, particularly parents. In my opinion, it was reasonable for Amazon to proceed on the understanding that users, particularly parents, would not simply hand an Internet-connected and credit card-enabled device to children without any supervision over purchases. It was and remains a reasonable design choice to build into such devices parental choice and regulation, which is what Amazon provided via its notices and Parental Controls (and later via FreeTime).[39] Ms. King ignores this context and reaches a conclusion that is based on the far less reasonable assumption that Kindle Fire account owners would exercise almost zero supervision or responsibility over how others, particularly children, used their devices once enabled for purchases over the Internet.

56.     Nor does Ms. King clearly identify to what standard she holds Amazon. She appears to demand a level of perfection or "best" practice from inception of the product, with the aid of hindsight, that is uncalled for in the industry or in the academic literature. No single evaluator can effectively and reliably determine a best practice, particularly in a developing market with a developing interface. The field of human-computer interaction does not recognize a single standard for best practices or even for complete "effectiveness." Ms. King's approach is

---

[39] Business planning documents for the Amazon Appstore indicate that Amazon early on identified Parental Controls as a tool available for parents who would supervise their child's use of a device. Amazon_265968-70, Amazon_265973, Amazon_265968, Amz_FTC_0037659.

inappropriate here where the question is whether Amazon's practices were unfair, not whether they were imperfect. Indeed, Ms. King's unqualified conclusions provide an inaccurate and inappropriate description of the tablet market, and her analysis fails to consider the state-of-the-art or industry practice when Amazon launched opportunities for in-app purchasing and introduced various interfaces over time. She similarly disregards whether Amazon's approach was reasonable even if not "best," whether it was part of a refinement process that employed data and information from actual user experience and feedback with the goal of continuously improving the user experience, or whether it was made in good faith and not intended to deceive.

57.     As a result, Ms. King produces a collection of potential or candidate problems of uncertain reliability and unknown severity, and her solutions, where suggested, do not adequately consider context, show little or no appreciation for competing design objectives, and could introduce unaddressed and unintended consequences. Some of these candidate problems are likely false-positives. Even those items that are not false-positives simply correspond to items that deviate from a set of guidelines, and those "deviations" do not necessarily mean that changes to the system are appropriate or that users would experience difficulty as a result of the issues identified. The following examples highlight why multiple, professional evaluators are necessary when applying such usability inspection techniques.

### 1.     Prominence of In-App Purchase Disclosures

58.     Beginning less than a week after Amazon first started offering opportunities for in-app purchasing, Amazon included on the app-description page information about in-app purchases allowing users to understand the meaning of in-app purchasing and to understand that Parental Controls were available for use in the context of in-app purchases. This information was appended to the end of the app description, highlighted by the uppercase text "PLEASE NOTE." The note itself informed users that the "app contains in-app purchasing, which allows you to buy items within the app using actual money." That text clearly and in understandable terms states that purchases can be made from within the app and that these purchases are made using real or "actual" money. The note continues by informing users that they "can configure parental controls from the device Settings menu by selecting Parental Controls." That text also clearly and in

understandable terms informs users that they have the ability to enable Parental Controls via the settings menu.

59.     In my opinion, and contrary to Ms. King's view, in the context in which it was encountered, the phrase "in-app purchase" was sufficiently clear. Moreover, because the device is connected to the account holder's Amazon account, which includes a method of paying for purchases such as a credit card, it is reasonable to expect users to understand that these "in-app purchases" would result in charges to their Amazon account.

60.     The use of uppercase to highlight "PLEASE NOTE" makes the in-app purchase note more prominent than it would be otherwise. The fact that the app developer could also use uppercase within the app description does not change this fact or completely eliminate its usefulness, as Ms. King suggests. There can be multiple important pieces of information within the app description including the in-app purchase note and other items identified by the app developer. The use of uppercase would help to attract the users' attention to these items that were considered important.

61.     Nor did Ms. King identify any instance in which uppercase was used so often that it was no longer a distinguishing feature. And had Amazon made the entirety of the in-app-purchase note uppercase (as opposed to the attention-grabbing first two words), it may have been more difficult for users to read and they may have then, as Ms. King notes, only skimmed or completely ignored the text.

62.     Ms. King opines that "in the majority of cases," users would not see or understand the in-app-purchase description, yet she performed no user testing or statistical measurement to draw such a conclusion. And there is simply no support for Ms. King's unqualified position that because other text may have also been displayed in uppercase, the in-app-purchase text was "difficult, if not *impossible*, to notice" and was categorically "ineffective."[40]

63.     Finally, Ms. King ignores the simple fact that not all notices and information can be prominent. Not everything can be distinct, else everything becomes indistinct. Tradeoffs regarding importance and placement must be made. Everything cannot always appear "above the

---

[40] Expert Report of Jennifer King (October 16, 2015) at 26 (emphasis added).

fold," nor should it. It was reasonable and fair and consistent with industry norms for Amazon to conclude that the most important information on the app-description page, and that which appeared at the top of the screen, describe the purpose and use of the app itself. In-app purchasing is optional and supplemental; its prominence should be commensurate with that significance. And Amazon reasonably adjusted that prominence as the significance of in-app purchasing also evolved in the market.

### 2. Prominence and Clarity of Key Details Badge

64. The Key Details badging was added in June 2013 as an additional means of highlighting important or useful information. As Ms. King notes, the Key Details were "Above the fold," making them even more visible than other text when the app description is initially displayed. The bulleted list makes it clear that this is a list of topics and not the complete details. The Key Details label is presented in a color and font similar to other text on the screen, and the words effectively convey that this section includes important information.

65. Ms. King asserts that the title suggests that the section contains information the user "may wish to know" but that it "does not communicate to the user who is concerned about the cost of the app that it contains information that he or she must know regarding potential charges prior to downloading or using the app." I disagree. The title "Key Details" is a useful way to highlight important details, particularly as users would understand that the term "Key" is synonymous with "important." The purpose of the title was not, as Ms. King suggests, to specifically "communicate to the user who is concerned about the cost of the app that it contains information that he or she must know regarding potential charges prior to downloading or using the app." The purpose of the title was to highlight the availability of important information or "key details."

66. I also disagree with Ms. King's analysis of the text provided for the In-App Purchases key detail. This text clearly and in understandable terms conveys that "actual money" is used, that purchases can be made from within apps, and that you can configure these purchases from within Parental Controls. I disagree with her assertion that the notice does not convey the "fact that IAPs have real costs associated with them."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

67.     Ms. King states that users must already be familiar with the term "in-app purchasing" for "the element to be immediately effective." I disagree. The choice of words makes it such that the phrase clearly refers to a "purchase" in the context of an "app" or gives the reasonable parent enough information to inquire further about the type of purchasing at issue.

68.     Ms. King does not offer alternatives or consider the unintended consequences of implementing those alternatives. With respect to the Key Details badging and implicit throughout Ms. King's report is the contention that Amazon should have added more text and more notices to describe in-app purchasing and Parental Controls in greater detail. But even she admits that "people prefer to skim, rather than read lengthy amounts of text" and that additional "task interruption [that diverts attention from the primary task, e.g., selecting and using the app] is a powerful disincentive."[41] Ms. King makes no effort to reconcile those inconsistent positions or address the balance required to most efficiently give all users, including parents and nonparents, the information and tools to make informed decisions about their devices and the individuals they permit to use those devices.

### 3.     Clarity of In-App Purchase Disclosures

69.     Ms. King asserts that it is important to disclose "in-app purchases in a brief and concise statement." She also asserts "given the fact that in-app purchases can quickly become quite costly, the importance of communicating their cost is crucial." However, her two assertions can be in conflict since it may be difficult to "communicat[e] their cost" in a "brief and concise statement" due to the potential for multiple, different in-app purchases with different costs within a single app. And she often criticizes Amazon for using brevity and conciseness in its notices. Given the trade-off, it is important that the message be brief; otherwise, as Ms. King has noted, people may be less likely to read to notice.

70.     Ms. King argues that the use of the phrase "parental controls" was "likely to introduce confusion or an additional learning barrier for novice parents or users who are not parents attempting to familiarize themselves with the system." She draws her conclusion from her assertion that the term "parental controls" was originally introduced in the context of content

---

[41] Expert Report of Jennifer King (October 16, 2015) at 24, 38.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

blocking and "purchase controls did not emerge until the late 2000s." Thus, according to Ms. King, for some unidentified portion of the user population "pre-existing familiarity with the term may trigger primary associations with content restriction rather than purchase restrictions." Ms. King's evaluation of the understanding of the term "parental controls" (particularly as late as November 2011) is unnecessarily and incorrectly narrow. Reasonable users would understand the term "parental controls" to refer to *restrictions* set up by parents—a restriction to content or a restriction to purchasing, or both. Much like the definition of the term "in-app purchasing" is self-evident, so too is the term "parental controls," particularly in this context.

