THE HONORABLE JOHN C. COUGHENOUR
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>AMAZON.COM, INC.,<br><br>    Defendant. | CASE NO. C14-1038-JCC<br><br>REDACTED ORDER GRANTING AMAZON'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING THE FTC'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Amazon's Motion for Partial Summary Judgment (Dkt. Nos. 92 and 93), the FTC's Response (Dkt. Nos. 156 and 158), Amazon's Reply in Support (Dkt. Nos. 188 and 189), the FTC's Motion for Summary Judgment (Dkt. Nos. 109 and 138), Amazon's Opposition (Dkt. Nos. 167 and 179), and the FTC's Reply (Dkt. Nos. 182 and 184). The Court held oral argument on the FTC's Motion on Thursday, April 21, 2016.

Having thoroughly considered the parties' briefing, argument, and the relevant record, the Court hereby GRANTS Amazon's Motion with respect to injunctive relief, and GRANTS the FTC's Motion with respect to liability. The Court ORDERS further briefing with respect to the appropriate remedy.

I.  BACKGROUND

A.  In-App Purchases

Defendant Amazon.com, Inc. ("Amazon") operates an Appstore in which customers can view and download apps to use on Android mobile devices or Kindle Fire tablets. (Dkt. No. 1 at 3.) Apps take many forms, but include functions that allow users to read books, play games, stream movies, check weather, and organize files. (Dkt. No. 1 at 3; Dkt. No. 15 at 2.) Apps may be free or come at a cost to download and install. (Dkt. No. 15 at 3.) Certain user activities within some apps also come with monetary charges, starting at $0.99 and ranging up to $99.99.

1    (*Id.*) These charges are known as "in-app purchases." (*Id.*) Amazon started charging customers

2    for "in-app purchases" or "IAPs" in November 2011. (*Id.*)

3           While the app developers set the price for apps and in-app purchases, Amazon retains

4    30% of the revenue from every in-app sale. (Dkt. No. 1 at 4; Dkt. No. 15 at 3.)

5           Many apps geared towards children, and likely to be used by children, offer in-app

6    purchases. (Dkt. No. 15 at 2–3, 7.) For example, a child may be prompted to use or acquire

7    seemingly-fictitious currency, including a "boatload of doughnuts, a can of stars, and bars of

8    gold," but in reality the child is making an in-app purchase using real money. (Dkt. No. 100 at

9    11.) ███████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ██████████████

12          Moreover, the evidence demonstrates that ████████████████ many customers did

13   not understand in-app purchases when they were first implemented. ████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

1    When Amazon's Appstore first implemented in-app purchases in November 2011, the

2  default setting did not require account holder approval, by entry of a password or any other

3  means, prior to completion of an in-app purchase. (Dkt. No. 127 at 160, 180.) Only if a customer

4  had previously enabled parental controls would the IAP require entry of a pin code or password.

5  (Dkt. No. 127 at 161.)

6

7

8    In the Amazon Appstore, individual apps were displayed using what is called a "detail

9  page," containing information relating to the app. (Dkt. No. 15 at ¶ 14; Dkt. No. 1 at ¶ 14.) When

10  in-app purchases were launched in November 2011, the detail page looked like this:

11

12  

13

14

15

16

17

18

19

20

21    (*See* Dkt. No. 100 at 3.) A button below the name of the app in the upper-left corner

22  included the price of the app download: either "FREE" or a set dollar amount. (*Id.*) The price

23  button itself did not acknowledge the existence of in-app charges. (*Id.*) Underneath the header,

24  "Description" was a long note providing more information about the app. While the "Note"

25  included information about the presence of in-app purchases, a user often had to scroll down

26  "below the fold" to read it:

1

2

3

4

5

6

7

8

9

10

11



12

(*Id.* at 4–5.) Within the Note is language, about two-thirds of the way towards the bottom,

13

beginning, "PLEASE NOTE."

14

█████████████████████████████████████████████████████████

15

████████████████████████████████████████  After making an

16

in-app purchase, Amazon customers were always notified via an e-mail. (*See, e.g.*, Dkt. No. 181

17

at 305.)