71.      Ms. King appears to ignore common sense while focusing exclusively on only the most uninformed users who are unwilling to make any effort to understand the purpose and capabilities of the device they purchased. There is of course the possibility that "some" users will not understand the term "parental controls," just as there is the possibility that some users will not understand any term or notice. Any interface design and any choice of words can result in "some proportion of the user population" misunderstanding some details; that possibility cannot be avoided, especially where a company must balance the needs and desires of many varied customers. Ms. King demands a level of perfection that is both unjustified and nonexistent. That *some* users *may* not have understood that commonly used and widely understood term does not make its use "ineffective."[42]

### 4.      Usability of In-App Purchase Flow and Disclosures

72.      In May 2013, even though only a small percentage of users were experiencing any misunderstanding about in-app purchases, Amazon introduced a password prompt on each device for all first-time in-app purchases. That dialog box not only required entry of the account holder's password to complete the purchase but also further explained in-app purchases; reiterated that if the account holder wanted to require a password for future purchases, he or she

---

[42] Ms. King also ignores that Amazon and its Appstore provide unfiltered customer reviews on every app-detail page. Those reviews, which are a widely recognized source of useful information, include commentary (both positive and negative) about the availability of in-app purchasing and Parental Controls. *See* Expert Report of Michael Callahan (October 16, 2015) at 10. By making available not just many reviews but all reviews (critical and otherwise), Amazon's design choice helps train customers to use those reviews as a source of information. Ms. King fails to consider that context.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

should set up Parental Controls; and provided a direct hyperlink to enable those parental-control settings.

73.     Despite this effort by Amazon to again convey both the opportunity for in-app purchases and the ability to disable them (creating additional friction unwanted by most of its customers in order to help those customers who may have needed additional assistance), Ms. King identifies "at least three" issues with the dialog box. She first observes that "the call to action (entering a password) dominates the focus of this prompt and suggests the other text is less important." Ms. King ignores the fact that the password prompt immediately above the space for entering the password says, "To complete your *purchase*, enter your Amazon password." The wording of the prompt conveys to the account holder that someone is making a purchase on the device, and this is the primary purpose of the dialog box. Moreover, the title of the dialog box, which is presented in larger font size than any other text, also says, "Confirm In-App *Purchase*," prominently verifying for the account holder that password entry will result in a purchase. These are reasonably the most important aspects of the dialog box, and they are made sufficiently clear to the user.

74.     Second, Ms. King suggests that users would not understand the phrase "real money" because it appears "without mentioning the dollar amount of the particular charge or using a dollar signs or other signals to emphasize that there is a financial transaction." I strongly disagree with Ms. King's analysis. The lack of dollar signs or a specific dollar amount on this dialog box would not cause the reasonable user (or even an uninformed user) to misunderstand that he or she would be spending money by completing the transaction.

75.     Finally, Ms. King opines that the phrase "future in-app purchases" is vague such that "even users familiar with in-app purchases are unlikely to understand that after entering their password a child would be able to incur additional in-app charges without password reentry." I disagree. She asserts that users who "read the full sentence" may "fail to understand that they must change their device settings to prevent children from incurring additional in-app charges without password entry" because the "If you'd like" at the beginning of the sentence characterizes the information as optional. I disagree. I believe this sentence presents the user with clear instructions in the form widely accepted formula: if GOAL then ACTION. If the user

would like to require passwords for future in-app purchases, they must "turn on Parental Controls." The standard by which Ms. King evaluates this dialog box, as well as other prompts, is unreasonably demanding, unsupported by academic literature, and implies that no phrase would ever be sufficient.[43]

### 5. Prominence and Clarity of Purchase Confirmation Screen

76. Ms. King critiques the "Purchase Confirmation Screen," asserting that "When Amazon required password entry, some parents may not have seen this screen after entering their password and handing the device back to a child." Her critique misses the point. By presenting a confirmation dialog box, Amazon provided the opportunity for users to confirm their transaction. It is always possible that someone may not notice such a confirmation if they quickly hand the device to someone else, but this does not negate the fact that Amazon provided users with an opportunity to confirm their transaction.

77. Ms. King also asserts that "Other parents may have seen the screen, but may not have read the text [about Parental Controls] given that the primary call to action is the close button in the top right." Again, this is always a possibility when a screen is designed to address multiple goals. In this case, the primary goal is to confirm a transaction. A secondary goal was to convey the status of the Parental Controls, providing users with yet another opportunity to verify and modify the status of these controls. Ms. King's analysis seems to assume that the primary task is always to deal with the Parental Controls related issues, failing to recognize the variety of tasks supported by this dialog box and which tasks were considered most important for the majority of users.

### 6. Ms. King's Analysis of Customer-Service Contacts Is Flawed

78. Ms. King's analysis of customer-service contacts is likewise flawed and suffers from the same defect of searching for and highlighting information that supports a theory rather than evaluating usability objectively. In particular, Ms. King began with over 152,000 "records of

---

[43] Notably, Ms. King highlights Nielsen's position that it is best practice to disclose additional fees as soon as possible. Expert Report of Jennifer King (October 16, 2015) at 20-21. But she ignores that Amazon in multiple locations disclosed—before even downloading an app and long before making any in-app purchase—that opportunities for in-app purchasing were available and optional. Amazon also disclosed every specific fee before the user made a purchase.

individual consumer complaints corresponding to certain Amazon complaint codes." But this entire set of records was *predisposed* to represent situations where customers raised concerns, thus deliberately reinforcing the existence of her allegedly uncovered "themes." Importantly, Ms. King provides no information or analysis regarding the total number of transactions during this period of time, limiting the ability to understand the prevalence of concerns based on this source of information alone.

79.    Moreover, Ms. King pruned those records to approximately 28,000 records of chat sessions and emails that included the phrase "Accidental Order – Child." By limiting the sample to only those contacts with the term "Accidental Order – Child," Ms. King necessarily restricted her analysis to records predisposed to support her "themes" about accidental orders made by children—to the exclusion of contacts made by all Amazon customers about in-app purchases let alone the total number of in-app purchases that occurred during this period.

80.    Taking a random sample of that focused subset of records, Ms. King manually reviewed 400 records, identifying a smaller subset of 219 records she deemed "informative" because the customer *explicitly noted* that the basis of the complaint was an unintentional order for an in-app purchase by a child."[44] It should come as no surprise that Ms. King discovered "themes" about accidental child purchases when her analysis *began* from a highly filtered set records consisting of just over 0.1% of the total customer contacts.

81.    Further, it is unreliable to draw meaningful conclusions based on approximately 20 self-selected quotes at the end of this process. Moreover, she presented the quotes without context. Ms. King provides no analysis of the outcomes for these interactions or the prior online and tablet shopping experiences for those customers. Understanding outcomes and customer history is critical because it speaks to the user experience and the satisfaction of the user after they contacted Amazon.

82.    Nor does Ms. King identify how many of the 400 randomly selected records supported each of her "themes." As presented, no theme was supported by more than five quotes and two were supported by just two quotes. Approximately 2.28% of the 219 selected records were presented in support of the most common themes, but a more appropriate analysis would focus at

---

[44] Emphasis added.

least on the 400 randomly selected records, in which case only 1.25% of the records supported the most common themes. Even then, however, those records were carefully selected by Ms. King from the broader set of over 152,000 records and this full collection of over 152,000 records represents just a fraction of the total in-app purchases during this period.

83.     Finally, different conclusions can be drawn from even those limited quotes Ms. King selects. For example, Ms. King relies on the quote, "my 5 year old was playing a free game on my kindle and apparently unlocked sections of the game that you have to pay for" to support her conclusion that "some customers assumed that a free app would not have a component that allowed for paid purchases." But that selected quote can just as easily support the inference that the consumer already understood that free games could have "sections of the game that you have to pay for" when unlocked and chose to disregard the available controls to prevent accidental purchases when providing the device to a child.

### D.     Amazon Designed for Parents to Exercise Control Over Their Devices

84.     Ms. King emphasizes the need for parents to be able to control their children's use of credit-card-enabled devices, yet she ignores the design objectives and strategies that Amazon employed when creating in-app purchasing for Amazon customers. The earliest consideration of design objectives on the part of Amazon Appstore engineers and business leaders acknowledged that parents would want the functionality to effectively control their children's ability to make purchases on an account-connected device, while simultaneously wanting the freedom to allow their children access to such devices. Those customer needs were fully anticipated, and the Amazon designers and planners included those objectives in their plans.

85.     For instance, as early as May 2011, months before in-app purchasing was first introduced, Amazon's design team circulated a Business Requirements Document that set forth the proposed roadmap for in-app purchasing and the design objectives that had been identified.[45] Under the heading "Customer Needs," Amazon's designers and planners observed that "Parental Control" would be desired by parents, stating, "Adults buying for children (or enabling their children to buy for themselves) will want the ability to guard against large, unexpected charges -

---

[45] Dep. Ex. 47, Deposition of A. Paleja (July 14, 2015).

e.g. through addition of a PIN requirement or spending limits."[46] Ms. King ignores the fact that Amazon built into its design the tools necessary for responsible parents to exercise the supervision that they desired by "opting in" to enable Parental Controls.[47]

### E.  Dr. Rosenberg's Usability Test

86.     As discussed above, a heuristic evaluation is not a substitute for usability testing, which has the advantage of directly observing and evaluating users' interaction with an interface. It is my opinion that a usability test would provide relevant information about the conclusions I have reached.

87.     On December 4, 2015, after I had formulated my opinions discussed above, Amazon's counsel informed me that another expert, Craig Rosenberg, Ph.D., had performed a usability test in this case. I requested the opportunity to review it and did so.[48] Based on my review of the Rosenberg test, I have the following additional observations and opinions regarding how it relates to the opinions I independently reached:

    a.    Dr. Rosenberg's test is the type of usability test that I would find useful when evaluating a user-interface design.

    b.    Findings in Dr. Rosenberg's test buttress many of my opinions identified above. For example:

        i.    Nearly all test subjects viewing an app-description page understood that it was possible to incur additional charges within an app that offered in-app-purchasing opportunities;

        ii.    All or nearly all test subjects understood the language used in the "PLEASE NOTE" and Key Details notices relating to in-app purchasing and Parental Controls, and nearly all subjects understood that they could set Parental Controls to limit in-app purchases; and

---

[46] Ibid. at 00265969.