18

**B.    Fallout from In-App Purchases Made By Children**

19

Amazon has received many complaints from adults who were surprised to find

20

themselves charged for in-app purchases made by children. █████████████████████

21

██████████████████████████████████████████████████████████

22

██████████████████████████████████████████████████████████

23

██████████████████████████████████████████████████████████

24

██████████████████████████████████████████████████████████

25

██████████████████████████████████████████████████████████

26

1

2

3      In March 2012, Amazon introduced a password prompt feature for in-app charges of $20

4   or more. (*See* Dkt. No. 1 at ¶ 20, Dkt. No. 15 at ¶ 20.) This initial step did not include charges

5   below $20 or charges that, in combination, exceeded $20. (Dkt. No. 127 at 169–170; Dkt. No.

6   115 at 13.)

7      In August 2012, the FTC notified Amazon that it was investigating its in-app billing

8   practices. (Dkt. No. 158 at 7; Dkt. No. 215 at 3; Dkt. No. 216 at 2.) In February 2013,

9   Amazon began to require password prompts

10  more frequently, though not consistently. (Dkt. No. 15 at ¶ 21.) Passwords became required

11  when: a purchase over $20 was initiated, a second IAP purchase attempt was made within five

12  minutes of a first, and when parental controls were enabled. (Dkt. No. 124 at 15.) And once a

13  password was entered, in-app purchases were often then authorized for the next sixty minutes.

14  (Dkt. No. 15 at ¶ 21.)

15

16

17

18

19     In October 2012, Amazon released software entitled Kindle FreeTime, which allowed

20  parents to control tablet usage by children in a variety of ways. (Dkt. No. 95 at 7.) Within Kindle

21  FreeTime, in-app purchasing was disabled. (*Id.*) FreeTime was available on Kindle Fire tablets

22  sold after September 2012. (*Id.*)

23

24

25

26

1       In May 2013, Amazon added a password requirement for all first-time in-app purchases

2   on Kindle Fire tablets. (Dkt. No. 95 at 8.) The prompt is pictured below:



(Dkt. No. 97 at 103.) The prompt refers to authorization of a singular "in-app purchase."

    In June 2013, Amazon changed the configuration of the AppStore so that the words "In-

App Purchasing" would appear on an app's description page:



1    (Dkt. No. 200 at 6.) The words, "In-App Purchasing" are smaller than the remainder of

2    the text on the screen and in the same font and color. Notably, though the words "In-App

3    Purchasing" represented a clickable hyperlink which users could click on to learn more about in-

4    app charges, the lettering is not presented in such a way as to make that obvious, such as setting

5    the words in a different color or underlining them.

6         In June, ██████████████████████████████████████████

7    Amazon refined its password prompt for first-time in-app purchases █████████████

8    ████████████████████. (Dkt. No. 95 at 9.) This new prompt enabled customers to select

9    whether they would like to require a password for future IAPs:



23         To date, Kindle devices of the "First Generation," for which software updates are no

24   longer available, enable customers to make in-app purchases of $1 or less without authorization

25   via entry of a password. (Dkt. No. 160 at 4–6.)

26   **C.    The Total Damage**

The FTC has calculated its estimate of consumer damages due to unauthorized billing on in-app purchases. As discussed below, Amazon objects to the inclusion of the declarations of Julie Miller, the FTC employee who summarized and assessed the damages data as untimely and/or speculative. Amazon's objections are unwarranted.

[redacted]

---

[redacted]



**D.      The Present Litigation**

The Federal Trade Commission ("FTC") brings suit against Amazon, alleging that the billing of parents and other account holders for in-app purchases incurred by children "without having obtained the account holders' express informed consent" is unlawful under Section 5 of the FTC Act, 15 U.S.C. § 45(n). (Dkt. No. 1 at 11.) The FTC argues, on summary judgment, that there is no remaining genuine dispute of material fact as to whether Amazon's billing practices for in-app purchases violated the FTC Act and seeks monetary and injunctive relief. (Dkt. No. 109.) Amazon also moves for partial summary judgment, solely over the FTC's request for injunctive relief. (Dkt. Nos. 92 and 93.)

**II.      DISCUSSION**

**A.      Standard of Review**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing

party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Contrary to Amazon's assertion, the material facts on record are not in meaningful dispute. Amazon's dispute pertains to whether the facts in the present case constitute an unfair practice under Section 5 of the FTC Act.

### B.    Injunctive Relief

The Court first turns to Amazon's Motion for Partial Summary Judgment. In its Complaint, the FTC seeks permanent injunctive relief, asserting that, absent such relief, Amazon "is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest." (Dkt. No. 1 at 11.) Such injunctive relief is authorized under Section 13(b) of the FTC Act. 15 U.S.C. § 53(b) ("in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.").