[47] Ibid. at 00265976.

[48] Expert Report of Craig Rosenberg (December 7, 2015).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

iii.     Nearly all test subjects understood the language used in the dialog box introduced in May 2013 for first-time in-app purchases relating to in-app purchasing and Parental Controls, and nearly all subjects understood the dialog box presented the option of requiring a password for future in-app purchases.[49]

## IV.     Conclusion

88.     Heuristic evaluations of user interfaces are subjective and, particularly when limited to a single evaluator, are prone to overestimate the number and severity of potential problems. It is my opinion that the heuristic evaluation by Jennifer King is an incomplete analysis and draws unreliable conclusions. Contrary to Ms. King, I conclude that Amazon's initial design and refinement of its user interface relating to in-app purchasing were reasonable and consistent with the practice of the industry. They did not fall so far below contemporary, accepted business practices that they would have unfairly confused parents about the presence of and opportunity to make in-app purchases, about the presence of and opportunity to enable Parental Controls to restrict in-app purchases, or the availability of and means to request a refund for any accidental or unwanted in-app purchases.

Dated December 7, 2015

_____

Andrew L. Sears, Ph.D.

---

[49] The test results revealed similarly positive results for the version of the dialog box introduced in June 2014.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

iii.     Nearly all test subjects understood the language used in the dialog box
         introduced in May 2013 for first-time in-app purchases relating to in-app
         purchasing and Parental Controls, and nearly all subjects understood the
         dialog box presented the option of requiring a password for future in-app
         purchases.[49]

## IV.     Conclusion

88.     Heuristic evaluations of user interfaces are subjective and, particularly when limited to a
single evaluator, are prone to overestimate the number and severity of potential problems. It is
my opinion that the heuristic evaluation by Jennifer King is an incomplete analysis and draws
unreliable conclusions. Contrary to Ms. King, I conclude that Amazon's initial design and
refinement of its user interface relating to in-app purchasing were reasonable and consistent with
the practice of the industry. They did not fall so far below contemporary, accepted business
practices that they would have unfairly confused parents about the presence of and opportunity to
make in-app purchases, about the presence of and opportunity to enable Parental Controls to
restrict in-app purchases, or the availability of and means to request a refund for any accidental
or unwanted in-app purchases.

Dated December 7, 2015

_ᵃᵛᵉˢ_

_____

Andrew L. Sears, Ph.D.

---

[49] The test results revealed similarly positive results for the version of the dialog box introduced in June 2014.

## Appendix A: Curriculum Vitae of Dean Andrew Sears

## Andrew L. Sears

The Pennsylvania State University
332 Information Sciences and Technology Building
University Park, PA 16802
Andrew.Sears@psu.edu

142 Fenwick Dr.
Port Matilda, PA 16870
sears@acm.org

**Education**

Ph.D., Computer Science. University of Maryland-College Park, May 1993

B.S., Computer Science. Rensselaer Polytechnic Institute, May 1988

**Experience**

| | |
|---|---|
| Sept 2015 – Present | Interim Chief Information Security Officer, The Pennsylvania State University |
| July 2015 – Present | Professor and Dean, College of Information Sciences and Technology, The Pennsylvania State University |
| Aug 2011 – June 2015 | Professor and Dean, B. Thomas Golisano College of Computing and Information Sciences, Rochester Institute of Technology |
| Aug 2008 – July 2011 | Constellation Professor of Information Technology and Engineering, UMBC |
| Dec 2007 – Nov 2010 | Professor of Research, US Department of Veterans Affairs |
| Oct 2007 – June 2013 | Professor of Anesthesiology, University of Maryland, School of Medicine |
| Oct 2005 – July 2008 | Associate Director, National Center for the Study of Elections, UMBC |
| Aug 2005 – July 2011 | Affiliate Professor, Erickson School of Aging Studies, UMBC |
| July 2003 – July 2011 | Professor, Information Systems Department, UMBC |
| July 2002 – July 2011 | Chair, Information Systems Department, UMBC |
| Sept 2002 – June 2005 | Member, Bioinformatics Research Center, UMBC |
| July 2001 – July 2002 | Graduate Program Director, Information Systems Department, UMBC |
| Oct 2001 – July 2011 | Director, Interactive Systems Research Center, UMBC |
| July 1999 – July 2003 | Associate Professor, Information Systems Department, UMBC |
| July 1993 – June 1999 | Assistant Professor, School of Computer Science, Telecommunications and Information Systems, DePaul University |
| Aug 1988 – July 1993 | NASA Fellow/Research Assistant, Human-Computer Interaction Lab, Computer Science Department, University of Maryland – College Park. |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| Oct 1990 – July 1993 | Software Engineer, NASA Goddard Space Flight Center, Greenbelt, Maryland |
| May 1990 – Aug 1990 | Usability Engineer, Sun Microsystems, Billerica, Massachusetts |

**Prior Testimony**

*In the Matter of Certain Mobile Handset Devices and Related Touch Keyboard Software," Investigation number 337-TA-864, U.S. International Trade Commission.*

**Publications**

*Books*

Sears, A. and Jacko, J. (Eds.) (2009). *Human-Computer Interaction: Fundamentals*. CRC Press.

Sears, A. and Jacko, J. (Eds.) (2009). *Human-Computer Interaction: Designing for Diverse Users and Domains*. CRC Press.

Sears, A. and Jacko, J. (Eds.) (2009). *Human-Computer Interaction: Design Issues, Solutions, and Applications*. CRC Press.

Sears, A. and Jacko, J. (Eds.) (2009). *Human-Computer Interaction: Development Process*. CRC Press.

Sears, A. and Jacko, J. (Eds.) (2008). *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Application*, 2nd Edition. CRC Press.

Jacko, J. and Sears, A. (Eds.) (2003). *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications*. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

*Book Chapters*

Young, M., Sears, A., O'Young, B., and Young, M. (2010). Assistive Technologies. In M. Gonzalez-Fernandez and J. D. Friedman (Eds) *Physical Medicine and Rehabilitation Pocket Companion*.

Feng, J. and Sears, A. (2009). Speech Input to Support Universal Access. *The Universal Access Handbook* (pp. 30-1 - 30-16).

Lin, M., Sears, A., Herbst, S., and Liu, F. (2008). Improving Stroke Based Input of Chinese Characters. In J. Lumsden (Ed) *Handbook of Research on User Interface Design and Evaluation for Mobile Technology* (pp. 426-445).

Feng, J. and Sears, A. (2007). Interaction Techniques for Users with Spinal Cord Injuries: A speech-based solution. In: J. Lazar (Ed) *Universal Usability* (pp. 389-419).

Boninger, M. L., Cho, H., Johnson, K., Young, M., Stiens, S., Sears, A. (2007). Assistive Technologies: Catalysts for Adaptive Function. In: B. O'Young, M. Young, and S. Stiens (Eds) *Physical Medicine and Rehabilitation Secrets*, 3rd Edition (pp. 201-206).

Sears. A. and Jacko, J. A.. (2007). Future trends in human-computer interaction. In: A. Sears and J. Jacko (Eds) *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications,* 2nd Edition (pp. 1279-1287). CRC Press. Reprinted in Sears, A. and Jacko, J. (2009). *Human-Computer Interaction: Designing for Diverse Users and Domains*. CRC Press.

Sears. A., Young, M., and Feng, J. (2007). Physical Disabilities and Computing Technologies: An Analysis of Impairments. In: A. Sears and J. Jacko (Eds) *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications,* 2nd Edition (pp. 829-852). CRC Press.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Lazar, J. and Sears, A. (2006). Design of E-Business Web Sites. In: G. Salvendy (Ed) *Handbook of Human Factors and Ergonomics*, 3rd Edition (pp. 1344-1363).

Sears, A. and Law, C. (2005). Physical Disabilities in Human Computer Interaction. In: W. Karwowski (Ed). *International Encyclopedia of Ergonomics and Human Factors*, 2nd Edition, pp. 1217-1223.

Sears, A. and Jacko, J. (2004). Exploring the effects of hardware performance, application design, and cognitive demands on user productivity and perceptions. In: M. A. Mahmood (Ed). *Advanced Topics in End User Computing, Volume III* (pp. 263-287). (This article is also listed below under peer reviewed journals. The article was originally published in the *Journal of End User Computing*).

Sears, A. (2003). Universal Usability and the WWW. In: J. Ratner (ed) *Human Factors and Web Development 2nd Edition* (pp. 21-46). Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears. A. and Young, M. (2003). Physical Disabilities and Computing Technologies: An Analysis of Impairments. In: J. Jacko and A. Sears (Eds) *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications.* Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears. A. (2003). Testing and Evaluation. In: J. Jacko and A. Sears (Eds). *The Human-Computer Interaction Handbook: Fundamentals, Evolving Technologies and Emerging Applications.* Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Smith, D., Huang, Z., Preece, J. & Sears, A. (2002). The effects of using a triangulation approach of evaluation methodologies to examine the usability of a University Website. In: T. Barrier (Ed). *Human Computer Interaction Development and Management*, Hershey, PA: IRM Press. (This article is also listed below under refereed conference proceedings. The article was originally published in the *Proceedings of the Information Resources Management Association International Conference 2001.*)

Plaisant, C., & Sears, A. (1995). Touchscreen interfaces for flexible alphanumeric data entry. In: G. Perlman, G. K. Green, and M. S. Wogalter (Eds) *Human Factors Perspectives on Human-Computer Interaction: Selections from Proceedings of Human Factors and Ergonomics Society Annual Meetings, 1983-1994.* Santa Monica, CA: HFES. (This article is also listed below under refereed conference proceedings. The article was originally published in the *Proceedings of the 36th Annual Meeting of the Human Factors Society.*)

Sears, A., Plaisant, C., & Shneiderman, B. (1992). A New Era for High Precision Touchscreens. In: H.R. Hartson & D. Hix (Eds.), *Advances in Human Computer Interaction* (Vol. 3). Norwood, NJ: Ablex.