A court may permanently enjoin defendants from violating the FTC Act where there exists "some cognizable danger of recurring violation." *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (citing *United States v. W.T. Grant*, 345 U.S. 629, 633 (1953)). "The determination that such danger exists must be based on appropriate findings supported by the record." *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854 (9th Cir. 1995) (internal citation omitted).

Past violations of the FTC Act do not justify the imposition of a permanent injunction.

1   *United States v. ACB Sales & Serv., Inc.*, 683 F. Supp. 734, 741 (D. Ariz. 1987) (citing *FTC v.*

2   *Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir.1985)). However, the Court may consider past

3   conduct in determining the likelihood of a future, recurring violation. *FTC v. Sharp*, 782 F. Supp.

4   1445, 1454 (D. Nev. 1991) (citing *C.FTC v. Co Petro Marketing*, 502 F.Supp. 806, 818

5   (C.D.Cal.1980), *aff'd,* 680 F.2d 573 (9th Cir.1981)). "In drawing the inference from past

6   violations that future violations may occur, the Court should look at the 'totality of

7   circumstances, and factors suggesting that the infraction might not have been an isolated

8   occurrence are always relevant.'" *Id.*

9       The FTC correctly asserts that "[m]ere voluntary cessation of allegedly illegal conduct

10  does not moot a case . . ." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1238 (9th Cir. 1999)

11  (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968)).

12  However, the Court's inquiry upon Amazon's motion for partial summary judgment hinges upon

13  whether the FTC has established, with evidence, a cognizable danger of a recurring violation: not

14  whether Amazon has met a mootness burden. *See, e.g., Sheely v. MRI Radiology Network, P.A.*,

15  505 F.3d 1173, 1182 n. 10 (11th Cir. 2007) ("To be sure, the analysis of whether a case is moot

16  overlaps with the analysis of whether a permanent injunction is appropriate on the merits because

17  both are concerned with the likelihood of future unlawful conduct. But the two inquiries are

18  strikingly different.").

19      While permanent injunctions are often awarded in cases where liability under the FTC

20  Act is determined, Amazon correctly distinguishes those cases from the facts of this case. For

21  example, in *FTC v. Gill*, the Ninth Circuit upheld a permanent injunction where defendants

22  engaged in continuous, fraudulent practices and were deemed likely to reoffend based on the

23  "systemic nature" of their misrepresentations. 265 F.3d 944, 950, 957 (9th Cir. 2001). Other

24  cases in which a permanent injunction has been entered involved deceptive, ongoing practices.

25  *See FTC v. Loewen*, 2013 WL 5816420, at *7 (W.D. Wash. Oct. 29, 2013); *FTC v. Commerce*

26  *Planet, Inc.*, 878 F. Supp. 2d 1048, 1086 (C.D. Cal 2012), *aff'd in part and reversed on other*

1    *grounds*, 815 F.3d 593 (9th Cir. 2016); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1010

2    (N.D. Cal. 2010).

3          The only potential ongoing violation of the FTC Act alleged is the fact that Amazon

4    customers are still billed for in-app purchases under $1 without authorization on First Generation

5    Kindle devices. The First Generation Kindle has not been sold since August 2012. (Dkt. No. 94

6    at 7.) The First Generation Kindle no longer receives software updates. (*Id.*)

7

8

9

10

11         While unauthorized billing of customers, even for small purchases, constitutes part of the

12   substantial harm that Amazon caused customers, and for which monetary damages should be

13   assessed, the Court does not find this to represent a cognizable danger of a recurring violation.

14   Accordingly, the Court finds that injunctive relief is not warranted here, and GRANTS

15   Amazon's Motion for Partial Summary Judgment (Dkt. Nos. 92 and 93.)

16         **C.      Liability Under the FTC Act**

17         The Court now turns to the FTC's Motion for Summary Judgment and Amazon's

18   opposition. The FTC presents strong support for its entitlement to judgment as a matter of law. In

19   opposition, Amazon argues that (1) the FTC is applying the wrong legal test for unfair business

20   practices, (2) the witness employed by the FTC to calculate money damages was not timely

21   disclosed and therefore her testimony should not be admitted or considered, and (3) its business

22   practices around in-app purchases did not violate Section 5.