***Journal Articles***
Vizer, L. M. and Sears, A. (2015). Classifying Text-Based Computer Interactions for Health Monitoring. *Pervasive Computing, IEEE* 14.4, 64-71.

Qian, H., Kuber, R., Sears, A. & Stanwyck, E. (2014). Determining the Efficacy of Multi-Parameter Tactons in the Presence of Real-world and Simulated Audio Distractors. *Interacting with Computers 26* (6), 572-594.

Sears, A. &Hanson, V. L. (2012). Representing users in accessibility research. *ACM Transactions on Accessible Computing* 4, 2, Article 7, 6 pages.

Qian, H., Kuber, R. & Sears, A. (2011). Developing Perceivable Tactile Feedback for Mobile Devices. *International Journal of Human Computer Studies*, 69, 705-719.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Qian, H., Kuber, R., Sears, A. & Murphy, E. (2011). Maintaining and Modifying Pace through Tactile and Multimodal Feedback. *Interacting with Computers,* 23(3), 214-225.

Zhu, S., Feng, J., and Sears, A. (2010). Investigating grid-based navigation: The impact of physical disability. *ACM Transactions on Accessible Computing*, 3(1), 30 pages.

Feng, J., Zhu, S., Hu, R. and Sears, A. (2010). Speech-based navigation and error correction: A comprehensive comparison of two solutions. *Universal Access in the Information Society,* 10(1), 17-31.

Zhou, L., Shi, Y. and Sears, A. (2010). Third-party error detection support mechanisms for dictation speech recognition. *Interacting with Computers*, 22(5), 375-388.

Feng, J. and Sears, A. (2010). Beyond errors: Measuring reliability for error-prone interaction devices. *Behaviour and Information Technology*, 29(2), 149-163.

Joshi, A., Arora, M., Dai, L., Price, K., Vizer, L. and Sears, A. (2009). Usability of a Patient Education and Motivation tool using Heuristic Evaluation. appear: *Journal of Medical Internet Research*, 11(4):e47.

Price, K., Lin, M., Feng, J., Goldman, R., Sears, A., and Jacko, J. (2009). Nomadic Speech-based Text Entry: A Decision Model Strategy for Improved Speech to Text Processing. *International Journal of Human-Computer Interaction,* 25(7), 692 – 706.

Joshi, A., Weng, W., Lichenstein, R., Arora, M., Sears, A. (2009). Prospective tracking of a Pediatric Emergency Department E-kiosk to deliver Asthma Education. *Health Informatics Journal*, 15(4), 282-295.

Vizer, L., Zhou, L., and Sears, A. (2009). Automated Stress Detection Using Keystroke and Linguistic Features: An Exploratory Study. *International Journal of Human-Computer Studies*, 67, 870-886. DOI=http://dx.doi.org/10.1016/j.ijhcs.2009.07.005

Price, K. and Sears, A. (2009). The Development and Evaluation of Performance-Based Functional Assessment: A Methodology for the Measurement of Physical Capabilities. *ACM Transactions on Accessible Computing*, 2(2), Article 10, 31 pages. DOI= http://doi.acm.org/10.1145/1530064.1530068

Dai, L., Sears, A., and Goldman, R. (2009). Shifting the focus from accuracy to recallability: A study of informal note-taking on mobile information technologies. *ACM Transactions on Computer-Human Interaction*, 16(1), Article 4, 46 pages. DOI = 10.1145/1502800.1502804

Sears, A., Lazar, J., Ozok, A., and Meiselwitz, G. (2008). Human-centered computing: Defining a research agenda. *International Journal of Human-Computer Interaction, 24*(1), 2-16.

Lin, M., Goldman, R., Price. K. J., Sears, A., and Jacko, J. (2007). How Do People Tap When Walking? An empirical investigation of nomadic data entry. *International Journal of Human Computer Studies, 65*, 759-769.

Lin, M. and Sears, A. (2007). Constructing Chinese characters: keypad design for mobile phones. *Behaviour and Information Technology*, 26(2), 165-178.

Barnard, L., Yi, J. S., Jacko, J. A., & Sears, A. (2007). Capturing the effects of context on human performance in mobile computing systems. *Personal and Ubiquitous Computing, 11*(2), 81-96.

Feng, J., Sears, A., Karat, C-M. (2006) A longitudinal evaluation of hands-free speech-based navigation during dictation. *International Journal of Human-Computer Studies, 64*(6), 553-569.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Zhou, L., Shi, Y., Feng, J., and Sears, A. (2006). Data mining for detecting errors in speech recognition. *IEEE Transactions on Speech and Audio Processing, 13*(5), 681-688.

Zhou, L., Shi, Y., Zhang, D., and Sears, A. (2006) Discovering Cues to Error Detection in Speech Recognition: A User-centered Approach. *Journal of Management Information Systems*, 22(4), 237-270.

Price, K. J., Lin, M., Feng, J., Goldman, R., Sears, A., and Jacko, J. A. (2006). Motion does Matter: An Examination of Speech-based Text Entry on the Move. *Universal Access in the Information Society*, 4(3), 246-257.

Price, K. and Sears, A. (2005). Speech-based Text Entry for Mobile Handheld Devices: An analysis of efficacy and error correction techniques for server-based solutions. *International Journal of Human-Computer Interaction*, 19(3), 279-304.

Barnard, L., Yi, J.S., Jacko, J. A., Sears, A. (2005). An Empirical Comparison of Use-in-Motion Evaluation Scenarios for Mobile Computing Devices. *International Journal of Human Computer Studies*, 62, 487-520.

Dai, L., Goldman, R., Sears, A. and Lozier, J. (2005). Speech-based cursor control using grids: Modeling performance and comparisons with other solutions. *Behaviour and Information Technology*, 24(3), 219-230.

Lu, Y.-C., Xiao, Y., Sears, A., and Jacko, J. A. (2005). A Review and A Framework of Handheld Computer Adoption in Healthcare. *International Journal of Medical Informatics*, 74(5), 409-422.

Feng, J., Karat, C-M., and Sears, A. (2005). How Productivity Improves in Hands-free Continuous Dictation Tasks: Lessons Learned from a Longitudinal Study. *Interacting with Computers*, 17(3), 265-289.

Lin, M., and Sears, A. (2005). Chinese character entry for mobile phones: A longitudinal investigation. *Interacting with Computers, 17*(2), 121-146.

Feng, J. and Sears. A. (2004). Using confidence scores to improve hands-free speech-based recognition error specification. *ACM Transactions on Computer-Human Interaction*, 11(4), 1-28.

Sears, A., Feng, J., Oseitutu, K. & Karat, C. (2003). Hands-free speech-based navigation during dictation: Difficulties, consequences, and solutions. *Human Computer Interaction, 18*(3), 229-258.

Sears, A. (2003). Simulating network delays: Applications, algorithms, and tools. *International Journal of Human-Computer Interaction, 16*(2), 301-323.

Sears, A. and Zha, Y. (2003). Data entry for mobile devices using soft keyboards: Understanding the effects of keyboard size and user tasks. *International Journal of Human-Computer Interaction, 16*(2), 163-184.

Sears, A. and Jacko, J. (2003). Exploring the effects of hardware performance, application design, and cognitive demands on user productivity and perceptions. *Journal of End User Computing, 15*(2), 55-75.

Sears, A. & Arora, R. (2002). Data entry for mobile devices: An empirical comparison of novice performance with Jot and Graffiti. *Interacting with Computers, 14*(5), 413-433.

Sears, A., Lin, M. and Karimullah, A. S. (2002). Speech-Based Cursor Control: Understanding the effects of target size, cursor speed, and command selection. *Universal Access in the Information Society, 2*(1), 30-43.

Jacko, J. A., Salvendy, G., Sainfort, F., Emery, V. K., Akoumianakis, D., Duffy, V. D., Ellison, J., Gant, D. B., Gill, Z., Ji, G. Y., Jones, P. M., Karsh, B-T., Karshmer, A. I., Lazar, J., Peacock, B., Resnick, M. L., Sears, A.,

Smith, M. J., Stephanidis, C., Ziegler, J. (2002). Intranets and Organizational Learning: A Research and Development Agenda, *International Journal of Human-Computer Interaction*, 14, 1, 93-130. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Jacko, J. A., Sears, A., Sorensen, S. J. (2001). A Framework for Usability: Healthcare Professionals and the Internet. *Ergonomics*, 44(11), 989-1007. London: Taylor and Francis.

Sears, A., Karat, C-M., Oseitutu, K., Karimullah, A., & Feng, J. (2001). Productivity, satisfaction, and interaction strategies of individual with spinal cord injuries and traditional users interacting with speech recognition software. *Universal Access in the Information Society*, 1, 4-15. Berlin, Germany: Springer-Verlag.

Sears, A., Jacko, J. A., Chu, J. & Moro, F. (2001). The role of visual search in the design of effective soft keyboards. *Behaviour and Information Technology*, 20(3), 159-166. London: Taylor and Francis.