23         **1.      Proper Test for Liability Under the FTC Act**

24         Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting

25   commerce." 15 U.S.C. § 45(a)(1). Acts or practices are considered unfair if (1) they cause or are

26   likely to cause substantial injury to consumers, (2) the injury is not reasonably avoidable by

1   consumers, and (3) the injury is not outweighed by any countervailing benefits to consumers or

2   competition. 15 U.S.C. § 45(n).

3        Amazon classifies the three-part test for unfair business practices as a "necessary but not

4   sufficient prerequisite[] for unfairness." (Dkt. No. 179 at 10.) However, Amazon does not point

5   the Court towards any concrete additional factors to incorporate into its review for unfairness.

6   Rather, in its effort to urge the Court to adopt a more searching inquiry under 15 U.S.C. § 45(n),

7   Amazon cites to a Third Circuit case in which the defendant suggested additional requirements

8   for a practice to be deemed "unfair," such as unscrupulous or unethical behavior, and the court

9   declined to adopt those additional requirements. *FTC v. Wyndham*, 799 F.3d 235, 244 (3rd Cir.

10  2015).

11       While accusing the FTC of adopting an expanded version of the FTC Act, it is Amazon

12  that advocates for a new, more searching, definition of "unfair" practices. (*See* Dkt. No. 179 at

13  1.) The three-part test for whether a practice is "unfair" under the FTC Act, found in the statute

14  itself, is followed without embellishment by courts in this Circuit. *See FTC v. Neovi, Inc.*, 604

15  F.3d 1150, 1153 (9th Cir. 2010); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th

16  Cir. 2012). The Court follows suit in its analysis below.

17         **2.**     **Ms. Miller's Declaration/Testimony**

18       As another preliminary matter, Amazon objects to the testimony of Ms. Miller, who

19  calculated the damages estimates, claiming that (1) she was not timely disclosed as a witness and

20  (2) that her statements are based on inadmissible conjecture. (Dkt. No. 179 at 16–21.)

21         **a.**     **Timeliness of Disclosure**

22       First, Amazon argues that Ms. Miller was disclosed as a witness after the discovery cut-

23  off. (Dkt. No. 179 at 17; Dkt. No. 172 at 2.) The calculated damages estimate was disclosed to

24  Amazon on January 7, 2016. (Dkt. No. 172 at 2, 26–27.) The discovery cut-off date was

25  originally September 28, 2015 (Dkt. No. 23), but after considering several discovery disputes,

26

the Court extended it to December 23, 2015.[2] (Dkt. No. 77.)

However, the FTC has made its intentions to seek monetary relief known since the beginning of this case. In September 2014, in its initial disclosures, the FTC identified monetary relief as "all charges consumers incurred in connection with [Amazon's] unfair billing practices, less any such charges that [Amazon] has already refunded." (Dkt. No. 172 at 33.) On November 6, 2014, the FTC requested, via interrogatories, the data upon which the damages calculations would be based. (*Id.*) Amazon objected and did not provide the information. (*Id.*) This request was eventually the subject of a motion to compel (Dkt. No. 24) which the Court granted (Dkt. No. 48.) On August 3, 2015, the Court ordered Amazon to provide the charge data by August 18, 2015. (Dkt. No. 48 at 5.) Amazon did not provide this data until nearly two months later on October 14, 2015. (Dkt. No. 172 at 34.)

A party must make its initial disclosures "based on the information then reasonably available to it," including those pertaining to the calculation of relief. Fed. R. Civ. P. 26(a)(1)(E). Moreover, "a party is not expected to provide a calculation of damages which depends on information in the possession of another party or person." *United States ex rel. Parikh v. Premera Blue Cross*, 2006 WL 2927699, at *1 (W.D. Wash. Oct. 11, 2006) (quoting Fed. R. Civ. P. 26(a) advisory committee's note). Not only did the FTC make its intent to calculate damages roughly using Ms. Miller's methods well known, but it was Amazon's own delay in turning over the data that contributed to the timing of the disclosure of a more specific damages estimate. In short, the Court does not exclude Ms. Miller's declaration for a lack of timeliness. The two-week "delay" in disclosure of the FTC's damages estimate was substantially justified.

Finally, the FTC classifies Ms. Miller's declaration as a summary of data provided by Amazon, permissible under Fed. R. Evid. 1006. (Dkt. No. 184 at 20.) This is a fair assessment, given that Ms. Miller does not offer additional facts or opinion evidence but simply ran

---

[2] While the Court extended the discovery cutoff pursuant to several motions, it did not specify that the extension of the cut-off was limited in any way.