Jacko, J. A., Sears, A. & Borella, M. S. (2000). The Effect of network delay and media on user perceptions of web resources. *Behaviour and Information Technology*, 19(6), 427-439. London: Taylor and Francis.

Sears, A. & Jacko, J. A. (2000). Understanding the relationship between network quality of service and the usability of distributed multimedia documents. *Human Computer Interaction, 15*, 43-68. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears, A., Jacko, J. A. & Dubach, E. M. (2000). International aspects of WWW usability and the role of high-end graphical enhancements. *International Journal of Human-Computer Interaction, 12*, 2, 243-263. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears, A. & Hess, D. (1999). Cognitive Walkthroughs: Understanding the effect of task description detail on evaluator performance. *International Journal of Human-Computer Interaction, 11*, 3, pp. 185-200. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sorensen, S. J., Jacko, J. A., Sears, A. (1998). Hospital pharmacists' use, perceptions, and opinions of the Internet. *Pharmacotherapy, 18*, 2, 438 (abstract). Kansas City, Missouri: American College of Clinical Pharmacy.

Sears, A. (1997). Heuristic Walkthroughs: Finding the problems without the noise. *International Journal of Human-Computer Interaction, 9*, 3, pp. 213-234. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Wolfe, R., Grissom, S., Naps, T. & Sears, A. (1996). A Tested Tool for Teaching Computer Graphics. *The Journal of Computing in Small Colleges, 12*, 2, 70-77. Indiana: Consortium for Computing Sciences in Small Colleges.

Wolfe, R. & Sears, A. (1996). An effective tool for learning the visual effects of rendering algorithms. *Computer Graphics, 30*, 3, 54-55. New York: ACM Press.

Sears, A. & Shneiderman, B. (1994). Split menus: Effectively using selection frequency to organize menus. *ACM Transactions on Computer-Human Interaction, 1*, 1, 27-51. New York: ACM Press

Sears, A. (1994). Automated metrics for user interface design and evaluation. *International Journal of Bio-Medical Computing, 34*, 1-4, 149-157. Amsterdam: Elsevier Science Publishers.

Wolfe, R. & Sears, A. (1994). TERA: An interactive tool for exploring rendering algorithms. *The Journal of Computing in Small Colleges, 10*, 4, 41-46. Indiana: Consortium for Computing Sciences in Small Colleges.

Sears, A. (1993). Layout Appropriateness: A metric for evaluating user interface widget layout. *IEEE - Transactions on Software Engineering, 19*, 7, 707-719. New York: IEEE.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Sears, A., Revis, D., Swatski, J., Crittenden, R., & Shneiderman, B. (1991). Investigating Touchscreen Typing: The effect of keyboard size on typing speed. *Behaviour and Information Technology, 12*, 1, 17-22. London: Taylor and Francis.

Sears, A. (1991). Improving Touchscreen Keyboards: Design issues and a comparison with other devices, *Interacting with Computers, 3*, 3, 253-269. Amsterdam: Elsevier Science Publishers.

Sears, A., & Shneiderman, B. (1991). High Precision Touchscreens: Design Strategies and Comparisons with a Mouse, *International Journal of Man Machine Studies, 34*, 4, 593-613. Cambridge, UK: Academic Press.

### Papers in Conference/Workshop Proceedings

Qian, H., Kuber, R. & Sears, A. (2014). Supporting the Mobile Notification Process through Tactile Cues Selected using a Paired Comparison Task. *Extended Abstracts on Human Factors in Computing Systems - CHI'14*, pp. 1741-1746.

Qian, H., Kuber, R. & Sears, A. (2013). Developing tactile icons to support mobile users with situationally-induced impairments and disabilities. *Proceedings of the 15th International ACM SIGACCESS Conference on Computers and Accessibility* (ASSETS '13), Article 47, 2 pages.

Qian, H., Kuber, R. & Sears, A. (2013). Tactile notifications for ambulatory users. *CHI '13 Extended Abstracts on Human Factors in Computing Systems*, pp. 1569-1574.

Zhu, S., Kane, S., Feng, J., & Sears, A. (2012). A crowdsourcing quality control model for tasks distributed in parallel. *CHI '12 Extended Abstracts on Human Factors in Computing Systems*, pp. 2501-2506.

Sears, A. and Hanson, V. (2011). Representing users in accessibility research. To appear: *Proceedings of the ACM Conference on Human Factors in Computing Systems (CHI '2011)*, pp. 2235-2238. Reprinted as: Sears, A. and Hanson, V. L. (2012). Representing users in accessibility research. *ACM Transactions on Accessible Computing*, 4(2), Article 7, 6 pages.

Hurst, A., Gajos, K., Findlater, L., Wobbrock, J., Sears, A. & Trewin, S. (2011). Dynamic accessibility: accommodating differences in ability and situation. *CHI '11 Extended Abstracts on Human Factors in Computing Systems* (CHI EA '11), pp. 41-44.

Vizer, L. M. and Sears, A. (2011). Detecting Cognitive Impairment Using Keystroke and Linguistic Features of Typed Text: Toward an Adaptive Method for Continuous Monitoring of Cognitive Status. *Proceedings of USAB 2011*, pp. 483-500.

Anthony, L., Carrington, P., Chu, P., Kidd, C., Lai, J., and Sears, A. (2011). Gesture dynamics: features sensitive to task difficulty and correlated with physiological sensors. *Proceedings of the ICMI 2011 Workshop on Inferring Cognitive and Emotional States from Multimodal Measures (MMCogEmS'2011)*, four pages.

Qian, H., Kuber, R. & Sears, A. (2011). A Longitudinal Pilot Study to Evaluate Non-Visual Icons in a Mobile Exertion Application. *Proceedings of INTERACT 2011*, LNCS 6949, 458–461.

Hu, R., Zhu, S., Feng, J. and Sears, A. (2011). Use of Speech Technology in Real Life Environment. *Proceedings of HCII 2011*, pp. 62-71.

Price K. and Sears, A. (2010). Performance-based functional assessment: integrating multiple perspectives. *Proceedings of the 12th international ACM SIGACCESS conference on Computers and accessibility* (ASSETS '10), pp. 275-276.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Qian, H., Kuber, R. and Sears, A. (2010). Maintaining levels of activity using a haptic personal training application. *CHI 2010 Extended Abstracts*, pp. 3217-3222.

Joshi, A., Arora, M., Sears, A. (2009). Design and Development of a Computer based Multiple Myeloma Educational Kiosk in VA settings. Proceedings of the 2009 International Cancer Education Conference & AACE-CPEN-EACE Joint Annual Meeting. Journal of Cancer Education. Volume 24, Supplement 1, 57-58 (poster presentation).

Qian, H., Kuber, R., and Sears, A. (2009). Towards Identifying Distinguishable Tactons for Use with Mobile Devices. *Proceedings of Assets 2009*, pp. 257-258.

Zhu, S., Ma, Y., Feng, J. and Sears, A. (2009). Don' t Listen! I Am Dictating My Password! *Proceedings of Assets 2009,* pp. 229-230.

Zhu, S., Ma, Y., Feng, J. and Sears, A. (2009). Speech-based navigation: Improving grid-based solutions. *Lecture Notes in Computer Science*, Volume 5726, 50-62 (Proceedings of INTERACT 2009).

Price, K. and Sears, A. (2008). Performance-Based Functional Assessment: An Algorithm for Measuring Physical Capabilities. *Proceedings of Assets 2008*, pp. 217-224.

Feng, J., Zhu, S., Hu, R., and Sears, A. (2008). Speech Technology in Real World Environment: Early Results from a Long Term Study. *Proceedings of Assets 2008*, pp. 233-234.

Sherman, A., Holden, S., Karabatis, G., Koru, A. G., Law, C., Norris, D., Pinkston, J., Sears, A., Zhang, D. (2006). An examination of vote verification technologies: Findings and experiences from the Maryland study. *Proceedings of the USENIX/Accurate Electronic Voting Technology (EVT) Workshop*. Accessed 2/18/07 from http://www.usenix.org/events/evt06/tech/

Yi, J. S., Choi, Y. S., Jacko, J. A., & Sears, A. (2005) Context Awareness via a Single Device-Attached Accelerometer During Mobile Computing. *Proceedings of 7th International Conference on Human Computer Interaction with Mobile Devices and Services (MobileHCI '05)*, pp. 303-306.

Lin, M., Price, K., Goldman, R., Sears, A. and Jacko, J. (2005). Tapping on the Move - Fitts' Law under Mobile Conditions. *Proceedings of the 16th Information Resources Management Association International Conference*, pp. 132-135.

Feng, J. and Sears, A. (2005) A power and reliability model for spatial navigation. *Proceedings of the 16th Information Resources Management Association International Conference*, pp. 1080-1082.

Lin, M. and Sears, A. (2005). Graphics matter: A case study of mobile phone keypad design for Chinese input. *CHI 2005 Extended Abstracts*, pp. 1593-1596.

Law, C. M., Sears, A. and Price, K. J. (2005). Issues in the categorization of disabilities for user testing. *Proceedings of HCII 2005* (CD version).

Goldman, R., Price, K. J., Lin, M., Feng, J., and Sears, A. (2005). Speech interaction for mobile devices: A natural solution to a contextual conundrum. *Proceedings of HCII 2005* (CD version).

Feng, J., Sears, A., and Law, C. M. (2005). Conducting Empirical Experiments Involving Participants with Spinal Cord Injuries. *Proceedings of HCII 2005* (CD version).