1   calculations from data that Amazon provided. (*See* Dkt. Nos. 99, 157, 159, 183.)

16          The FTC's burden is to "reasonably approximate" monetary relief. *FTC v. Inc12.com*

17   *Corp*, 475 F. App'x 106, 110 (9th Cir. 2012); *see also FTC v. Febre*, 128 F.3d 530, 535 (7th Cir.

18   1997) ("The Commission must show that its calculations reasonably approximated the amount of

19   customers' net losses, and then the burden shifts to the defendants to show that those figures

20   were inaccurate.") (citing *SEC v. Lorin,* 76 F.3d 458, 462 (2nd Cir.1996); *United States*

21   *Department of Housing & Urban Development v. Cost Control Marketing & Sales Mgmt. of*

22   *Virginia, Inc.,* 64 F.3d 920, 927 (4th Cir.1995); *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp.

23   2d 202,. 214 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010); *FTC v. Verity Intern., Ltd.*, 443

24   F.3d 48, 69 (2nd Cir. 2006).

1

2

3    As discussed below, further briefing will assist the Court in determining a more appropriate

4    money damages award to enter in this case.

5            **3.       Liability Under 15 U.S.C. § 45(n)**

6            Turning now to the three-part test for an "unfair practice" under 15 U.S.C. § 45(n), the

7    Court finds that all three portions of the test are satisfied by the FTC's evidence. The Court

8    reviews Amazon's billing practices around in-app purchases to determine whether (1) they

9    caused (or were likely to cause) substantial injury to consumers, (2) that injury was not

10   reasonably avoidable by consumers, and (3) the injury was not outweighed by any countervailing

11   benefits to consumers or competition. 15 U.S.C. § 45(n).

12           **a.       Substantial Injury**

13           An act or practice may cause substantial injury either by doing "small harm to a large

14   number of people, or if it raises a significant risk of concrete harm." *FTC v. Neovi, Inc.*, 604 F.3d

15   1150, 1157 (9th Cir. 2010). Consumer injury can occur in "a variety of ways." *Id.* at 1156. While

16   courts should look to any deception on the part of businesses, "the absence of deceit is not

17   dispositive." *Id.* Nor is actual knowledge on the part of the consumer a requirement to establish

18   substantial harm. *Id.* Injury can be shown where consumers are "injured by a practice for which

19   they did not bargain." *Neovi*, 604 F.3d at 1157.

20           Courts have repeatedly held that billing customers without permission causes injury for

21   the purposes of asserting a claim under Section 5 of the FTC Act. *See, e.g.*, *Neovi*, 604 F.3d. at

22   1153; *FTC v. Ideal Fin. Solutions, Inc.*, 2014 WL 2565688, at *5 (D. Nev. June 5, 2014); *FTC v.*

23   *Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1078 (C.D. Cal. 2012); *FTC v. Inc21.com Corp.*,

24   745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012); *FTC v.*

25   *Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 322 (S.D.N.Y. 2001); *FTC v. J.K.*

26   *Publications, Inc.*, 99 F. Supp. 2d 1176, 1191–1192 (C.D. Cal. 2000); *FTC v. Willms*, 2011 WL

4103542, at *9 (W.D. Wash. Sept. 13, 2011); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 719–720 (S.D. Tex. 2008).

███████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████  Amazon argues that because of its liberal practices around providing refunds, its customers were not injured. Amazon's argument conflates complaints with the total universe of injury. However, given the design of the Appstore and procedures around in-app purchases, it is reasonable to conclude that many customers were never aware that they had made an in-app purchase. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████

Finally, the time spent pursuing those refunds constitutes additional injury to Amazon's customers. *Neovi*, 598 F. Supp. 2d 1104 at 1115 (noting that "harm need not be monetary to qualify as injury" and finding that time consumers spent contesting unauthorized checks and "attempting to get their money back" contributed to substantial injury).

### b.      Reasonably Avoidable

An injury is reasonably avoidable under Section 5 of the FTC Act if the consumer could have made a "free and informed choice" to avoid it. *Neovi*, 604 F.3d at 1158. Amazon contends that its customers could have mitigated damages either before an in-app purchase through parental controls, or afterwards by pursuing a refund.