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Zhou, L., Feng, J., Sears, A., and Shi, Y. (2005). Applying the Naïve Bayes Classifier to Help Users in Detecting Speech Recognition Errors. *Proceedings of Hawaii International Conference on System Sciences* (pp. 1-9). (Best Paper Award)

Dai, L., Goldman, R., Sears, A. and Lozier, J. (2004). Speech-based cursor control: A study of grid-based solutions. *Proceedings of Assets 2004*, pp94-101.

Lazar, J., Ratner, J., Jacko, J., and Sears, A. (2004). User Involvement in the Web Development Process: Methods and Cost-Justification. *Proceedings of the 2004 International Conference on Industry, Engineering, and Management Systems*, 223-232.

Price, K., Lin, M., Feng, J., Goldman, R., Sears, A. and Jacko, J. (2004). Data Entry on the Move: An Examination of Nomadic Speech-based Text Entry. *Lecture Notes in Computer Science*, 3196, 460-471 (Proceedings of the 8th ERCIM Workshop: User Interfaces for All).

Lu, Y.-C., Kyung Lee, J., Xiao, Y., Sears, A., Jacko, J. A., and Charters, K. (2003). Why Don't Physicians Use Their Personal Digital Assistants? *Proceedings of the American Medical Informatics Association Symposium*, pp. 405-409.

Campbell, J., Stanziola, E. and Sears, A. (2003). Data Analysis and Visualization for Usability Evaluation for Collaborative Systems. *Proceedings of HCII 2003*, pp. 869-873.

Price, K. and Sears, A. (2003). Speech-based Text Entry for Mobile Devices. *Proceedings of HCII 2003*, pp. 766-770.

Karimullah, A., Sears, A., Lin, M. and Goldman, R. (2003). Speech-based cursor control: Understanding the effects of variable cursor speed on target selection. *Proceedings of HCII 2003*, pp. 681-685.

Feng, J. and Sears, A. (2003). Using Confidence Scores to Improve Hands-Free Speech-Based Navigation. *Proceedings of HCII 2003*, pp. 641-645.

Sears, A., Lin, M., Jacko, J. and Xiao, Y. (2003). When Computers Fade … Pervasive Computing and Situationally-Induced Impairments and Disabilities. *Proceedings of HCII 2003*, pp. 1298-1302.

Lu, Y., Xiao, Y., Sears, A. and Jacko, J. (2003). An Observational and Interview Study on Personal Digital Assistant (PDA) Uses by Clinicians in Different Contexts. *Proceedings of HCII 2003*, pp 93-97.

Karimullah, A. S. and Sears, A. (2002). Speech-based cursor control. *Proceedings of Assets 2002*, pp. 178-185. New York: ACM Press.

Sears, A. & Arora, R. (2001). An evaluation of gesture recognition for PDAs. *Proceedings of HCI International 2001*, pp. 1-5. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Zha, Y. & Sears, A. (2001). Data entry for mobile devices using soft keyboards: Understanding the effect of keyboard size. *Proceedings of HCI International 2001*, pp. 16-20. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Smith, D., Huang, Z., Preece, J. & Sears, A. (2001). The effects of using a triangulation approach of evaluation methodologies to examine the usability of a University Website. *Proceedings of the Information Resources Management Association International Conference 2001*, pp. 1-5. Hershey, PA: IRM Press. (This article was reprinted in a book including selected articles from the IRMA 2001 Conference. The article is also listed above under books and book chapters.)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Oseitutu. K., Feng, J., Sears, A. & Karat, C-M. (2001). Speech recognition for data entry by individuals with spinal cord injuries. *Proceedings of the 1st International Conference on Universal Access in Human-Computer Interaction*, pp. 402-406. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Emery, V. C., Jacko, J. A., Kongnakorn, T., Kuruchittham, V., Landry, S., McLeland Nickles, G., Sears, A. and Whittle, J. (2001). Identifying Critical Interaction Scenarios for Innovative User Modeling. *Proceedings of the 1st International Conference on Universal Access in Human-Computer Interaction*, pp. 481-485. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears, A. & Bischof-Rosario, J. (1999). Redesigning speech recognition for use by individuals with spinal cord injuries. *Proceedings of HCI International '99*, pp. 966-969. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears, A., Jacko, J. A., Brewer, B., Robelo, L. D. (1998, October). An empirical perspective on visual icon design. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting '98*, pp. 448-452. Santa Monica, CA: HFES.

Jacko, J. A. , Sears, A., Sorensen, S. J. (1998, October). The effect of domain on usage patterns and perceptions of the Internet: Focusing on healthcare professionals. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting '98*, pp. 521-525. Santa Monica, CA: HFES.

Sears, A. and Hess, D. J. (1998, April). The Effect of Task Description Detail on Evaluator Performance with Cognitive Walkthroughs. *CHI 98 Summary*, pp. 259-260. New York: ACM Press.

Jacko, J. A. and Sears, A. (1998, April). Designing Interfaces for an Overlooked User Group: Considering the Visual Profiles of Partially Sighted Users. *Proceedings of ASSETS'98*, pp. 75-77. New York: ACM Press.

Borella, M. S., Sears, A., and Jacko, J. A. (1997, November). The Effects of Internet Latency on User Perception of Information Content. *Proceedings of IEEE Global Telecommunications Conferences*, pp. 1932-1936. New York: IEEE.

Borella, M. S. & Sears, A. (1997, May). WANDS: Wide-Area Network Delay Simulator. *Proceedings of the 7th International Workshop on Network and Operating System Support for Digital Audio and Video*. 89-96. New York: IEEE.

Sears, A., Jacko, J. A. & Borella, M. S. (1997, April). Internet Delay Effects: How Users Perceive Quality, Organization, and Ease of Use of Information. *CHI 97 Conference Companion*, 353-354. New York: ACM Press.

Sears, A. & Borella, M. S. (1997, April). WANDS: Tools for designing and testing distributed documents. *CHI 97 Conference Companion*, 327-328. New York: ACM Press.

Beer, T., Anodenko, T., & Sears, A. (1997, September). A Pair of Techniques for Effective Interface Evaluation: Cognitive Walkthroughs and Think-Aloud Evaluations. *Proceedings of the Human Factors and Ergonomics Society 41st Annual Meeting*, pp. 380-384. Santa Monica, CA: HFES.

Sears, A. & Borella, M. S. (1997, August). The Effect of Internet Delay on the Design of Distributed Multimedia Documents. *Proceedings of HCI International '97*. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers. Published as: Advances in Human Factors/Ergonomics Volume 21 - Design of Computer Systems: Social and Ergonomic Considerations, pp. 331-334.

Sears, A., Jacko, J. A. & Borella, M. S. (1997, August). The Effect of Internet Delay on the Perceived Quality of Information. *Proceedings of HCI International '97*. Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers. Published as: Advances in Human Factors/Ergonomics Volume 21 - Design of Computer Systems: Social and Ergonomic Considerations, pp. 335-338.

Sears, A. (1996, April). Visualizing Efficiency: A technique to help designers judge interface efficiency. *CHI'96 Conference Companion* (pp. 311-312), New York: ACM Press.

Sears, A. & Wolfe, R. (1996, May). An undergraduate degree in Human-Computer Interaction. *1st International Conference on Applied Ergonomics (ICAE'96)* (pp. 992-995). Mahwah, NJ: Lawrence Erlbaum Associates Inc. Publishers.

Sears, A. (1995, November). AIDE: A step toward metric-based interface development tools. *Proceedings of the ACM Symposium on User Interface Software and Technology (UIST) '95* (pp. 101-110), New York: ACM Press.

Sears, A. (1995, March). Heuristic Walkthroughs: Combining the advantages of existing evaluation techniques. *Proceedings of the 3rd Annual Mid-Atlantic Human Factors Conference* (pp. 29-35), Blacksburg, VA: Virginia Tech.

Sears, A. & Wolfe, R. (1995, March). Visual Analysis: An effective method of adding breadth to an introductory computer graphics course. *Proceedings of the 26th SIGCSE Technical Symposium on Computer Science Education* (pp. 195-198), Volume 27, Number 1, New York: ACM Press.

Plaisant, C., & Sears, A. (1992, October). Touchscreen interfaces for flexible alphanumeric data entry. *Proceedings of the 36th Annual Meeting of the Human Factors Society*. pp. 293-298, Santa Monica, CA: Human Factors Society. (This article was reprinted in a book including selected articles from 12 years of the Human Factors meetings. The article is also listed above under books and book chapters.)

Sears, A., Kochavy, Y., & Shneiderman, B. (1990, February). Touchscreen Field Specification for Public Access Database Queries: Let your fingers do the walking, *Proceedings of the Computer Science Conference '90* (pp. 1-7), New York: ACM.

***Other Publications***

Sears, A. and Hanson, V. (2011). Accessible Electronic Health Records: Developing a Research Agenda. *SIGACCESS Newsletter,* Issue 99, 60-64.

Sears, A., Lazar, J., Ozok, A., and Meiselwitz, G. (2008). Defining an agenda for human-centered computing. *HFES Bulletin*, *51*(2), 5-7. (Reprinted in the *SIGACCESS Bulletin*, Issue 91, pages 12-16. Reprinted in the *ASIS&T Bulletin*, April/May 2008).

Yesilada, Yeliz and Sears, A. (2006). ASSETS 2006 Doctoral Consortium. *SIGACCESS Newsletter, Issue 86.*

Goldman, R. and Sears, A. (2004). Touchscreens. *Encyclopedia of Human-Computer Interaction*.