An injury is reasonably avoidable if consumers "have reason to anticipate the impending harm and the means to avoid it," or if consumers are aware of, and are reasonably capable of pursuing potential avenues toward mitigating the injury after the fact. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012) (citing *Orkin Exterminating Co., Inc. v.*

1    *FTC,* 849 F.2d 1354, 1365–66 (11th Cir.1988); *Neovi,* 604 F.3d at 1158).

2         Amazon argues that the harm to consumers was "reasonably avoidable" because (1) upon

3    first linking their mobile device to their Amazon account a password entry was required, (2) the

4    Appstore "Terms of Use" mentioned in-app purchasing, (3) in-app purchasing is mentioned on

5    the app-description pages, (4) parental controls could always be activated, and (5) complaining

6    customers often received refunds for their in-app purchases.

7         Amazon argues that a reasonable consumer would preemptively "identify and sidestep a

8    potential injury." (Dkt. No. 179 at 29.) However, ██████████████████████████████

9    ████████████████████████████████████████████████████████████████████████████████

10   ████████████  it is unreasonable to expect customers to be familiar with the potential to accrue in-

11   app purchases while using apps labeled as "FREE." Many of Amazon's arguments improperly

12   assume a familiarity with in-app purchases on the part of consumers. For example, Amazon cites

13   to a case determining that a "reasonable Amazon customer is accustomed to online shopping,"

14   but online shopping and spending real currency while obtaining virtual items in a game are

15   completely different user activities. (Dkt. No. 179 at 29) (citing *Multi Time Mach., Inc. v.*

16   *Amazon.com, Inc.*, 804 F.3d 930, 939 (9th Cir. 2015)). In other words, while entering a password

17   linking her Amazon account to a new device, a reasonable consumer unaware of the possibility

18   of in-app purchases would not assume she was authorizing unforeseen charges. Nor would a

19   reasonable consumer have seen any connection between IAPs and parental controls until

20   Amazon changed its Appstore interface in June 2013.

21        Amazon directs the Court to *Davis v. HSBC Bank Nevada, N.A.*, in which the Ninth

22   Circuit held that a consumer's injury was "certainly avoidable" because the advertisement for the

23   credit card he applied for contained the disclaimer, "other restrictions may apply," and such a

24   disclaimer "would have motivated a reasonable consumer to consult the terms and conditions."

25   691 F.3d 1152, 1169 (9th Cir. 2012). Additionally, the *Davis* Court pointed to the credit card

26   application process in which a "boldface and oversized font" alerted the consumer to the credit

card's terms and conditions and instructed him to "read the notice below carefully." *Id.* The text

alerting the customer to read the terms and conditions of the card was twice the size as the

remaining text on the page. *Id.* at 1158. Finally, the consumer in *Davis* had to affirmatively

check a box agreeing to the terms and conditions, and certifying that he read them. *Id.* at 1169.

The notice that Amazon customers were given regarding in-app purchases is distinct from

the notices in *Davis*. From 2011 until June 2013, the only warning about in-app purchases that

customers would see during the download process on the Appstore was towards the bottom of a

long "description" note that a user would have to scroll down to see, in the same size and color

font as the rest of the text:



Moreover, until Amazon began to introduce password prompts for in-app purchases in

March 2012, no affirmative assent to the charges was required, like the check-box in *Davis*. And

the password prompts introduced, asking customers to "confirm in-app purchase," did not make

it clear that a single password entry served to authorize multiple IAPs within a certain timeframe.

Even in June 2013 when the Appstore was reconfigured, the notice that an app included "in-app

purchases" was not conspicuous: the text was in a smaller sized font of the same color as the rest

of the text on the page, and though it was a hyperlink to more information, this was not obvious from the way the text was presented:



Finally, Amazon's argument that customers could reasonably avoid their injury by seeking a refund fails ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Second, it was Amazon's stated policy not to provide refunds for in-app purchases and so many customers would have reasonably believed such recourse was not available to them. (Dkt. No. 114 at 11.) Nothing on Amazon's website states that in-app charges are refundable. (Dkt. No. 102 at 54.) The confirmation email Amazon sends to consumers following an in-app charge is consistent with this policy: it does not provide any information about whether refunds for in-app charges are available or how to obtain one. (Dkt. No. 127 at 138; Dkt. No. 125 at 41–43.)