Feng, J. and Sears, A. (2004). Are we speaking slower than we type? Exploring the gap between natural speech, typing, and speech-based dictation. *Accessibility and Computing*. 79, 6-9.

Sears, A. (2001). Improving speech recognition for communication-oriented activities. *ERCIM News*, No 46, pp. 21-22.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Sears, A. (2000). Introduction to Special Issue on Empirical Studies of WWW Usability. *International Journal of Human-Computer Interaction*, 12, 2, 167-171.

Sears, A. (1998). Dealing with "The Need for Speed." *Common Ground* (pp. 18-23), Volume 8, Number 2, Dallas, TX: Usability Professionals' Association.

Sears, A. (1998). An HCI reading list, *SIGCHI Bulletin* (pp. 49-64), Volume 30, Number 1, New York: ACM.

Sears, A. & Williams, M. (1997). HCI Education and CHI 97, *SIGCHI Bulletin* (pp. 9-12), Volume 29, Number 4, New York: ACM.

Sears, A., Jacko, J. A., & Mantei, M. (1997). The SIGCHI Educational Resource Development Group, *SIGCHI Bulletin* (pp. 4-6), Volume 29, Number 3, New York: ACM.

Sears, A. (1997). Forums for Improving HCI Education, *SIGCHI Bulletin* (pp. 6-7), Volume 29, Number 2, New York: ACM.

Sears, A. (1997). HCI Education: Where is it headed?, *SIGCHI Bulletin* (pp. 7-9), Volume 29, Number 1, New York: ACM.

Sears, A. (1996). HCI Education: Some progress and some new questions, *SIGCHI Bulletin* (pp. 11-14), Volume 28, Number 4, New York: ACM.

Sears, A., Czerwinski, M., Dringus, L., & Bernal Thomas, B. (1996). Educating HCI Practitioners: Evaluating what industry needs and academia delivers, *SIGCHI Bulletin* (pp. 26-28), Volume 28, Number 4, New York: ACM.

Cohen, M., Dringus, L., Sears, A., and Hornstein, S. (1995). Increasing collaboration between industry and academia in HCI education, *SIGCHI Bulletin* (pp. 29-30), Volume 27, Number 4, New York: ACM.

Sears, A. (1993). Layout Appropriateness: Guiding user interface design with simple task descriptions, Ph.D. Dissertation, Computer Science Department, University of Maryland, College Park, MD.

Sears, A. (1993). Layout Appropriateness: Guiding user interface design with simple task descriptions, *HCIL Open House '93 Videotape*, Human-Computer Interaction Lab, University of Maryland, College Park, MD.

Sears, A., & Shneiderman, B. (1991). Touchscreen Keyboards, *HCIL Open House '91 Videotape.*, Human-Computer Interaction Lab, University of Maryland, College Park, MD.

Sears, A., & Shneiderman, B. (1991). PlayPen II: A novel finger painting program, *HCIL Open House '91 Videotape*, Human-Computer Interaction Lab, University of Maryland, College Park, MD.

**Select Research Support**

| | | | | |
|---|---|---|---|---|
| 10/10 – 9/11 | NIST (iDoxSolutions) | Voting System Dexterity Analysis | PI | $45,744 |
| 9/10 – 8/11 | NSF | Accessible Electronic Health Records: Defining a Research Agenda | PI | $24,747 |
| 10/09 – 9/12 | US Department of Education, NIDRR | Cognitive decline, work, and technological interruptions | PI | $180,000 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 7/09 – 6/10 | MD Commission on Community Health | IT support for community health | PI | $49,684 |
| 6/09 – 6/10 | MD Judiciary, Office Of Communications and Public Affairs | Web design: Information Architecture, Accessibility, and New Technologies | PI | $120,000 |
| 4/09 – 3/10 | IBM | Interruption recovery in an aging workforce: The role of cognitive abilities and visual cues | PI | $40,000 |
| 2/09 – 1/10 | MD Department of Transportation – State Highway Administration | Anomaly detection for traffic management data | Co-PI | $53,580 |
| 1/09 – 12/09 | Quality Assured Services | Consortium for Information Technology and Health Outcomes Research (CITHOR) | Co-PI | $40,000 |
| 7/08 – 6/09 | MD Commission on Community Health Resources | IT support for community health | PI | $49,684 |
| 7/08 – 1/09 | Department of Veterans Affairs | Evaluation of a web based Multiple Sclerosis education | Co-PI | $67,500 |
| 9/07-9/08 | Para Consulting (VA funding) | Healthcare and computer assisted education | Co-PI | $23,616 |
| 9/07 – 6/08 | MD Commission on Community Health Resources | IT support for community health | PI | $93,999 |
| 9/07 – 9/08 | Para Consulting (VA funding) | Multiple Myeloma VA Education Program | Co-PI | $62,395 |
| 5/07 – 4/08 | State of Maryland Board of Elections | Maintaining and supporting website mdelections.umbc.edu | Co-PI | $125,913 |
| 1/07 – 12/09 | NSF | MRI: Acquisition of equipment to establish a research Infrastructure to support HCI and UA research | PI | $180,000 |
| 9/06 – 8/07 | NSF | Human-centered computing: Defining a research agenda | PI | $47,212 |
| 2/06 – 12/06 | State of Maryland Board of Elections | Candidates Database | Co-PI | $63,460 |
| 2/06 – 12/06 | State of Maryland Board of Elections | Campaign Finance Database | Co-PI | $138,468 |
| 2/06 – 8/06 | State of Maryland Board of Elections | Electronic Voter Interfaces | PI | $57,176 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 2/06 – 1/07 | NSF | Consortium on IT accessibility | PI | $28,766 |
| 12/05 – 11/08 | US Department of Education, NIDRR | Optimized Hands-Free Speech Recognition | PI | $449,653 |
| 11/05 – 4/06 | The Paciello Group | FEMA web site usability study | PI | $8,117 |
| 11/05 | The Verizon Foundation | IT accessibility research | PI | $25,000 |
| 8/05 – 1/06 | State of Maryland Board of Elections | State Elections Board Technical Evaluation | Co-PI | $114,800 |
| 6/05 | IBM | Increased accessibility thorugh speech-based interactions for mobile technologies | PI | $30,000 |
| 6/05 – 5/07 | NSF | Consortium for research on accessible computing | PI | $28,673 |
| 3/05 – 2/06 | NSF | IT-Oriented Functional Assessments | PI | $99,320 |
| 6/04 | IBM | Increased accessibility thorugh speech-based interactions for mobile technologies | PI | $40,000 |
| 8/04 – 8/07 | US Department of Education | Graduate Assistantships in Areas of National Need | Co-PI | $622,665 |
| 9/03 – 8/06 | NSF | Using speech recognition to enhance communication capabilities for individuals with physical disabilities | PI | $408,902 |
| 4/03 – 3/06 | NSF | REU Site: Human-Computer Interaction | Co-PI | $236,146 |
| 9/02 – 8/03 | NSA | Visualization for intrusion detection | Co-PI | $149,827 |
| 9/02 – 8/03 | NSA | Visualization for intrusion detection: Identifying promising research directions | Co-PI | $99,862 |
| 9/01 – 8/06 | NSF | Universal access for situationally induced impairments | PI | $1,050,020 |
| 9/01 – 8/06 | NSF | REU Supplement: Universal access for situationally induced impairments | PI | $33,000 |
| 1/01 – 12/01 | Aether Systems, Inc. | Speech recognition based data entry for handheld mobile computing devices | PI | $93,320 |
| 3/01 – 2/02 | NSF | Human-Computer Interaction Doctoral Research Consortium | Co-PI | $30,000 |
| 9/99 – 8/03 | NSF | Using speech recognition to enhance communication capabilities for individuals with disabilities | PI | $456,284 |
| 9/99 – 9/04 | Motorola, Inc. | Text input methods for hand-held devices | PI | $105,034 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| 6/99 – 12/99 | Intel Corporation | Exploring system performance, cognitive demands, interface design and user productivity | PI | $12,650 |
| 10/98 – 12/99 | Platinum Technologies | Software for assessing system response time and user productivity | PI | $81,750 |
| 4/98 – 12/99 | Intel Corporation | Exploring the relationship between system performance and user productivity | PI | $122,213 |
| 4/97 – 3/98 | Microsoft Corporation | The impact of internet delay and document content on user perceptions | PI | $17,887 |
| 9/91 – 5/93 | NASA | Layout Appropriateness: Guiding user interface design with simple task descriptions | PI | $44,000 |

## Select Editorial Activities

- Member of Editorial Board, *ACM Transactions on Accessible Computing* (2013-present)
- Associate Editor, *ACM Transactions on Computer-Human Interaction* (2011 – present)
- Associate Editor/Member of Editorial Board, *European Journal of Information Systems* (6/2009-12/2012)
- Member of Editorial Board, *International Journal of Human-Computer Studies* (2008 – present)
- Member of Editorial Board, *International Journal of Mobile Human-Computer Interaction* (2008-2010)
- Editor-in-Chief (with Vicki Hanson), *ACM Transactions on Accessible Computing* (2006-2013)
- Co-Editor, Special issue of *ACM Transactions on Computer Human Interaction* (2006)
- Co-Editor, Special issue of *Behaviour and Information Technology* on Accessible Computing (2005)
- Member of Editorial Board, *Journal of Organizational and End User Computing* (2003 – 2007)
- Member of Editorial Board, *International Journal of Human-Computer Interaction* (2001 – 2009)
- Member of Editorial Board, *Universal Access in the Information Society* (2000 – 2015)
- Editor, Special Issue of the *International Journal of Human-Computer Interaction* on Empirical Studies of WWW Usability (to be published as issue 12(2) in 2000)
- Guest Editor (with Arnold Lund) for a Special Issue of *IEEE Software* on Creating Effective Interfaces, Volume 14, Number 4 (July/August 1997)