Third, the time customers spent seeking refunds actually constitutes additional injury to them. *Neovi*, 598 F. Supp. 2d 1104 at 1115 (noting that "harm need not be monetary to qualify as injury" and finding that time consumers spent contesting unauthorized checks and "attempting to get their money back" contributed to substantial injury). ███████████████████████████ ██████████████████████████████████████████████████████

1          c.       **Countervailing Benefits**

2          Finally, Amazon's billing practices around in-app purchases did not benefit consumers or

3  competition. Amazon's argument to the contrary is twofold: (1) "consumers prefer a seamless,

4  efficient mobile experience," essentially, that failing to require a password was a benefit, and (2)

5  that the general interest in innovation constitutes a benefit to consumers. (Dkt. No. 179 at 37–

6  39.)

7          First, even accepting as true the notion that consumers prefer a seamless and efficient

8  experience, the "benefit" of ensuring a streamlined experience is not incompatible with the

9  practice of affirmatively seeking a customer's authorized consent to a charge. In fact, a clear and

10 conspicuous disclaimer regarding in-app purchases and request for authorization on the front-end

11 of a customer's process could actually prove to better inform customers about their risk of

12 accruing in-app purchases *and* be more seamless than the somewhat unpredictable password

13 prompt formulas rolled out by Amazon. Moreover, as the FTC points out, Amazon has not

14 provided evidence of any customers who reported being upset or harmed by the existence of a

15 password prompt.

16         Amazon's second argument about stifling innovation is too vague, and unsupported by

17 any evidence, to create a genuine issue with respect to this cost-benefit analysis.

18         The cost–benefit prong of the unfairness test is "easily satisfied" where, as here, "a

19 practice produces clear adverse consequences for consumers that are not accompanied by an

20 increase in services or benefits to consumers or by benefits to competition." *FTC v. J.K. Publ'ns,*

21 *Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000) (internal citation omitted); *see also In re In-app*

22 *Purchase Litig.*, 855 F. Supp. 2d 1030, 1041 (N.D. Cal. 2012).

23         In summary, the FTC has met its burden to demonstrate Amazon's liability under Section

24 5 of the FTC Act. In this respect, its motion for summary judgment is GRANTED.

25         **D.      Damages**

26         While, as discussed above, the general methods used by the FTC to reasonably

1  approximate the damages to consumers by unauthorized in-app charges serve as a fair starting

2  place, the Court ████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ██████████████████  invites further briefing on the issue of the scope of appropriate monetary relief.

5        The Court determines that the scope of Amazon's unfair billing practices pertains to all

6  in-app charges made by account users without express, informed authorization. The Court

7  concludes that Amazon's injurious practices lasted up until users were clearly informed both

8  about the existence of in-app purchases and the scope of their consent by virtue of the revised in-

9  app purchase prompt on June 3, 2014. The Court finds that continuous unauthorized purchases

10 on First Generation devices, not provided the benefit of updated password prompts, constitutes

11 additional relevant injury.

12       The parties are hereby ORDERED to submit briefing with respect to the appropriate

13 methodologies and final amount of monetary relief as follows:

14       1.    Defendant Amazon is to submit a more detailed brief explaining all
15             of the methodologies for which it advocates in its Offer of Proof
16             and attached declaration ████████████████████████████
               ████████████████████████████████████████████████
17             ████████████████████████████████████████████████
18             ██████████  This brief, not to exceed 16 pages, will be due to the Court
19             on or before May 27, 2016.

20       2.    Plaintiff FTC shall be afforded an opportunity to respond to
21             Amazon's brief, in a response not to exceed 16 pages, due to the
               Court on or before June 17, 2016.

22       3.    The parties are to notify the Court if they wish to hold oral
23             argument on this issue, and if so, include proposed time limits for
               the hearing.

24 **III.   CONCLUSION**

25       For the foregoing reasons, Amazon's motion for partial summary judgment (Dkt. Nos. 92

26 and 93) is GRANTED and injunctive relief is denied. However, with respect to liability, the

1 FTC's Motion for Summary Judgment (Dkt. Nos. 109 and 138) is GRANTED. Judgment is

2 hereby entered in the FTC's favor. Following consideration of additional briefing and possibly

3 oral argument, the Court will make a determination as to the appropriate remedy. Amazon's

4 currently-pending Motions in Limine (Dkt. No. 209) are hereby TERMINATED as moot.

5    DATED this 26th day of April 2016.

6

7

8

9

10       John C. Coughenour
        UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAGE - 23