## Select Conference Committee Activities

- Co-chair, Technical Program, International Conference on Multimodal Interaction, 2013
- Associate Chair, Program Committee, ACM Conference on Computer Human Interaction 2012
- Judge, Student Research Competition, ASSETS 2011
- Associate Chair, Program Committee, ACM Conference on Computer Human Interaction 2011
- Associate Chair, Program Committee, ACM Conference on Computer Human Interaction 2010
- Judge, Student Research Competition, ASSETS 2008
- Co-chair, Doctoral Consortium, Assets 2006
- Conference Chair, Assets 2005
- Chair, Program Committee, Assets 2004
- Registration Chair, ACM Conference on Universal Usability 2003
- Publicity Chair, Assets 2002. Responsible for all publicity for the conference.
- Conference and Technical Program Co-Chair, CHI 2001. Responsible for committee selection (approximately 35 volunteers and 20 professional staff), budget development (over $2.2 million), and managing all logistical and technical aspects of the conference. CHI is the premier conference on human computer interaction and regularly attracts over 2500 attendees.
- Associate Chair, Program Committee, ACM Conference on Universal Usability 2000.
- Student Volunteers Co-chair, CHI 99. Responsibilities: Organize, schedule, and oversee 150 volunteers
- Tutorials Co-chair, CHI 98. Responsibilities: Run review process, select tutorials, deal with all logistical concerns, oversee tutorials program. The tutorials program traditionally makes approximately ½ of the revenue

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

for the conference. The tutorials program included 36 tutorials over 3.5 days and resulted in approximately 3500 ½ day tutorial units being sold. This was one of the most successful tutorials programs at any CHI conference.

- Doctoral Consortium Faculty Advisor, INTERACT'99.

## Select Awards/Honors
- ACM Distinguished Scientist, 2010
- SIGACCESS Recognition of Service Award for serving as Conference Chair of Assets 2005, 2005
- SIGACCESS Recognition of Service Award for serving as Program Chair of Assets 2004, 2004
- Best Paper Award, Hawaii International Conference on Systems Science, Internet and Digital Economy Track, 2005
- SIGCHI Recognition of Service Award for serving as Chair of CHI 2001, 2001
- SIGCHI Recognition of Service Award for Chairing the Chicago Area Chapter of SIGCHI, 1999
- SIGCHI Recognition of Service Award for serving as Tutorial Chair for CHI 1998, 1998
- Selected to participate in the CHI 1992 Doctoral Consortium, 1992

## Other
- Organizer, CHI 2011 Workshop on Data Driven Accessibility with L. Findlater, K. Gajos, A. Hurst, S. Trewin, and J. Wobbrock (May 2011).
- Organizer, CHI 2002 SIG on "User involvement in the web development process." With Jonathan Lazar – Towson University, Julie Jacko – Georgia Institute of Technology, and Julie Ratner (April 2002).
- Conducted a workshop at CHI 2000: "A Compendium of Practical Techniques for HCI Instruction." With Marian Williams – University of Massachusetts – Lowell (April, 2000)
- Co-chair and founder of the ACM SIGCHI Educational Resource Development Group (June 1996 – May 1998)
- Member, ACM SIGCHI International Advisory Task Force
- Organized and moderated the panel at CHI 98: "Famous HCI Educators Tell All" with Marian Williams - University of Massachusetts – Lowell (April, 1998)
- Panelist at HFWeb 3 - The Third Conference on Human Factors and the Web. "Web Usability: Search for a yardstick." Organized by Jean Schotz – NIST (June, 1997)
- Organized and moderated the panel at CHI 97: "None of the above: What's really essential in HCI Education?" with Marian Williams - University of Massachusetts – Lowell (March 1997)
- Conducted workshop at CHI 96: "Educating HCI Practitioners: Evaluating what industry needs and what academia delivers." with Mary Czerwinski, Laurie Dringus, and Barbara Bernal Thomas (April, 1996)
- Conducted workshop at CHI 95: "Increasing collaboration between industry and academia in HCI education." With Maxine Cohen, Laurie Dringus, and Susan Hornstein (May, 1995)
- Participant in workshop at CHI 94: "Designing the teaching of HCI." Organized by Jonas Lowgren, Clark Quinn, Jean Gasen, and Peter Gorney (April 1994)
- Conducted workshop at ACM SIGUCCS '89.: "Hypertext Workshop." (October 1989)

## Select Service
- 2013-Present, Member, USACM (ACM US Public Policy Council) Accessibility Committee
- 2013-2015, Member, Board of Trustees, Al Sigl Community of Agencies
- 2011-2014, ACM SIG Governing Board Representative to the ACM Council
- 2010-2012, Vice Chair for Operations, ACM Special Interest Group Governing Board Executive Committee
- 2009 – 2012, Member, ACM Special Interest Group Governing Board
- 2009 – 2015, Chair, ACM SIGACCESS
- 2006 – 2009, Member, Steering Committee, Maryland Governor's Workforce Investment Board, IT industry workforce initiative
- 2006 – 2009, Vice chair, ACM SIGACCESS
- 2005 – 2015, Member, Assets Conference Steering Committee, ACM SIGACCESS
- 2001 – 2006, Secretary/Treasurer, ACM SIGACCESS
- 1997 – 1999, Founding Chair, Chicago area Chapter of ACM SIGCHI

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Appendix B: Materials Considered**

- Expert Report of Ravi Dhar (October 16, 2015)

- Expert Report of Donna Hoffman (October 16, 2015)

- Expert Report of Michael Callahan (October 16, 2015)

- Expert Report of Jennifer King (October 16, 2015)

- Expert Report of Daniel Hamermesh (October 15, 2015)

- Expert Report of Craig Rosenberg (December 7, 2015)

- Amazon_ 00265966-77; Amz_FTC_0037648-66; Amazon_00008749-00008892; Amazon_00290192-00290446; Amazon_00385350-00385372.

- Deposition Ex. 189 (M. Harbut)

- Deposition transcript of Ryan J. Kortekaas (July 23, 2015)

- Deposition transcript of Ameesh Paleja (July 14, 2015)

- *In re Apple Inc.*, Dkt. No. C-4444, Complaint, Federal Trade Commission (Mar. 2014) (FTC_AMZ_00000001)

- *In re Google Inc.*, Dkt. No. C-4499, Complaint, Federal Trade Commission (Dec. 2014) (FTC_AMZ_00000025)

- Amazon Memorandum to Federal Trade Commission (May 30, 2014)

- Amazon Presentation to FTC, Part 2 (In-App Purchasing at Amazon A Discussion with the Federal Trade Commission) (Jun3 2014)

- Device and Feature Specifications, https://developer.amazon.com/appsandservices/solutions/devices/kindle-fire/specifications/01-device-and-feature-specifications.

- Fire tablet, 7" Display.

- Potter, Richard L., Linda J. Weldon, and Ben Shneiderman. "Improving the accuracy of touch screens: an experimental evaluation of three strategies." Proceedings of the SIGCHI conference on Human factors in computing systems. ACM, 1988

- Sears, Andrew, and Ben Shneiderman. "High precision touchscreens: design strategies and comparisons with a mouse." International Journal of Man-Machine Studies 34.4 (1991): 593-613

- Sears, Andrew, et al. "Investigating touchscreen typing: the effect of keyboard size on typing speed." Behaviour & Information Technology 12.1 (1993): 17-22

- Zhai, Shumin, and Per Ola Kristensson. "The word-gesture keyboard: reimagining keyboard interaction." Communications of the ACM 55.9 (2012): 91-101

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

- Cockton, Gilbert, and Alan Woolrych. "Understanding inspection methods: lessons from an assessment of heuristic evaluation." People and Computers XV—Interaction without Frontiers. Springer London, 2001. 171-191

- Nielsen, Jakob, and Rolf Molich. "Heuristic evaluation of user interfaces." Proceedings of the SIGCHI conference on Human factors in computing systems. ACM, 1990

- Sears, Andrew. "Heuristic walkthroughs: Finding the problems without the noise." International Journal of Human-Computer Interaction 9.3 (1997): 213-234

- Law, Effie Lai-Chong, and Ebba Thora Hvannberg. "Analysis of strategies for improving and estimating the effectiveness of heuristic evaluation." Proceedings of the third Nordic conference on Human-computer interaction. ACM, 2004.

- Chisnell, Dana. "What you really get from a heuristic evaluation." UX Magazine, Feb. 19, 2010. http://uxmag.com/articles/what-you-really-get-from-a-heuristic-evaluation

- Hartson, R., & P.S. Pyla, The UX Book: Process and guidelines for ensuring a quality user experience, Elsevier (2012)

- Nielsen, Jakob. "Finding usability problems through heuristic evaluation." Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '92), ACM, New York, NY, USA, 373-380.

- Shneiderman et al., Designing the User Interface: Strategies for Effective Human-Computer Interaction.

- http://www.nngroup.com/articles/how-to-rate-the-severity-of-usability-problems/

- http://www.nngroup.com/articles/how-to-conduct-a-heuristic-evaluation

- http://www.nngroup.com/articles/usability-problems-found-by-heuristic-evaluation/.

- http://www.usability.gov/how-to-and-tools/methods/heuristic-evaluation.html.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER